# IN THE FEDERAL DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| Joan Blue, et. al. | ) | |
| 1001 F Street, NE | ) | |
| Washington, D.C. 20002 | ) | |
| Plaintiff, | ) | |
| v. | ) | CA No.:  1:08-cv-00729 |
| | ) | |
| Fremont Investment & Loan, Inc., et. al. | ) | |
| 2727 E. Imperial Highway | ) | |
| Brea, California 92821 | ) | |
| Defendant, | ) | |
| | ) | |
| | ) | |

## PLANTIFF'S OPPOSITION TO DEFENDANT FREMONT INVESTMENT & LOAN'S MOTION TO DISMISS

**COMES NOW**, the plaintiffs, by and through counsel, hereby opposes the Defendant Fremont Investment and Loan's Motion to Dismiss the plaintiff's complaint.  The plaintiffs argue in the opposite of the defendant, however, should this honorable Court decide in the favor of the defendant, plaintiff requests this honorable Court allows them to amend their pleading.  In support of their opposition to defendant Fremont Investment & Loan's Motion to Dismiss, the supplies the accompanying memorandum of points and authorities.

May 27, 2008

*/s/ William C. Johnson, Jr.*
_____
William C. Johnson, Jr., Esq.
1229 15th St. NW
Washington, D.C. 20005
(202) 483-0808; (202) 431-2650
Fax (202) 483-0909

## IN THE FEDERAL DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

Joan Blue, et. al.              )
1001 F Street, NE          )
Washington, D.C. 20002    )
       Plaintiff,        )
     v.                 )     CA No.:  1:08-cv-00729
                          )
Fremont Investment & Loan, Inc., et. al.  )
2727 E. Imperial Highway   )
Brea, California 92821      )
       Defendant,     )
                          )
_____)

## PLANTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT FREMONT INVESTMENT & LOAN'S MOTION TO DISMISS

### Foreword

The defendant has sought to dismiss the instant action upon procedural grounds rather than the substance of the complaint.  Though not abundantly clear, the framing of the defendant's motion appears to ask for a more definite statement rather than a motion to dismiss for failure to state a claim as titled.  In either event, the Court has been extremely liberal in allowing the plaintiff an opportunity to amend the pleadings.  As such, as a matter of course, the plaintiffs shall motion this honorable Court to amend their pleadings.

The instant lawsuit attempts to address a problem of great implication in the area of mortgage fraud and predatory lending.  At issue shall be the role and limitation of liability for all active participants in the "mortgage lending chain." The defendant Fremont's role is that of a co-conspirator in the fraud being committed against the plaintiffs.  As such, the defendant Fremont would also be liable for each underlying tort as well.

The defendants all represent a phase of the mortgage lending process to which a necessary level of collusion is required to facilitate a mortgage fraud transaction. The transaction complained of involves a variation of the "bait and switch scheme." It is the plaintiffs' position that all parties to this transaction knew, or should have known, of the mortgage fraud which has been alleged.

## INTRODUCTION

### (First Mortgage Loan)

The facts of the complaint are seemingly straight forward as to the mortgage transaction supported by the documentation available in the public records. It is clear through the facts of the Complaint and the corresponding documentation attached as exhibits hereto, the plaintiffs were victims of a scheme to abscond away with the equity of their home.

The subject property was held as "tenants in the entirety" by Halbert and Rose Blue. The property had an existing mortgage on the property in the amount of $50,000. Halbert and Rose Blue were retirees living on a fixed retirement income. Also living in the home were their two daughters: Joan Blue and Edna Robinson. The property was placed into foreclosure by the original lender.

The plaintiffs were approached by defendant Mr. Denis Bishop of Town & Country Mortgage. Defendant Bishop informed the plaintiffs that he could get them a loan to stop the foreclosure. The plaintiffs in their complaint allege they were fraudulently led to believe they were receiving a loan to refinance their property. They never applied for the refinancing loan.

Despite not having an application for the loan, the plaintiffs were instructed to attend a closing of the loan on April 27, 2007. At the closing, the plaintiffs were not informed as to the nature of the transaction. The plaintiffs were led believe it was a refinancing but, were actually signing documents to orchestrate the sale of their property to Brenda Carew.

The subject property was in fact fraudulently transferred to Brenda Carew who then obtained a mortgage to the now defunct and/or bankrupt New Century

Mortgage Company.  Upon signing the deed, the plaintiff's were instructed not to worry about the deed, "that it was necessary in order for them to receive a loan." The plaintiffs were led to believe they received a loan to stop an impending foreclosure and that they were applying for a loan to refinance the property.  The plaintiffs was instructed as to where they should send their payments.

## SECOND MORTGAGE LOAN

### (Defendant Fremont Investment & Loan)

The plaintiffs began to receive notices and applications for loan approvals at their address for Brenda Carew.  With the belief that they owned their property, the plaintiff then called Denis Bishop at Town & Country Mortgage to ask for an explanation as to why Brenda Carew was receiving loan applications at their home address.

Under suspicion as to the transaction, Plaintiffs then stopped making their monthly mortgage payments.  New Century Mortgage commenced to send foreclosure notices to Brenda Carew at the plaintiff's home address.  Another call to defendant Denis Bishop concerning the identity of Brenda Carew was made.  Defendant Denis Bishop informed the plaintiffs that, "he would take care of it."

Approximately six weeks later, the defendant Denis Bishop, once again instructed the plaintiffs Rose Blue and, this time, Edna Robinson to attend a closing at Executive Title & Escrow.  This time, the plaintiffs were instructed to sign the documents in order to obtain a refinancing to stop the foreclosure.  The plaintiffs Joan Blue and Edna Robinson were informed they were being utilized to replace their mother and father, plaintiffs Halbert and Rose Blue, because their incomes were higher.

At no time, did the plaintiffs, Joan Blue and Edna Robinson, understand that Brenda Carew already owned their property.  The loan was provided by the defendant Fremont Investment & Loan.  The plaintiffs never made an application to neither defendant Town & Country Mortgage nor defendant Fremont

Investment & Loan.  The defendant Fremont provided a loan to the plaintiffs without their authorization and under fraudulent conditions.

The defendant Fremont willfully turned a "blind-eye" to the fraudulent loan transaction and provided a loan a property that had sufficient equity and more than adequate loan-to-value to secure the residential mortgage it provided.  The defendant Fremont had a business relationship with the defendants Town & Country Mortgage and Denis Bishop whereby the defendants supplied defendant Fremont with a specific type of loan known, or should have been known to be fraudulently procured and outside the normal policies and procedures for underwriting loans.  The defendant Fremont foreclosed on the loan to the plaintiffs Joan Blue and Edna Robinson.  The defendant Fremont purchased the property at the foreclosure sale.

## STANDARD FOR REVIEW

The accepted rule in every type of case" is that a court should not dismiss a complaint for failure to state a claim unless the defendant can show beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief. *Warren v. Dist. of Columbia,* 353 F.3d 36, 37 (D.C.Cir.2004); *Kingman Park,* 348 F.3d at 1040.  Thus, in resolving a Rule 12(b)(6) motion, the court must treat the complaint's factual allegations-including mixed questions of law and fact-as true and draw all reasonable inferences therefrom in the plaintiff's favor. *Macharia v. United States,* 334 F.3d 61, 64, 67 (D.C.Cir.2003); *Holy Land Found. for Relief & Dev. v. Ashcroft,* 333 F.3d 156, 165 (D.C.Cir.2003); *Browning,* 292 F.3d at 242.  The plaintiffs in the instant action have provided a substantial amount of facts, if proven, can lead the Court to hold the defendant Fremont liable for civil conspiracy and all underlying torts.

In *Bell Atlantic Corp. v. Twombly,* --- U.S. ----, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), the Supreme Court clarified the standard of pleading that a plaintiff must meet in order to survive a motion to dismiss under Rule 12(b)(6). The Court noted that "Federal Rule of Civil Procedure 8(a)(2) requires only 'a

short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests[.]' " *Id.* at 1965 (quoting *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)); *see also Erickson v. Pardus,* ---U.S. ----, ----, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007). Although "detailed factual allegations" are not necessary to survive a Rule 12(b)(6) motion to dismiss, to provide the "grounds" of "entitle[ment] to relief," a plaintiff must furnish "more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Bell Atlantic Corp. v. Twombly,* 127 S.Ct. at 1964-65; *see also Papasan v. Allain,* 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986).

The Court stated that while there was no "probability requirement at the pleading stage," *Bell Atlantic Corp. v. Twombly,* 127 S.Ct. at 1965, "something beyond ... mere possibility ... must be alleged[.]" *Id.* at 1966. The facts alleged in the complaint "must be enough to raise a right to relief above the speculative level," *id.* at 1965, or must be sufficient "to state a claim for relief that is plausible on its face." *Id.* at 1974. The Court referred to this newly clarified standard as "the plausibility standard." *Id.* at 1968 (abandoning the "no set of facts" language from *Conley v. Gibson* ).

On a motion to dismiss for failure to state a claim under Rule 12(b)(6), the Court "must accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus,* 127 S.Ct. at 2200; *see also Bell Atlantic Corp. v. Twombly,* 127 S.Ct. at 1965; *Summit Health, Ltd. v. Pinhas,* 500 U.S. 322, 325, 111 S.Ct. 1842, 114 L.Ed.2d 366 (1991). The complaint "is construed liberally in the plaintiffs' favor, and [the Court should] grant plaintiffs the benefit of all inferences that can be derived from the facts alleged." *Kowal v. MCI Communications Corp.,* 16 F.3d 1271, 1276 (D.C.Cir.1994); *see also Browning v. Clinton,* 292 F.3d 235, 242 (D.C.Cir.2002); *Sparrow v. United Air Lines, Inc.,* 216 F.3d 1111, 1113 (D.C.Cir.2000).

While the complaint is to be construed liberally in plaintiffs' favor, the Court need not accept inferences drawn by plaintiffs if those inferences are unsupported by facts alleged in the complaint; nor must the Court accept plaintiffs' legal conclusions. *See Kowal v. MCI Communications Corp.,* 16 F.3d at 1276; *Browning v. Clinton,* 292 F.3d at 242.

## LEGAL ARGUMENT

**I.     Fact issues arise as to the validity of the Deed Transfers from Halbert and Rose Blue to defendants.  Plaintiffs Halbert Blue and Rose Blue were Victims of the "Bait and switch Scheme" to which the Defendant Fremont was a Co-Conspirator and was not a Bonafide Third-Party Purchaser for Value at the Foreclosure Sale.**

The defendants' primary task is to prove the plaintiffs can prove no set of facts that would entitle them to relief. *Warren v. Dist. of Columbia,* 353 F.3d 36, 37 (D.C.Cir.2004); *Kingman Park,* 348 F.3d at 1040. The plaintiffs Halbert Blue and Rose Blue were the original owners of the property in the first loan transaction involving defendants Denis Bishop, Brenda Carew, Executive Title & Escrow and New Century Mortgage.  The transaction was a variation of the "bait and switch scheme."  This variation however initially began as a "sale leaseback scheme."  The defendant Denis Bishop could not convince the property owners to be a "knowledgeable" participant.  The plaintiffs Halbert Blue and Rose Blue never knew they were giving up their property which evidences the bait and switch.  The property was deeded to co-conspirator Brenda Carew.  **"EXHIBIT 1"**

Defendant Carew then received a mortgage upon the property from New Century Mortgage.  **"EXHIBIT 2"**  Defendant Brenda Carew then took back a "Sellers Credit" in the amount of $45,000.00 and made false entries regarding deposits in the amount of $17,000 on the HUD-1.  **EXHIBIT 3.**  (line 201 and line 214.)  The defendant itemized miscellaneous charges on lines 514 thru line 517.  The defendant effectively siphoned $99,000.00 of the plaintiffs equity at closing.

Defendant Brenda Carew then performed a "reverse bait and switch" and "fraudulently" and without their knowledge sold the property to plaintiffs Joan Blue and Edna Robinson for an amount of $555,000.00. **"EXHIBITS 4 & 5"** The second mortgage transaction was fraudulent two-fold. First, plaintiff's Joan Blue and Edna Robinson had no knowledge they were "purchasing" a home they assumed was owned by their parents, plaintiffs Halbert and Rose Blue. **EXHIBIT 5**. Second, the plaintiffs never applied for the loan. The defendant Brenda Carew alleged a deposit of $55,500.00 and seller contribution of $24,264.82. **EXHIBIT 5.** The plaintiffs lost additional equity in the transaction in the amount of $79,764.82. The plaintiffs had $178,764.82 fraudulently taken from the equity of their home. **EXHIBITS 3 & 5.**

The defendant Denis Bishop arranged for the mortgage loan utilizing a "willing lender," defendant Fremont. The defendant Fremont was used as an artifice to defraud and should have known through its own procedures that mortgage fraud was being committed. The chain of "fraudulent transfers" must be set aside in favor of plaintiffs Halbert and Rose Blue. The legitimate transfer of title in a real property sales transaction requires a bonafide third-party purchaser for value. As a co-conspirator to the transaction, defendant Fremont's purchase of the property at the foreclosure sale will not preclude the Court from setting aside the foreclosure sale.

**II.     All Claims and Counter-Claims by the plaintiffs have been adequately preserved or stayed pursuant to the rulings of the Court**

It appears as if the defendant is making an attempt to raise res judicata and collateral estoppel issues for the Court. More specifically, the defendant has confused the procedural rules of the Federal District Court and Superior Court-Civil Division with the Landlord and Tenant Branch.

The Court must be clear as the purpose and role of claims in the Courts f limited jurisdiction. The Landlord and Tenant Branch is a "possessory" court. Whereby, the vast majority of "defenses" must in some form or fashion affect

"possession."  The "plea of title" in effect, changes the defendant to a plaintiff in the Superior Court Civil Division where effectively, the counter-claim rule is ineffectual.  It is clear that no full adjudication upon the merits had been had at any level or forum in the instant matter.

In order for the plaintiff to be precluded from bringing her claims according to the rationale provided by the defendant there must either be a full adjudication on the merits as to the claim or the claims must be procedurally dismissed with prejudice.  The defendant has referred to the Superior Court's Landlord & Tenant Branch, Case No. LT 25876-07, against Joanne Blue, Edna Robinson, and "all other occupants."  All parties agreed and have consented in this Court that the matters and proceedings at the Superior Court, both Civil division and Landlord & Tenant Branch will be stayed until a decision upon the merits have been adjudicated.

The Consent Motion was filed in the Civil Division to stay the Judgment of Possession ruling and the Landlord & Tenant Court Branch granted a stay until the matter has been decided in the federal District Court.  Thus, the core issues and clams will evade both issue and claim preclusion.

## III.    Plaintiffs Claim for Civil Conspiracy is supported by the Facts of their Complaint

In the District of Columbia, the claim of Civil Conspiracy requires a showing of (1) an agreement between two or more persons; (2) to participate in an unlawful act in an unlawful manner; and (3) an injury caused by an unlawful overt act performed by one of the parties to the agreement (4) pursuant to, and in furtherance of, the common scheme.  Paul v. Howard University, 754 A.2d 297 (D.C 2000) citing *Griva v. Davison, 637 A.2d 830, 848 (D.C.1994).*  In Paul, the plaintiff made several conclusory statements in her complaint that defendant had engaged in a conspiracy against her, she alleged no specific facts to support these assertions, and the record contains no actual evidence of an agreement between or among any of the appellees to commit an unlawful act against Dr. Paul. When a

plaintiff does not allege and prove such an agreement, summary judgment is proper. *Id.* at 849.

The Court in <u>Paul</u> supports the proposition that proof of civil conspiracy does not require an overt or even direct agreement.  A statement that a defendant engaged in a conspiracy is a "bald assertion" of "conclusory allegations" without supporting facts.  The plaintiffs in the instant action provides facts identifying the relationship between the defendants Town and Country Mortgage and Fremont in paragraphs 22 thru 24 and 28 thru 35.  The relationship demonstrates an agreement whereby defendants Denis Bishop and Town Country Mortgage arrange a loan through defendant Fremont.  They commence to engage in unlawful activity as described throughout the complaint, particularly paragraphs 40 thru 44.

Furthermore, the defendants' arguments that the Civil Conspiracy cause of action, as utilized in the plaintiffs complaint, is a stand alone claim is without merit.  Civil conspiracy is not an independent tort but only "a means for establishing vicarious liability for [an] underlying tort." *Griva,* 637 A.2d at 848; *see also Elliott v. Healthcare Corp.,* 629 A.2d 6, 9 (D.C.1993).  The plaintiffs provided fraud and various statutory claims as the underlying torts.  As such, the Civil Conspiracy cause of action may stand alongside the various claims.

Wherefore, the plaintiffs have provided their response to the defendants' claim, should the Court deem the Complaint as insufficient as provided, we ask that this honorable Court allows the plaintiffs an opportunity to make its first amendment in these proceedings.

## IV.    Plaintiffs Claim for Fraud has been adequately Pled

Under District of Columbia law, elements of common law fraud are: (1) false representation; (2) in reference to material fact; (3) made with knowledge of its falsity; (4) with intent to deceive; and (5) action is taken in reliance upon representation.  <u>Juergens v. Urban Titles Services,</u> 533 F. Supp. 2d 64 (D.D.C 2008).  To satisfy specificity requirements under federal rules, party alleging fraud must state time, place and content of false misrepresentations, fact misrepresented

and what was retained or given up as consequence of fraud; further, party must identify individuals allegedly involved in fraud. Fed.Rules Civ.Proc.Rules 8, 9(b), 28 U.S.C.A. Id.

In the plaintiffs complaint, the "introduction section," paragraphs 15 thru 27, provide a detailed description of the fraud committed by the defendants. The complaint specifically identifies the time, place and content of the false misrepresentations. As stated previously, the crux of this scheme is based upon the "sale leaseback scheme" and the "Bait and Switch." The defendant Denis Bishop led the plaintiffs to believe that they had qualified for a loan to stop a foreclosure, when in fact he engineered a sale of the property to Brenda Carew and then back to the plaintiffs.

The defendant Fremont was an enabler to the transaction. The receipt of the loan proceeds form the basis of the fraud and the failure to follow "loan underwriting procedures" facilitated the fraud. As stated in paragraphs 22 thru 35 of the Complaint, defendant Fremont was an agent of the defendants Town & Country Mortgage, defendant Denis Bishop, defendant Brenda Carew and defendant Executive Title.

To prove fraud in a real estate transaction by false representation, the plaintiff must first show that the defendant made a "representation." Generally, any speech or conduct that is intended to communicate a fact, or create an impression, illusion, or belief, as to the property to be sold may constitute a "representation" for purposes of showing the defendant's fraud. Sundown, Inc. v. Pearson Real Estate Co., Inc., 8 P.3d 324 (Wyo. 2000).

Clearly, the defendant Denis Bishop and defendant Town & Country Mortgage's representation that the plaintiffs would be receiving a loan to stop the foreclosure was a misrepresentation. Most misrepresentations are direct, specific, and declarative statements by the defendant to the plaintiff. These statements may include direct answers to questions put to the defendant by the plaintiff, as well as spontaneously volunteered declarations by the defendant. Id.

Specific representations also are often found on disclosure statements required to be given to prospective purchasers in many states. Such statutorily required representations, if false, can serve as the basis for a common-law fraud claim. See, e.g., Dockter v. Slowik, 91 Conn. App. 448, 881 A.2d 479 (2005), certification denied, 276 Conn. 919, 888 A.2d 87 (2005) (representation that quantity and quality of water supply was adequate).

Demonstrating the falsity of the defendants representation is often a simple matter of establishing that the actual character, utility, or value of the transaction was something different than what was represented by the defendant. Sometimes, however, it is not entirely clear what was represented by the defendant. If the defendant made a statement that is open to more than one interpretation, the plaintiff must be prepared to demonstrate how he or she interpreted the statement and why such an interpretation was an objectively reasonable one given the context in which the statement was made.

The plaintiff's is clearly ready to combat such a defense in the explanation of why they would buy their property from Brenda Carew for $555,000.00 when they sold it her the prior year for $430,000.00.  This transaction resulted in a $170,000.00 loss of the plaintiffs' equity.

Representations will be judged in the light of the meaning which the plaintiff would reasonably attach to them in existing circumstances, and the words employed will be considered against the background and in the context in which they were used. Haberstick v. Gordon A. Gundaker Real Estate Co., Inc., 921 S.W.2d 104 (Mo. Ct. App. E.D. 1996).

**V.    Plaintiffs Claims are not Time-Barred**

**A.    The Federal Claims are not Time-Barred**

The statute of limitations in Truth-In-Lending (TILA) causes of action are subject to a one year statute of limitations.  However, the one year limitations period commences one day after the provision of the requisite disclosures in maters concerning the rescission of the mortgage loan.

Although there is no separate statute of limitations for rescission, the combination of the one year limitation with the rule of rescission commonly means that monetary damage claims for rescission related violations may be brought up to four years after consummation of the consumer credit transaction.

The end of the statute of limitations period may be much later because the right to rescind may itself extend for up to three years in the event the creditor failed to provide all material disclosures and proper notice of the right to rescind. 15 U.S.C § 1635(f): Reg. Z § 226.23(a)(3).

The plaintiffs may rescind at any time during this extended period, and the defendant Fremont's failure to respond properly to the rescission gives rise to a cause of action and damage claim at that time.  The defendant Fremont's failure to provide a "notice of rescission" thus may occur up to three years and twenty days after the transaction date, and the one year statute of limitations begins to run only then.  Ralls v. Bank of New York, 230 B.R. 508 (Bankr. E.D. Pa 1999).  Thus, the plaintiffs claims cannot be time-barred since the defendant Fremont failed to provide the required disclosure.

**B.     The Truth-In-Lending Claim is not barred because the Real Property was fraudulently transferred from Plaintiffs Halbert and Rose Blue and Defendant Fremont holds the Property in a Constructive Trust**

The plaintiffs Halbert and Rose Blue have argued that their interest in the subject property located at 1001 F St. NE, Washington, D.C. was fraudulently transferred to Brenda Carew, who in turn fraudulently transferred the property to Joan Blue and Edna Rose in a fraudulently procured mortgage loan on their behalf by defendant Denis Bishop and defendant Fremont.  Defendant Fremont purchased the property at a foreclosure sale.  Since the defendant Fremont was the lienholder of the fraudulently procured loan, it is precluded from being a "bonafide third party purchaser for value."

There is a difference of opinion as to when the constructive trust arises.  Some courts have taken the position that the constructive trust arises at the time the

property is wrongfully acquired while other courts have stated that the trust arises only after the beneficiary exercises his election to seek a constructive trust and the court grants such relief even though the defendant may be treated as a trustee from the date of his wrongful acquisition. Maricau v. Haugen, 56 N.E.2d 367, (1944).

This Court must take the position the constructive trust was created upon the fraudulent transfer of the property from Plaintiffs halberd and Rose Blue. Defendant Brenda Carew was a necessary component of the conspiracy for she fraudulently served as the conduit for the transferral of the property from plaintiffs Halbert and Rose Blue to plaintiffs Joan Blue and Edna Robinson.

The court must have sufficient equitable jurisdiction in order to impose a constructive trust as a remedy. British Columbia Inv. Co. v. Federal Deposit Ins. Corp., 420 F.Supp. 1217.(D.C. Cal 1976) It is not necessary that the complainant specifically seek the imposition of a constructive trust; the court will impose that remedy where it concludes the facts justify its application. The types of relief sought by complainant may appear inconsistent, but more than one type of relief may be granted by the court. Lesikar v. Rappeport, 33 S.W.3d 282 (Tex.App.2000)

In many cases where a constructive trust is decreed, the plaintiff has the choice between a remedy at law and the constructive trust or another remedy in equity. In a suit to obtain a constructive trust, it should not be necessary to prove the inadequacy of the remedy at law, but there have been some decisions or dicta to the contrary. The complainant should be able to elect freely between the relief which the law can give him and the constructive trust remedy. Wilson v. Scruggs, 371 F. Supp. 2d 837 (S.D. Miss. 2005).

The decree which establishes the constructive trust usually declares the defendant to be a constructive trustee of the property for the complainant and directs defendant to convey the property to the complainant. Buchanan v. Buchanan, 585 S.E.2d 533, 266 Va. 207 (2003). It is recommend the defendant Fremont serve in this capacity until this matter has been properly disposed.

**VI.    Plaintiffs Claims under the District of Columbia Lender Regulation Laws are Applicable to Defendant Fremont**

A clear reading of the statutes clearly indicate the defendant Fremont cannot be held directly liable for violating the D.C. Code § 26.11051 et. seq. and D.C. Code 26-1111, et. seq.  The issue becomes whether it can be held liable for the damages proven under the corresponding acts if it is held liable for Civil Conspiracy with the defendants who have been determined to be liable for the violations.  The plaintiffs argue in the affirmative.

Under no circumstances can the defendant Fremont circumvent the coverage of the law by utilizing an artifice to defraud.  The defendant Town & Country is a mortgage Broker and Loan Originator/Lender.  The act does not contemplate the "exempt" parties participation in the mortgage brokerage arena. The Civil Conspiracy claims, as enumerated above, allows the plaintiffs to receive relief for torts indirectly attributed to the actions of the "exempt" parties.

In the District of Columbia, "there is no recognized independent tort action for civil conspiracy...." Executive Sandwich Shoppe, Inc. v. Carr Realty Corp., 749 A.2d at 738 (citing Waldon v. Covington, 415 A.2d 1070, 1074 n. 14 (D.C.1980)). Rather, "it is a means for establishing vicarious liability for the underlying tort.' " *Id.* (citing Halberstam v. Welch, 705 F.2d 472, 479 (D.C. Cir1983)).   As a result, "civil conspiracy depends on performance of some underlying tortuous act." *Id.* (citing Halberstam v. Welch, 705 F.2d at 479).

In Hancock v. Homeq Servicing, 2007 wl 1238746, the Court recognized that the D.C. Lending laws could be brought against the "exempt" parties "derivatively."  Although dismissed upon other grounds, the Court acknowledged that a Civil Conspiracy claim creates vicarious liability on claims that cannot be directly attributed to the "exempt" parties.  Id.  Thus, the D.C. lending laws can be applied to the defendant Fremont derivatively through a finding of liability for Civil Conspiracy.

**CONCLUSION**

Wherefore, in consideration of the defendant Fremont's Motion to Dismiss, and the plaintiffs oppositions thereto, the Court should deny the motion or in the alternative, grant the plaintiff's request to amend their pleadings.

May 27, 2008

/s/ William C. Johnson, Jr.

_____

William C. Johnson, Jr., Esq.
1229 15th St. NW
Washington, D.C. 20005
(202) 483-0808; (202) 431-2650
Fax (202) 483-0909

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on May 27, 2008, a copy of the foregoing Opposition to the Defendant Fremont's Motion to Dismiss and Memorandum of Points and Authorities was served via ECF and first class mail to the following:

Freemont Investment & Loan
2727 E. Imperial Highway
Brea, California 92821

Executive Title & Escrow
9500 Arena Drive #480
Largo, Maryland 20774

Town and Country Mortgage and Financial
Services, Inc.
1300 Mercantile Lane
Suite 150
Largo, Maryland 20776

Dennis Bishop
1300 Mercantile Lane
Suite 150
Largo, Maryland 20776

Brenda Carew
10423 Beacon Ridge Drive
Mitchellville, Maryland 20721

Date:  May 27, 2008

*/s/ William C. Johnson, Jr.*
_____
William C. Johnson, Jr.

# IN THE FEDERAL DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| Joan Blue, et. al. | ) | |
| 1001 F Street, NE | ) | |
| Washington, D.C. 20002 | ) | |
|       Plaintiff, | ) | |
|       v. | ) | CA No.:  1:08-cv-00729 |
| | ) | |
| Fremont Investment & Loan, Inc., et. al. | ) | |
| 2727 E. Imperial Highway | ) | |
| Brea, California 92821 | ) | |
|       Defendant, | ) | |
| | ) | |
| _____ | ) | |

## <u>PROPOSED ORDER</u>

**UPON CONSIDERATION** of the foregoing defendant Fremont's Motion to Dismiss, and any opposition thereto, it is, this ____ day of _____, 2008 at _____ a.m./p.m., by the District Court for the District of Columbia.

      ORDERED the Motion to Dismiss is DENIED;

      ORDERED that a party or any person affected by this Order may apply for a modification or dissolution of this Court may prescribe.


                                     _____

                                     Judge

Cc:

William C. Johnson, Jr., Esq.
1229 15th St. NW
Washington, D.C. 20005

Freemont Investment & Loan
2727 E. Imperial Highway
Brea, California 92821

Executive Title & Escrow
9500 Arena Drive #480
Largo, Maryland 20774

Town and Country Mortgage and Financial
Services, Inc.
1300 Mercantile Lane
Suite 150
Largo, Maryland 20776

Dennis Bishop
1300 Mercantile Lane
Suite 150
Largo, Maryland 20776

Brenda Carew
10423 Beacon Ridge Drive
Mitchellville, Maryland 20721

Doc# 2004072447

File No. 04-435RTL
DEED-SHORT FORM D.C.

**This Deed**, made this **27th** day of **April, 2004**, by and between Halbert T. Blue, Rose M. Blue and Joanne Blue, parties of the first part, and Brenda D. Carew, party of the second part.

WITNESSETH, that in consideration of the sum of FOUR HUNDRED THIRTY THOUSAND AND 00/100 DOLLARS ($430,000.00), the parties of the first part do hereby grant unto the party of the second part, in fee simple, as sole owner, all that piece or parcel of land, together with the improvements, rights, privileges and appurtenances to the same belonging, situate in the District of Columbia, described as follows, to wit:

LOT 18 IN VINCENT W. KRAMER'S SUBDIVISION OF LOTS IN SQUARE 961AS PER PLAT RECORDED IN THE OFFICE OF THE SURVEYOR FOR THE DISTRICT OF COLUMBIA IN LIBER 75 AT FOLIO 55 SUBJECT TO A PERPETUAL RIGHT OF WAY OVER THE REAR 12 FEET OF SAID LOT NUMBERED 18 FOR THE USE AND BENEFIT OF LOTS NUMBERED 19, 20 AND 21 IN SAID IN SAID SUBDIVISION.
PROPERTY ADDRESS:1001 F STREET N.E WASHINGTON DC 20002
PROPERTY TAX ID NUMBER:SQUARE 0961 LOT 0018

AND the said parties of the first part covenant that they will warrant specially the property hereby conveyed; and that they will execute such further assurances of said land as may be requisite.

WITNESS the hands and seals the day and year first hereinbefore written.

IN PRESENCE OF:

_____        _Halbert T. Blue_         {SEAL}
                               **Halbert T. Blue**

_____        _Rose M. Blue_            {SEAL}
                               **Rose M. Blue**

_____        _Joanne Blue_             {SEAL}
                               **Joanne Blue**

DISTRICT OF COLUMBIA

I, Lawrence Elliott , a Notary Public, in and for the jurisdiction aforesaid, do hereby certify that Halbert T. Blue, Rose M. Blue and Joanne Blue, who are personally well known to me as the grantors in, and the persons who executed the foregoing and annexed deed, bearing the date of **April 27, 2004**, personally appeared before me in the said District and acknowledged the said deed to be their act and deed.

Given under my hand and seal this **27th** day of **April, 2004.**

_____
Notary Public

My Commission Expires: _____

AFTER RECORDING MAIL TO:
**Executive Title and Escrow L.L.C.**
**9500 Arena Drive, Suite 480**
**Largo, MD  20774**

GRANTEE ADDRESS:

*(Notary seal: LAWRENCE D. ELLIOTT, JR. NOTARY PUBLIC, PRINCE GEORGE'S COUNTY, MD — MY COMMISSION EXPIRES 12/1/07)*

Doc# 2004072447
Book:
Page:
Filed & Recorded
    05/24/2004  02:01:50 PM
LARRY TODD
RECORDER OF DEEDS
WASHINGTON D.C. RECORDER OF DEEDS
    RECORDING        $      20.00
    SURCHARGE        $       6.50
    RECORDATION TAX  $   6,450.00
    TRANSFER TAX 1.  $   6,450.00

Executive Title And Escrow LLC
9500 Arena Dr. #480
Largo, MD 20774

File 04_435

Return To:
NEW CENTURY MORTGAGE CORPORATION

18400 VON KARMAN, SUITE 1000
IRVINE, CA 92612

Old Republic National Tax ID# Square :0961 Lot: 18

Purchase Money

[Space Above This Line For Recording Data]

# DEED OF TRUST

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) **"Security Instrument"** means this document, which is dated **April 27, 2004** together with all Riders to this document.

(B) **"Borrower"** is
**BRENDA D. CAREW**

Borrower's address is **10423 BEACON RIDGE RD    MITCHELVILLE, MD 20721**
. Borrower is the trustor under this Security Instrument.

(C) **"Lender"** is **NEW CENTURY MORTGAGE CORPORATION**

Lender is a **CORPORATION**
organized and existing under the laws of **CALIFORNIA**
Lender's address is **18400 VON KARMAN, SUITE 1000**
**IRVINE, CA 92612**
Lender is the beneficiary under this Security Instrument.

(D) **"Trustee"** is **Stephen F.J. Ornstein, Esq.**

Trustee's address is **1700 Pennsylvania Avenue N.W.**
**Washington, D.C. 20006**

**DISTRICT OF COLUMBIA**-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT    Form 3009

0001498691

VMP-6(DC) (0205).01    1/01 (rev. 5/02)
Page 1 of 16    Initials: BC
VMP MORTGAGE FORMS - (800)521-7291

(E) "Note" means the promissory note signed by Borrower and dated **April 27, 2004**
The Note states that Borrower owes Lender **Three Hundred Eighty-Seven Thousand and No/100** ------------------------------------------------------------- Dollars
(U.S. $ **387,000.00** ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than **May 1, 2034**

(F) "Property" means the property that is described below under the heading "Transfer of Rights in the Property."

(G) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(H) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| [X] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [ ] Planned Unit Development Rider | [ ] 1-4 Family Rider |
| [ ] VA Rider | [ ] Biweekly Payment Rider | [X] Other(s) [specify] |
| | | **Prepayment Rider** |

(I) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(J) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(K) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(L) "Escrow Items" means those items that are described in Section 3.

(M) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(N) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(O) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(P) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used

**0001498691**

Initials: _BC_

-6(DC) (0205).01            Page 2 of 16            Form 3009 1/01 (rev. 5/02)

in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(Q) **"Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the District of Columbia:
**SEE LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF.**

Parcel ID Number: **SQUARE 0961 LOT 0013**          which currently has the address of
**1001 F STREET NE**                                                                    [Street]
Washington, District of Columbia    **20002**      [Zip Code] ("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items

**0001498691**

-6(DC) (0205).01          Page 3 of 15          Initials: _____          **Form 3009 1/01 (rev. 5/02)**

pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all

**0001498691**

-6(DC) (0205).01                    Page 4 of 16          Initials: _BC_          **Form 3009 1/01 (rev. 5/02)**

Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain

**0001498691**

Initials: _BC_

-6(DC) (0205).01                  Page 9 of 15                      **Form 3009** 1/01 (rev. 5/02)

priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to

**0001498691**

Initials: _BC_

the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien

**0001498691**

which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. **Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) **Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

**0001498691**

Initials: _BSC_

-6(DC) (0205).01                    Page 8 of 15                    **Form 3009** 1/01 (rev. 5/02)

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**0001498691**

-6(DC) (0205).01                    Page 9 of 16          Initials: _SC_          Form 3009 1/01 (rev. 5/02)

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). To the extent permitted by Applicable Law, Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

0001493691

Initials: _BL_

-6(DC) (0205).01                     Page 10 of 15                     Form 3009 1/01 (rev. 5/02)

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the

**0001498691**

Initials: _____

-6(DC) (0205).01                    Page 11 of 15                    Form 3009 1/01 (rev. 5/02)

address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. **Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

**0001498691**

Initials: [signature]

VMP-6(DC) (0205).01                    Page 12 of 15                    **Form 3009  1/01 (rev. 5/02)**

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. **Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall send written notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall give notice of sale by public advertisement as Trustee deems proper to protect the interests of Borrower and Lender. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, Trustee's fees of 5.00 % of the gross sale price and reasonable attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

23. **Release.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to release this Security Instrument and shall surrender all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24. **Substitute Trustee.** Lender, at its option, may from time to time remove Trustee and appoint a successor trustee to any Trustee appointed hereunder by recording a Deed of Appointment. Without conveyance of the Property, the successor trustee shall succeed to all the title, power and duties conferred upon Trustee herein and by Applicable Law.

0001498691

Initials: BDC

Form 3009 1/01 (rev. 5/02)

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:



_____          _____ (Seal)
                                          BRENDA D. CAREW                  -Borrower


                                                                          (Address)


_____          _____ (Seal)
                                                                          -Borrower


                                                                          (Address)


_____ (Seal)   _____ (Seal)
                          -Borrower                                       -Borrower


                   (Address)                                              (Address)


_____ (Seal)   _____ (Seal)
                          -Borrower                                       -Borrower


                   (Address)                                              (Address)


_____ (Seal)   _____ (Seal)
                          -Borrower                                       -Borrower


                   (Address)                                              (Address)


                                                           0001498691

-6(DC) (0205).01                Page 14 of 15               Form 3009  1/01 (rev. 5/02)

**DISTRICT OF COLUMBIA, ss:**

I, _Lawrence Elliott_ , a Notary Public in and for the District of Columbia, do hereby certify that

_Brenda D. Craven_

personally known to me as the person(s) who executed the foregoing instrument bearing date of day of , personally appeared before me in said District and acknowledged said instrument to be his/her/their act and deed, and that he/she/they executed said instrument for the purposes therein contained.

Witness my hand and official seal this 27 day of _April_ 200_ .

_____ (Seal)
Notary Public, D.C.

*[Seal: LAWRENCE O. ELLIOTT, JR. NOTARY PUBLIC MY COMMISSION EXPIRES 12/1/07 PRINCE GEORGE'S COUNTY, MD]*

THIS IS TO CERTIFY THAT THIS
DOCUMENT WAS PREPARED BY, OR
UNDER THE SUPERVISION OF THE
UNDERSIGNED, AN ATTORNEY DULY
ADMITTED TO PRACTICE BEFORE
THE COURT OF APPEALS OF
MARYLAND.

0001498691

Initials: _____

-6(DC) (0205).01             Page 15 of 15             Form 3009 1/01 (rev. 5/02)

## Exhibit A

LOT 18 IN VINCENT W. KRAMER'S SUBDIVISION OF LOTS IN SQUARE 961 AS PER PLAT RECORDED IN THE OFFICE OF THE SURVEYOR FOR THE DISTRICT OF COLUMBIA IN LIBER 75 AT FOLIO 55 SUBJECT TO A PERPETUAL RIGHT OF WAY OVER THE REAR 12 FEET OF SAID LOT NUMBERED 18 FOR THE USE AND BENEFIT OF LOTS NUMBERED 19, 20 AND 21 IN SAID   IN SAID SUBDIVISION.
PROPERTY ADDRESS:1001 F STREET N.E WASHINGTON DC 20002
PROPERTY TAX ID NUMBER:SQUARE 0961 LOT 0018

## ADJUSTABLE RATE RIDER
### (LIBOR Six-Month Index (As Published In The Wall Street Journal) - Rate Caps)
### 2 YEAR RATE LOCK

THIS ADJUSTABLE RATE RIDER is made this    **27th** day of    **April**                     ,
**2004** ,and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or
Security Deed (the "Security Instrument") of the same date given by the undersigned ("Borrower") to secure
Borrower's Adjustable Rate Note (the "Note") to
**NEW CENTURY MORTGAGE CORPORATION**

("Lender") of the same date and covering the property described in the Security Instrument and located at:

   **1001 F STREET NE   , WASHINGTON, DC  20002**

*(Property Address)*

**THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE INTEREST RATE AND
THE MONTHLY PAYMENT. THE NOTE LIMITS THE MAXIMUM RATE BORROWER MUST PAY.**

ADDITIONAL COVENANTS.  In addition to the covenants and agreements made in the Security
Instrument, Borrower and Lender further covenant and agree as follows:

**A.    INTEREST RATE AND MONTHLY PAYMENT CHANGES**
The Note provides for an initial interest rate of    **6.0000**  %. The Note provides for changes in the interest
rate and the monthly payments as follows:

**4.  INTEREST RATE AND MONTHLY PAYMENT CHANGES**

   **(A)    Change Dates**

The interest rate I will pay may change on the first day of    **May**                     , **2006** and
on the same day of every 6th month thereafter.  Each date on which my interest rate could change is called an
"Interest Rate Change Date."

   **(B)    The Index**

Beginning with the first Interest Rate Change Date, my interest rate will be based on an Index plus a
margin.  The "Index" is the average of interbank offered rates for six-month dollar deposits in the London market
("LIBOR"), as published in The Wall Street Journal "Money Rates" Table.  The most recent Index figure available
as of the first business day of the month immediately preceding the month in which the Change Date occurs is
called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable
information.  The Note Holder will give me notice of this choice.

**0001498691**

**(C) Calculation of Changes**

At each Interest Rate Change Date, the Note Holder will calculate my new interest rate by adding **Five and Fifty-Five Hundredths** percentage points ( **5.5500%**) to the Current Index. The Note Holder will then round this figure to the nearest one-eighth of one percentage point (0.125%). Subject to the limit stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Interest Rate Change Date.

> **(i) Interest-Only Period.** The "Interest-only Period" is the period from the date of this Note through **May 1, 2006** . For the Interest-only Period, the Note Holder will calculate the amount of the monthly payment to be one-twelfth (1/12th) of one (1) year's interest at **6.0000** % per annum. The result of this calculation will be the amount of my monthly payment until the Interest Rate Change Date.

> **(ii) Amortization Period.** The "Amortization Period" is the period after the Interest-only Period and continuing until the Maturity Date. During the Amortization Period, after calculating my new interest rate as provided in Section 4(C) above, the Note Holder will then calculate the amount of the monthly payment that would be sufficient to fully repay the remaining unpaid principal in equal monthly payments by the Maturity Date, assuming, for purposes of each calculation, that the interest rate remained unchanged during that period. The result of this calculation will be the new amount of my monthly payment.

**(D) Limit on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than **7.5000** % or less than **6.0000** %. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than one and one half percentage points (1.5%) from the rate of interest I have been paying for the preceding month. My interest rate will never be greater than **13.0000** % nor less than **6.0000%**.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Interest Rate Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Interest Rate Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment at least 25 days before the effective date of any change. The notice will include information required by law to be given me and also the title and telephone number of a person who will answer any questions I may have regarding the notice.

**0001498691**

NCMC                                                    Page 2 of 3
2/28 Six Month LIBOR Adjustable Rate Rider
RE-409              (111803)                                          RE409P2.iid
                                                                     krr 010404

## 11. GOVERNING LAW - SECURED

The Note is governed by federal law and the law of the jurisdiction in which the property encumbered by the Security Instrument (as defined below) is located. In addition to the protections given to the Note Holder under the Note, a Mortgage, Deed of Trust or Security Deed (the "Security Instrument"), dated the same date as the Note protects the Note Holder from possible losses which might result if I do not keep the promises which I make in the Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under the Note. Some of those conditions are described as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

_BDCarew_

| | | |
|---|---|---|
| BRENDA D. CAREW | - Borrower | - Borrower |
| | - Borrower | - Borrower |
| | - Borrower | - Borrower |
| | - Borrower | - Borrower |

_(Sign Original Only)_

0001498691

_Page 3 of 3_

NCMC
_2/28 Six Month LIBOR Adjustable Rate Rider_
RE-409          (111803)

RE409P3.ifd
krr 010404

Loan Number   0001498691

# PREPAYMENT RIDER
## ADJUSTABLE RATE LOAN - D.C., MD

This prepayment Rider is made this   27th   day of April, 2004
and is incorporated into and shall be deemed to amend and supplement the Promissory Note (the "Note") and Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure repayment of Borrower's Note to

   NEW CENTURY MORTGAGE CORPORATION

(the "Lender")

To the extent that the provisions of this Prepayment Rider are consistent with the provisions of the Note and/or Security Instrument, the provisions of this rider shall prevail over and shall supercede any such inconsistent provisions of the Note and/or Security Instrument.

In addition the covenants and agreements made in the Note and Security Instrument, the Borrower and Lender further covenant and agree as follows:

## 5. BORROWERS RIGHT TO PREPAY
      I have the right to make prepayments of principal any time before thay are due. A payment of principal only is known as a "prepayment". When I make a prepayment, I will tell the Note Holder in writing I am doing so. The Note Holder will use all of my prepayments to reduce the amount of principal that I owe under this Note. If I make a partial prepayment, there will be no changes in the due dates of my monthly payments unless: the Note Holder agrees in writing to those changes.

      If within   2 year(s) from the due date of the execution of the Security Instrument, I make a full prepayment or, in certain cases a partial prepayment, and the total of such prepayment(s) in any 12 month period exceeds ONE THIRD (1/3) of the original principal amount of this loan, I will pay a prepayment charge in an amount equal to the payment of 2 months advance interest on the amount by which the total of my prepayment(s) within that 12 month period exceeds ONE THIRD (1/3) of the original principal amount of the loan.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Prepayment Rider.


_____          _____
**BRENDA D. CAREW**


NCMC
Adjustable Rate Prepayment Rider
D.C., MD
RE-134 (060603) (nki)

# SECURITY AFFIDAVIT

## CLASS 1 AND CLASS 2

File No. 04-435RTL

I, Brenda D. Carew, the owner of the real property described within, certify, subject to criminal penalties for making false statements pursuant to Section 404 of the District of Columbia Theft and White Collar Crimes Act of 1982, effective December 1, 1982 (D.C. Law 4-164; D.C. Code 22-2514), that the real property described within is either Class 1 Property or Class 2 Property, as those classes of property are established pursuant to Section 412a of district of Columbia Real Property Tax Revision Act of 1974, approved September 3, 1974 (88 Stat. 1051 D.C. Code 47-813), with 5 or fewer units.

*Carew*

**Brenda D. Carew**

Subscribed and sworn to before me this 27th day of April, 2004.

LAWRENCE O. ELLIOTT, JR.
NOTARY PUBLIC
MY COMMISSION EXPIRES
12/1/07
PRINCE GEORGE'S COUNTY, MD

Notary Public

My commission expires: _____

Book:   —
Pages:  —
Filed & Recorded
   05/24/2004   02:01:56 PM
LARRY TODD
RECORDER OF DEEDS
WASHINGTON D.C. RECORDER OF DEEDS
   RECORDING      $     153.00
   SURCHARGE      $       6.50

Previous editions are obsolete

## A. Settlement Statement

U.S. Department of Housing and Urban Development
OMB Approval No. 2502-0265 (expires 9/30/2006)

| B. Type of Loan | | | | | |
|---|---|---|---|---|---|
| 1. ☐FHA | 2. ☐FmHA | 3. ☐Conv. Unins. | 6. File Number 04-435RTL | 7. Loan Number 0001498591 | 8. Mortgage Insurance Case Number |
| 4. ☐VA | 5. ☐Conv. Ins. | | | | |
| C. Note: | This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown. Items marked "(p.o.c)" were paid outside the closing; they are shown here for information purposes and are not included in the totals. WARNING: It is a crime to knowingly make false statements to the United States on this or any other similar form. Penalties upon conviction can include a fine and imprisonment. For details see: Title 18 U.S. Code Section 1001 and Section 1010. | | | | TitleExpress Settlement System |

| | |
|---|---|
| D. NAME OF BORROWER: | Brenda D. Carew |
| ADDRESS: | 1001 F Street, NE, Washington, DC 20002 |
| E. NAME OF SELLER: | Halbert T. Blue and Rose M. Blue and Joanne Blue |
| ADDRESS: | 1001 F Street, NE, Washington, DC 20002 |
| F. NAME OF LENDER: | New Century Mortgage Corporation |
| ADDRESS: | 18400 Von Karman, Ste 1000, Irvine, CA 92612 |
| G. PROPERTY ADDRESS: | 1001 F Street, NE, Washington, DC 20002 |
| H. SETTLEMENT AGENT: | Executive Title and Escrow L.L.C., Telephone: 301-341-6444 Fax: 301-341-1238 |
| PLACE OF SETTLEMENT: | 9500 Arena Drive, Suite 480, Largo, MD 20774 |
| I. SETTLEMENT DATE: | 04/27/2004 |

| J. SUMMARY OF BORROWER'S TRANSACTION: | | K. SUMMARY OF SELLER'S TRANSACTION: | |
|---|---|---|---|
| **100. GROSS AMOUNT DUE FROM BORROWER** | | **400. GROSS AMOUNT DUE TO SELLER** | |
| 101. Contract sales price | 430,000.00 | 401. Contract sales price | 430,000.00 |
| 102. Personal Property | | 402. Personal Property | |
| 103. Settlement charges to borrower (line 1400) | 20,835.80 | 403. | |
| 104. | | 404. | |
| 105. | | 405. | |
| Adjustments for items paid by seller in advance | | Adjustments for items paid by seller in advance | |
| 109. | | 409. | |
| 110. | | 410. | |
| 111. | | 411. | |
| 112. | | 412. | |
| **120. GROSS AMOUNT DUE FROM BORROWER** | 450,835.80 | **420. GROSS AMOUNT DUE TO SELLER** | 430,000.00 |
| **200. AMOUNTS PAID BY OR ON BEHALF OF BORROWER** | | **500. REDUCTIONS IN AMOUNT DUE TO SELLER** | |
| 201. Deposit or earnest money | 43,000.00 | 501. Excess Deposit (see instructions) | 43,000.00 |
| 202. Principal amount of new loans | 387,000.00 | 502. Settlement charges to seller (line 1400) | 7,075.00 |
| 203. Existing loan(s) taken subject to | | 503. Existing loan(s) taken subject to | |
| 204. | | 504. Payoff:30910806 | 315,485.20 |
| | | Ocwen Federal Bank | |
| 205. | | 505. | |
| 206. | | 506. Release Fee | 225.00 |
| | | Executive Title and Escrow L.L. | |
| 207. | | 507. | |
| 208. | | 508. | |
| 209. | | 509. | |
| Adjustments for items unpaid by seller | | Adjustments for items unpaid by seller | |
| 210. City/town taxes 04/01/04 to 04/27/04 | 107.47 | 510. City/town taxes 04/01/04 to 04/27/04 | 107.47 |
| 213. | | 513. Water Escrow | 450.00 |
| 214. SELLER CREDIT | 17,500.00 | 514. SELLER CREDIT | 17,500.00 |
| 215. | | 515. MISC/BILL | 27,000.00 |
| 216. | | 516. MISC/BILL | 4,000.00 |
| 217. | | 517. ESCROW | 8,000.00 |
| 218. | | 518. | |
| 219. | | 519. | |
| **220. TOTAL PAID BY/FOR BORROWER** | 447,607.47 | **520. TOTAL REDUCTION AMOUNT DUE SELLER** | 422,842.6 |
| **300. CASH AT SETTLEMENT FROM OR TO BORROWER** | | **600. CASH AT SETTLEMENT TO OR FROM SELLER** | |
| 301. Gross amount due from borrower (line 120) | 450,835.80 | 601. Gross amount due to seller (line 420) | 430,000.0 |
| 302. Less amounts paid by/for borrower (line 220) | 447,607.47 | 602. Less reduction amount due seller (line 520) | 422,842.6 |
| **303. CASH FROM BORROWER** | 3,228.33 | **603. CASH TO SELLER** | 7,157.3 |

SUBSTITUTE FORM 1099 SELLER STATEMENT: The information contained herein is important tax information and is being furnished to the Internal Revenue Service. If you are required to file a return, a negligence penalty or other sanction will be imposed on you if this item is required to be reported and the IRS determines that it has not been reported. The Contract Sales Price described on line 401 above constitutes the Gross Proceeds of this transaction.

You are required by law to provide the settlement agent (Fed. Tax ID No: _____) with your correct taxpayer identification number. If you do not provide the settlement agent with your correct taxpayer identification number, you may be subject to civil or criminal penalties imposed by law. Under penalties of perjury, I certify that the number shown on this statement is my correct taxpayer identification number.

TIN: ____-____-____ / ____-____-____     SELLER(S) SIGNATURE(S): _____ / _____

SELLER(S) NEW MAILING ADDRESS: _____

SELLER(S) PHONE NUMBERS: _____ (H) _____ (W)

Previous editions are obsolete

| U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT | File Number: 04-435 | | PAGE 2 |
|---|---|---|---|

**SETTLEMENT STATEMENT**   TitleExpress Settlement System

| L. SETTLEMENT CHARGES | | PAID FROM BORROWER'S FUNDS AT SETTLEMENT | PAID FROM SELLER'S FUNDS AT SETTLEMENT |
|---|---|---|---|
| 700. TOTAL SALES/BROKER'S COMMISSION based on price $430,000.00 = | | | |
| Division of commission (line 700) as follows: | | | |
| 701. $ | to | | |
| 702. $ | to | | |
| 703. Commission paid at Settlement | | | |
| 704. Administrative Fee | | | |
| **800. ITEMS PAYABLE IN CONNECTION WITH LOAN** | | | |
| 801. Loan Origination Fee | 2,000 % Town and Country Mortgage | 7,740.00 | |
| 802. Loan Discount | % | | |
| 803. Appraisal Fee | to Town and Country Mortgage | 350.00 | |
| 804. Credit Report | to Town and Country Mortgage | 9.00 | |
| 805. UNDERWRITING FEE | to New Century Mortgage Corporation | 350.00 | |
| 806. DOCUMENT FEE | to New Century Mortgage Corporation | 350.00 | |
| 807. TAX SERVICE FEE | to New Century Mortgage Corporation | 78.00 | |
| 808. FLOOD CERTIFICATION | to New Century Mortgage Corporation | 11.20 | |
| 809. PROCESSING FEE | to Town and Country Mortgage | 600.00 | |
| 810. | | | |
| 811. | | | |
| **900. ITEMS REQUIRED BY LENDER TO BE PAID IN ADVANCE** | | | |
| 901. Interest From 04/27/2004 to 05/01/2004 @$ 63.6200 /day 4 Days | | 254.48 | |
| 902. Mortgage Insurance Premium for | to | | |
| 903. Hazard Insurance Premium for | to STATE FARM (P.O.C.) 1,288.00 Buyer | | |
| 904. | | | |
| 905. | | | |
| **1000. RESERVES DEPOSITED WITH LENDER FOR** | | | |
| 1001. Hazard Insurance | 2 mo. @ $ 101.50 /mo | 203.00 | |
| 1002. Mortgage Insurance | mo. @ $ /mo | | |
| 1003. City Property Taxes | 2 mo. @ $ 209.06 /mo | 418.12 | |
| 1004. County Property Taxes | mo. @ $ /mo | | |
| 1005. Annual Assessments | mo. @ $ /mo | | |
| 1009. Aggregate Analysis Adjustment | | 0.00 | 0.00 |
| **1100. TITLE CHARGES** | | | |
| 1101. Settlement or closing fee | to Executive Title and Escrow L.L.C. | 175.00 | 250.00 |
| 1102. Abstract or title search | to LKW Title and Abstract Service, LLC | 255.00 | |
| 1103. Title examination | to Executive Title and Escrow L.L.C. | 325.00 | |
| 1104. Title insurance binder | to Executive Title and Escrow L.L.C. | 75.00 | |
| 1105. Document Preparation | to Executive Title and Escrow L.L.C. | | 150.00 |
| 1106. Notary Fees | | | |
| 1107. Attorney's fees | to Lawrence O. Elliott, Jr. Esq. | 100.00 | |
| (includes above items No: | ) | | |
| 1108. Title Insurance | to Old Republic National Title Insurance Co. | 2,378.00 | |
| (includes above items No: | ) | | |
| 1109. Lender's Policy | 387,000.00 - 1,522.98 | | |
| 1110. Owner's Policy | 430,000.00 - 855.04 | | |
| 1111. Judgment Search | to Property Insight | 25.00 | |
| 1112. | | | |
| 1113. Courier/Overnight | to Executive Title and Escrow L.L.C. | 65.00 | 65.00 |
| **1200. GOVERNMENT RECORDING AND TRANSFER CHARGES** | | | |
| 1201. Recording Fees Deed $ 40.00 ; Mortgage $ 250.00 ; Release $ 160.00 | | 290.00 | 160.00 |
| 1202. City Transfer Tax | Deed $6,450.00 ; Mortgage $ | 3,225.00 | 3,225.00 |
| 1203. City Recordation Tax | Deed $6,450.00 ; Mortgage $ | 3,225.00 | 3,225.00 |
| 1204. Construction Tax | Deed $ ; Mortgage $ | | |
| 1205. | | | |
| **1300. ADDITIONAL SETTLEMENT CHARGES** | | | |
| 1301. Survey | to Duley and Associates, Inc. | 275.00 | |
| 1302. Pest Inspection | | | |
| 1303. CLEAL LIEN | to DC TREASURER | 50.00 | |
| 1304. | | | |
| 1305. | | | |
| 1306. | | | |
| 1307. | | | |
| 1308. | | | |
| **1400. TOTAL SETTLEMENT CHARGES** (enter on lines 103, Section J and 502, Section K) | | 20,835.80 | 7,075.0 |

HUD CERTIFICATION OF BUYER AND SELLER

I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction. I further certify that I have received a copy of the HUD-1 Settlement Statement.

Brenda D. Carew
161782272

Harban T. Blue                     Rose M. Blue                          Joanne Blue

WARNING: IT IS A CRIME TO KNOWINGLY MAKE FALSE STATEMENTS TO THE UNITED STATES ON THIS OR ANY SIMILAR FORM. PENALTIES UPON CONVICTION CAN INCLUDE A FINE AND IMPRISONMENT. FOR DETAILS SEE TITLE 18: U.S. CODE SECTION 1001 AND SECTION 1010.

The HUD-1 Settlement Statement which I have prepared is a true and accurate account of this transaction. I have caused or will cause the funds to be disbursed in accordance with this statement.

By:_____

File No. **05-860RTL**    LT1-5-2005148519-1        LT2-0-0-2
DEED-SHORT FORM D.C.

# This Deed, made this **29th** day of **September, 2005,** by and between

Brenda D. Carew, party of the first part, and Joanne Blue and Edna Robinson, parties of the second part.

WITNESSETH, that in consideration of the sum of FIVE HUNDRED FIFTY FIVE THOUSAND AND 00/100 DOLLARS (**$555,000.00**), the party of the first part does hereby grant unto the parties of the second part, in fee simple, as joint tenants with the right of survivorship, all that piece or parcel of land, together with the improvements, rights, privileges and appurtenances to the same belonging, situate in the District of Columbia, described as follows, to wit:

*See Attached Exhibit A*

AND the said party of the first part covenants that he will warrant specially the property hereby conveyed; and that he will execute such further assurances of said land as may be requisite.

WITNESS the hand and seal the day and year first hereinbefore written.

IN PRESENCE OF:

_____        _____ {SEAL}
                                                **Brenda D. Carew**

Slate of MD, Prince George's Co.

~~DISTRICT OF COLUMBIA~~

I, Lauren Elliott , a Notary Public, in and for the jurisdiction aforesaid, do hereby certify that Brenda D. Carew, who is personally well known to me as the grantor in, and the person who executed the foregoing and annexed deed, bearing the date of **September 29, 2005,** personally appeared before me in the said District and acknowledged the said deed to be his act and deed.

Given under my hand and seal this **29th** day of S**e**ptember**, 2005.**

_____
N**o**t**a**ry Public

My Commission Expires: _____

AFTER RECORDING MAIL TO:                    GRANTEES ADDRESS:
**Executive Title and Escrow L.L.C.**            **1001 F Street NE**
**9500 Arena Drive**                              **Washington, DC 20002**
**Suite 480**
**Largo, MD 20774**

# Exhibit A

LOT 18 IN VINCENT W. KRAMER'S SUBDIVISION OF LOTS IN SQUARE 961 AS PER PLAT RECORDED IN THE OFFICE OF THE SURVEYOR FOR THE DISTRICT OF COLUMBIA IN LIBER 75 AT FOLIO 55 SUBJECT TO A PERPETUAL RIGHT OF WAY OVER THE REAR 12 FEET OF SAID LOT NUMBERED 18 FOR THE USE AND BENEFIT OF LOTS NUMBERED 19, 20 AND 21 IN SAID  IN SAID SUBDIVISION.
PROPERTY ADDRESS:1001 F STREET N.E WASHINGTON DC 20002
PROPERTY TAX ID NUMBER:SQUARE 0961 LOT 0018

RECORDING SURCHARGE                $    20.00
RECORDATION TAX FEE                $     6.50
TRANSFER TAX FEE                   $ 6,050.00
                                   $ 6,050.00

Doc# 2005148519 Fees:$12126.50
10/17/2005   9:41AM Pages 2
Filed & Recorded in Official Records c
WASH DC RECORDER OF DEEDS LARRY TODD

A. **Settlement Statement**

B. Type of Loan

U.S. Department of Housing and Urban Development

OMB No. 2502-0265 REV. HUD-1 (3/86)

| 1. ☐FHA | 2. ☐FmHA | 3. ☐Conv. Unins. | 6. File Number | 7. Loan Number | 8. Mortgage Insurance Case Number |
|---|---|---|---|---|---|
| 4. ☐VA | 5. ☐Conv. Ins. | | 05-860RTL | 921000278868 | |

C. Note: This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown. Items marked "(p.o.c.)" were paid outside the closing; they are shown here for information purposes and are not included in the totals. WARNING: It is a crime to knowingly make false statements to the United States on this or any other similar form. Penalties upon conviction can include a fine and imprisonment. For details see: Title 18 U. S. Code Section 1001 and Section 1010.

TitleExpress Settlement System

| | | |
|---|---|---|
| D. NAME OF BORROWER: | Joanne Blue and Edna Robinson | |
| ADDRESS: | 1001 F Street NE, Washington, DC 20002 | |
| E. NAME OF SELLER: | Brenda D. Carew | |
| ADDRESS: | 1001 F Street NE, Washington, DC 20002 | |
| F. NAME OF LENDER: | Fremont Investment & Loans | |
| ADDRESS: | ISAOA and/or ATIMA, 1065 N. Pacificenter Drive, Anaheim, CA 92806 | |
| G. PROPERTY ADDRESS: | 1001 F Street NE, Washington, DC 20002 | |
| H. SETTLEMENT AGENT: | Executive Title and Escrow L.L.C., Telephone: 301-341-6444 Fax: 301-341-1238 | |
| PLACE OF SETTLEMENT: | 9500 Arena Drive, Suite 480, Largo, MD 20774 | |
| I. SETTLEMENT DATE: | 09/29/2005 | |

| J. SUMMARY OF BORROWER'S TRANSACTION: | | K. SUMMARY OF SELLER'S TRANSACTION: | |
|---|---|---|---|
| **100. GROSS AMOUNT DUE FROM BORROWER** | | **400. GROSS AMOUNT DUE TO SELLER** | |
| 101.   Contract sales price | 555,000.00 | 401.   Contract sales price | 555,000.00 |
| 102.   Personal Property | | 402.   Personal Property | |
| 103.   Settlement charges to borrower (line 1400) | 29,232.57 | 403. | |
| 104. | | 404. | |
| 105. | | 405. | |
| Adjustments for items paid by seller in advance | | Adjustments for items paid by seller in advance | |
| 106.   City/town taxes      04/02/05 to 09/29/05 | 32.25 | 406.   City/town taxes      04/02/05 to 09/29/05 | 32.25 |
| 109.   Release Fee | | 409. | |
| 110. | | 410. | |
| 111. | | 411. | |
| 112. | | 412. | |
| **120. GROSS AMOUNT DUE FROM BORROWER** | 584,264.82 | **420. GROSS AMOUNT DUE TO SELLER** | 555,032.25 |
| **200. AMOUNTS PAID BY OR ON BEHALF OF BORROWER** | | **500. REDUCTIONS IN AMOUNT DUE TO SELLER** | |
| 201.   Deposit or earnest money | 55,500.00 | 501.   Excess Deposit (see instructions) | 55,500.00 |
| 202.   Principal amount of new loans | 444,000.00 | 502.   Settlement charges to seller (line 1400) | 6,385.00 |
| 203.   Existing loan(s) taken subject to | | 503.   Existing loan(s) taken subject to | |
| 204. | | 504.   Payoff:0001498691 | 403,739.55 |
| | | New Century Mortgage Corporati | |
| 205. | | 505. | |
| 206. | | 506. | |
| 207. | | 507. | |
| 208. | | 508. | |
| 209. | | 509. | |
| Adjustments for items unpaid by seller | | Adjustments for items unpaid by seller | |
| 213.   SELLER HED 2ND LOAN | 55,500.00 | 513.   SELLER HED 2ND LOAN | 55,500.00 |
| 214. | | 514.   WATER ESCROW | 350.00 |
| 215. | | 515.   RELEASE FEE | 225.00 |
| 216.   BROKER CREDIT | 5,000.00 | 516. | |
| 217. | | 517. | |
| 218.   SELLER CONTRIBUTION | 24,264.82 | 518.   SELLER CONTRIBUTION | 24,264.82 |
| 219. | | 519. | |
| **220. TOTAL PAID BY/FOR BORROWER** | 584,264.82 | **520. TOTAL REDUCTION AMOUNT DUE SELLER** | 545,964.37 |
| **300. CASH AT SETTLEMENT FROM OR TO BORROWER** | | **600. CASH AT SETTLEMENT TO OR FROM SELLER** | |
| 301.   Gross amount due from borrower (line 120) | 584,264.82 | 601.   Gross amount due to seller (line 420) | 555,032.25 |
| 302.   Less amounts paid by/for borrower (line 220) | 584,264.82 | 602.   Less reduction amount due seller (line 520) | 545,964.37 |
| **303. CASH FROM BORROWER** | 0.00 | **603. CASH TO SELLER** | 9,067.88 |

SUBSTITUTE FORM 1099 SELLER STATEMENT: The information contained herein is important tax information and is being furnished to the Internal Revenue Service. If you are required to file a return, a negligence penalty or other sanction will be imposed on you if this item is required to be reported and the IRS determines that it has not been reported. The Contract Sales Price described on line 401 above constitutes the Gross Proceeds of this transaction.

SELLER INSTRUCTIONS: If this real estate was your principal residence, file Form 2119, Sale or Exchange of Principal Residence, for any gain, with your income tax return; for other transactions, complete the applicable parts of Form 4797, Form 6252 and/or Schedule D (Form 1040).

You are required by law to provide the settlement agent (Fed. Tax ID No: _____) with your correct taxpayer identification number. If you do not provide your correct taxpayer identification number, you may be subject to civil or criminal penalties imposed by law. Under penalties of perjury, I certify that the number shown on this statement is my correct taxpayer identification number.

TIN: _____ / _____   SELLER(S) SIGNATURE(S): _____ / _____

SELLER(S) NEW MAILING ADDRESS: _____

SELLER(S) PHONE NUMBERS: _____ (H) _____ (W)

U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT
**SETTLEMENT STATEMENT**     REV. HUD-1 (3/86)

File Number: 05-860
TitleExpress Settlement System

| L.  SETTLEMENT CHARGES | | PAID FROM BORROWER'S FUNDS AT SETTLEMENT | PAID FROM SELLER'S FUNDS AT SETTLEMENT |
|---|---|---|---|
| 700.  TOTAL SALES/BROKER'S COMMISSION based on price $555,000.00 = | | | |
| Division of commission (line 700) as follows: | | | |
| 701.  $ | to | | |
| 702.  $ | to | | |
| 703.  Commission paid at Settlement | | | |
| **800. ITEMS PAYABLE IN CONNECTION WITH LOAN** | | | |
| 801.  Loan Origination Fee | %Fremont Investment & Loans | 489.00 | |
| 802.  Loan Discount | % | | |
| 803.  Appraisal Fee | to Town and Country Mortgage          (P.O.C.) 350.00 Buyer | | |
| 804.  Credit Report | to Town and Country Mortgage | 20.00 | |
| 805.  BROKER FEE | to Town and Country Mortgage | 13,979.00 | |
| 806.  UNDERWRITING FEE | to Fremont Investment & Loans | 405.00 | |
| 807.  TAX SERVICE FEE | to LANDAMERICA TAX AND FLOOD SERVICES | 60.00 | |
| 808.  FLOOD CERT FEE | to LANDAMERICA TAX AND FLOOD SERVICES | 9.50 | |
| 809.  PROCESSING FEE | to Town and Country Mortgage | 600.00 | |
| 810. | | | |
| 811. | | | |
| **900. ITEMS REQUIRED BY LENDER TO BE PAID IN ADVANCE** | | | |
| 901.  Interest From  09/29/2005 to 10/01/2005  @$  76.6400 /day  2 Days | | 153.28 | |
| 902.  Mortgage Insurance Premium for | to | | |
| 903.  Hazard Insurance Premium for | to STATE FARM | 1,201.00 | |
| 904. | | | |
| 905. | | | |
| **1000. RESERVES DEPOSITED WITH LENDER FOR** | | | |
| 1001.  Hazard Insurance | 3 mo. @ $  100.09 /mo | 300.27 | |
| 1002.  Mortgage Insurance | mo. @ $  /mo | | |
| 1003.  City Property Taxes | mo. @ $  392.46 /mo | | |
| 1004.  County Property Taxes | 4 mo. @ $  392.47 /mo | 1,569.88 | |
| 1005.  Annual Assessments | mo. @ $  /mo | | |
| 1009.  Aggregate Analysis Adjustment  to Fremont Investment & Loans | | -392.61 | 0.00 |
| **1100. TITLE CHARGES** | | | |
| 1101.  Settlement or closing fee | to Executive Title and Escrow L.L.C. | 175.00 | 175.00 |
| 1102.  Abstract or title search | to TJ Abstracts | 280.75 | |
| 1103.  Title examination | to Executive Title and Escrow L.L.C. | 570.00 | |
| 1104.  Title insurance binder | to Executive Title and Escrow L.L.C. | 75.00 | |
| 1105.  Document Preparation | | | |
| 1106.  Notary Fees | | | |
| 1107.  Attorney's fees | to Lawrence O. Elliott, Jr. Esq. | 100.00 | |
| (includes above items No: ) | | | |
| 1108.  Title Insurance | to Old Republic National Title Insurance Co. | 2,982.50 | |
| (includes above items No: ) | | | |
| 1109.  Lender's Policy | 444,000.00  - 1,568.00 | | |
| 1110.  Owner's Policy | 555,000.00  - 1,414.50 | | |
| 1111.  Judgment Search | to Property Insight | 25.00 | |
| 1112. | | | |
| 1113.  Courier/Overnight | to Executive Title and Escrow L.L.C. | 65.00 | 65.00 |
| **1200. GOVERNMENT RECORDING AND TRANSFER CHARGES** | | | |
| 1201.  Recording Fees Deed $ 40.00  ; Mortgage $ 250.00  ; Release $ | | 250.00 | 40.00 |
| 1202.  City Transfer Tax | Deed $6,105.00  ; Mortgage $ | 3,052.50 | 3,052.50 |
| 1203.  City Recordation Tax | Deed $6,105.00  ; Mortgage $ | 3,052.50 | 3,052.50 |
| 1204.  Construction Tax | Deed $  ; Mortgage $ | | |
| 1205. | | | |
| **1300. ADDITIONAL SETTLEMENT CHARGES** | | | |
| 1301.  Survey | to Duley and Associates, Inc. | 210.00 | |
| 1302.  Pest Inspection | | | |
| 1303. | | | |
| 1304. | | | |
| 1305. | | | |
| 1306. | | | |
| 1307. | | | |
| 1308. | | | |
| **1400. TOTAL SETTLEMENT CHARGES**  (enter on lines 103, Section J and 502, Section K) | | 29,232.57 | 6,385.00 |

HUD CERTIFICATION OF BUYER AND SELLER

I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction. I further certify that I have received a copy of the HUD-1 Settlement Statement. I agree to further adjustments in the event of errors or omissions and indemnify and hold harmless Settlement Agent against such error or omissions.

Joanne Blue
579900596

Edna Robinson
145543670

Brenda D. Carew

WARNING: IT IS A CRIME TO KNOWINGLY MAKE FALSE STATEMENTS TO THE UNITED STATES ON THIS OR ANY SIMILAR FORM. PENALTIES UPON CONVICTION CAN INCLUDE A FINE AND IMPRISONMENT. FOR DETAILS SEE TITLE 18: U.S. CODE SECTION 1001 AND SECTION 1010.

The HUD-1 Settlement Statement which I have prepared is a true and accurate account of this transaction. I have caused or will cause the funds to be disbursed in accordance with this statement.

By:_____
                          DATE