# IN THE FEDERAL DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

Joan Blue, et. al.                                    )
1001 F Street, NE                                     )
Washington, D.C. 20002                               )
        Plaintiff,                   )
        v.                          )    CA No.:  1:08-cv-00729-CKK
                                    )
Fremont Investment & Loan, Inc., et. al.  )
2727 E. Imperial Highway                             )
Brea, California 92821                               )
        Defendant,                   )
                                    )
_____)

## PLANTIFFS' OPPOSITION TO DEFENDANT FREMONT INVESTMENT & LOAN'S MOTION TO DISMISS FIRST AMENDED COMPLAINT

      **COMES NOW**, the plaintiffs, by and through counsel, hereby opposes the Defendant Fremont Investment and Loan's Motion to Dismiss the plaintiff's first amended complaint.  The plaintiffs argue in the opposite of the defendant, however, should this honorable Court decide in the favor of the defendant's position pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6).  In support of their opposition to defendant Fremont Investment & Loan's Motion to Dismiss First Amended Complaint , the plaintiff supplies the accompanying memorandum of points and authorities.

August 4, 2008

                      */s/ William C. Johnson, Jr.*
                      _____
                      William C. Johnson, Jr., Esq.
                      1229 15th St. NW
                      Washington, D.C. 20005
                      (202) 483-0808; (202) 431-2650
                      Fax (202) 483-0909

## IN THE FEDERAL DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

Joan Blue, et. al.                                    )
1001 F Street, NE                                     )
Washington, D.C. 20002                                )
       Plaintiff,                             )
    v.                                              )    CA No.: 1:08-cv-00729-CKK
                                 )
Fremont Investment & Loan, Inc., et. al.  )
2727 E. Imperial Highway                              )
Brea, California 92821                                )
       Defendant,                             )
                                 )
                                 )
_____)

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT FREMONT INVESTMENT & LOAN'S MOTION TO DISMISS FIRST AMENDED COMPLAINT

### Foreword

The defendant Fremont Investment & Loan has sought to dismiss the plaintiffs' first amended complaint under the guise that no claim of action may exist against it under the current facts and allegations.  In addition to the defendant's "contrived ambiguity" defense, the defendant also appears to rely on a curious claim of "substantiation," or lack thereof.

Despite having the current facts and allegations supported by the "pre-discovery" documentation submitted to this Court as exhibits, the defendant appears to be positioning itself to claim that the complaint is comprised of "bald assertions" and "conclusory allegations."  As a primer, a "bald assertion" is a fact without any support and a "conclusory allegation" is an allegation devoid of any facts.  Aside from the Federal Deposit Insurance Corporation's "Cease and Desist Order" against defendant Fremont Investment & Loan, (**Exhibit 1**), the instant

1

action is replete with "substantiated claims" of mortgage fraud and deceptive trade practices and lends itself to the need for discovery to prove the allegations. Therefore, a defense of that nature is misplaced and nonsensical in light of the circumstances.

The area of mortgage fraud and predatory lending as it pertains to the decline in the housing market has opened the door to an inquiry into the loan underwriting practices of the mortgage lenders. At issue shall be the role and limitation of liability for all active participants in the "mortgage lending chain." The defendants in the instant action all represent a phase of the mortgage lending process to which a necessary level of collusion is required to facilitate a mortgage fraud transaction.

The varied participants in the mortgage lending chain coupled with the profits to be earned upon a successful mortgage loan closing has facilitated a channel of unabashed greed, deceit and fraud. The transaction complained of involves a variation of the "bait and switch scheme." It is the plaintiffs' position that all parties to this transaction knew, or should have known, of the mortgage fraud which has been alleged.

The defendant Fremont Investment& Loans appear to take umbrage with the plaintiffs' use of the terminology, "… knew, or should have known, of the mortgage fraud." As this Court will determine, the use of said terminology is in accord with the Federal Deposit Insurance Corporations language in its "Cease and Desist" Order against the defendant Fremont Inv. and Loans. **Exhibit 1**.

Knowledge of an on-going fraud does not alone create a cause of action. However, facilitating and benefiting from the very fraud to which knowledge may be imputed as an unfair and deceptive trade practice to which a remedy exist. The issue to which this Court must be concerned is whether the plaintiff has pled the necessary facts and allegations to support a cause of action for a violation under the District of Columbia Consumer Protection Act and fraud.

## INTRODUCTION

## MORTGAGE LOAN UNDERWRITING PRACTICES

### (Defendant Fremont Investment & Loan)

The relevant facts of this opposition to the Defendant Fremont Investment & Loans motion to dismiss plaintiffs first amended complaint commenced when plaintiffs began to receive notices and applications for loan approvals at their address for Brenda Carew.  With the belief that they owned their property, the plaintiff then called Denis Bishop at Town & Country Mortgage to ask for an explanation as to why Brenda Carew was receiving loan applications at their home address.

Under suspicion as to the transaction, Plaintiffs then stopped making their monthly mortgage payments.  New Century Mortgage commenced to send foreclosure notices to Brenda Carew at the plaintiff's home address.  Another call to defendant Denis Bishop concerning the identity of Brenda Carew was made.  Defendant Denis Bishop informed the plaintiffs that, "he would take care of it."

Approximately six weeks later, the defendant Denis Bishop, once again instructed the plaintiffs Rose Blue and, this time, Edna Robinson to attend a closing at Executive Title & Escrow.  This time, the plaintiffs were instructed to sign the documents in order to obtain a refinancing to stop the foreclosure.  The plaintiffs Joan Blue and Edna Robinson were informed they were being utilized to replace their mother and father, plaintiffs Halbert and Rose Blue, because their incomes were higher.

At no time, did the plaintiffs, Joan Blue and Edna Robinson, understand that Brenda Carew already owned their property.  The loan was provided by the defendant Fremont Investment & Loan.  The defendant Fremont Investment & Loan either failed or neglected to engage in a meaningful mortgage loan underwriting process.  The plaintiffs never made an application to neither defendant Town & Country Mortgage nor defendant Fremont Investment & Loan.

3

The defendant Fremont provided a loan to the plaintiffs without their authorization and under fraudulent conditions.

The defendant Fremont Investment and Loans, utilizing its mortgage loan underwriting practices, or lack thereof, willfully turned a "blind-eye" to the fraudulent loan transaction and provided a loan secured by a property that had sufficient equity and more than adequate loan-to-value to secure the residential mortgage it provided.  The defendant Fremont had a business relationship with the defendants Town & Country Mortgage and Denis Bishop whereby the defendants supplied defendant Fremont with a loan application known, or should have been known to be fraudulently procured and outside the normal policies and procedures for underwriting loans.  The defendant Fremont foreclosed on the loan to the plaintiffs Joan Blue and Edna Robinson.  The defendant Fremont purchased the property at the foreclosure sale.  Which given the facts and circumstances, is a questionable transaction.

## STANDARD FOR REVIEW

In *Bell Atlantic Corp. v. Twombly*, --- U.S. ----, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), the Supreme Court clarified the standard of pleading that a plaintiff must meet in order to survive a motion to dismiss under Rule 12(b)(6). The Court noted that "Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests[.]' " *Id.* at 1965 (quoting *Conley v. Gibson*, 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)); *see also Erickson v. Pardus*, ---U.S. ----, ----, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007). Although "detailed factual allegations" are not necessary to survive a Rule 12(b)(6) motion to dismiss, to provide the "grounds" of "entitle[ment] to relief," a plaintiff must furnish "more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Bell Atlantic Corp. v. Twombly*, 127 S.Ct. at 1964-65; *see also Papasan*

4

*v. Allain,* 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986). The Court stated that while there was no "probability requirement at the pleading stage," *Bell Atlantic Corp. v. Twombly,* 127 S.Ct. at 1965, "something beyond ... mere possibility ... must be alleged[.]" *Id.* at 1966. The facts alleged in the complaint "must be enough to raise a right to relief above the speculative level," *id.* at 1965, or must be sufficient "to state a claim for relief that is plausible on its face." *Id.* at 1974. The Court referred to this newly clarified standard as "the plausibility standard." *Id.* at 1968 (abandoning the "no set of facts" language from *Conley v. Gibson* ).

On a motion to dismiss for failure to state a claim under Rule 12(b)(6), the Court "must accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus,* 127 S.Ct. at 2200; *see also Bell Atlantic Corp. v. Twombly,* 127 S.Ct. at 1965; *Summit Health, Ltd. v. Pinhas,* 500 U.S. 322, 325, 111 S.Ct. 1842, 114 L.Ed.2d 366 (1991). The complaint "is construed liberally in the plaintiffs' favor, and [the Court should] grant plaintiffs the benefit of all inferences that can be derived from the facts alleged." *Kowal v. MCI Communications Corp.,* 16 F.3d 1271, 1276 (D.C.Cir.1994); *see also Browning v. Clinton,* 292 F.3d 235, 242 (D.C.Cir.2002); *Sparrow v. United Air Lines, Inc.,* 216 F.3d 1111, 1113 (D.C.Cir.2000). While the complaint is to be construed liberally in plaintiffs' favor, the Court need not accept inferences drawn by plaintiffs if those inferences are unsupported by facts alleged in the complaint; nor must the Court accept plaintiffs' legal conclusions. *See Kowal v. MCI Communications Corp.,* 16 F.3d at 1276; *Browning v. Clinton,* 292 F.3d at 242.

## LEGAL ARGUMENT

**I.     Plaintiffs Halbert Blue and Rose Blue were limited by this Court to the remaining Defendants excluding Defendant Fremont Investment & Loan**

This honorable Court dismissed the claims of Halbert and Rose Blue against the Defendant Fremont Investment & Loan citing their remoteness to the subsequent mortgage loan transaction.   Plaintiffs do not re-allege that which the Court has already decided.

## II.    Count III Should Not Be Dismissed Because Plaintiffs Joan Blue and Edna Robinson State Adequate Claims Under the District of Columbia Consumer Protection Act.

The defendant alleges plaintiffs Joan Blue and Edna Robinson fails to assert a cause of action under the District of Columbia's Consumer and Protection and Procedures Act, D.C. Code § 29-3901 et. seq [sic]  In support of its position, the defendant cites the opinion of *Osbourne v. Capital City Mortgage Company*, 727 A.2d 322,  (D.C. 1999)(citations omitted).

In *Osbourne,* the Court states, "[t]he Consumer Protection and Procedures Act is a comprehensive statute with an extensive regulatory framework designed to remedy all improper trade practices." *Id.* at 325.  The plaintiffs agree and consistently argue that the defendant Fremont's implementation of its mortgage loan underwriting practices in plaintiffs Joan Blue and Edna Robinson's loan transaction represent improper trade practices.

The issue before the Court is whether the plaintiffs adequately and particularly pled facts sufficient to make a claim under the Consumer Protection and Procedures Act.  Pursuant to the relevant case law and the Federal Deposit Insurance Corporation, hereinafter FDIC, the claims of the plaintiffs are valid and legitimate.  The failure to implement a meaningful and legitimate underwriting process is an improper trade practice.

On March 7, 2007, the Federal Deposit Insurance Corp. issued a cease and desist order to Fremont Investment & Loan, alleging the bank lacked adequate underwriting criteria, and "was marketing and extending subprime mortgage loans

in a way that substantially increased the likelihood of borrower default or other loss to the bank." **Exhibit 1**.

In Count III of the plaintiffs' first amended complaint, paragraph 49 thru 60, plaintiffs specifically identify several actions or inactions performed by the defendant Fremont in the underwriting process that implicate improper trade practices. Assuming all of the allegations against the other defendants to be true, the defendant Fremont Investment& Loans underwriting process should have denied the alleged loan application of the plaintiffs Joan Blue and Edna Robinson.

In paragraphs 50 thru 52 of the first amended complaint, the plaintiffs adequately allege that they did not apply for a mortgage loan with the defendant Fremont Investment & Loan. The plaintiffs allege the defendant knew or should have known that plaintiff had little knowledge of the purported financing of their property. Complaint, para. 50.

Once a mortgage application is taken, the phase of the loan process known as underwriting begins. It is perhaps the most difficult segment of the process because information must be collected and thoroughly analyzed in order to decide whether or not the loan will be granted. The borrower's employment, income, and funds on deposit for the down payment and closing costs must all be verified. An appraisal may also be ordered at this time. Depending on the type of loan, other documentation might be requested, as well. **See Exhibit 5.**

The plaintiffs provide in paragraph 51, "[d]efendant Fremont Investment and loans, Inc. engaged in very relaxed underwriting practices purposefully allowing the defendant Town and Country and Dennis Bishop to submit fraudulent loan applications on the behalf of the unknowing plaintiffs. Complaint, para. 51.

Neither of the plaintiffs Joan Blue nor Edna Robinson provided the defendant Fremont Investment and Loan with any documentation, financial or otherwise, to commence the loan underwriting process.

In a valid underwriting process, the underwriter, or loan endorser, carefully reviews the borrower's documentation and decides whether he or she would be a sound lending risk. If segments of the borrower's employment, credit history, or overall financial picture are vague, problematic, or appear to be contradictory, the underwriter will request more information. This decision process can take hours or even weeks to complete. However, much of the procedure is streamlined using current technology such as electronic underwriting and credit scoring, which help interpret the borrower's financial qualifications. **See Exhibit 5**.

The defendant Fremont Investment and Loan engaged in a fraudulent underwriting transaction due to the fact that it did not take a valid application from the plaintiffs, did not perform a credit verification and relied upon the representations of the defendant Town and Country, with whom it had a business relationship.

The plaintiff alleged the defendant Fremont committed a violation of the D.C. Consumer Protection and Procedures Act, by making a loan when it knew or should have known there was no reasonable probability of repayment in full. D.C. Code §28-3904(r)(1), by misrepresenting a material fact the failure of which tends to mislead, D.C. Code § 28-3904(e), and by failing to state a material fact which tends to mislead, D.C. Code § 28-3904(f).

A similar issue was decided in *Commonwealth v. Fremont Investment & Loan* (Mass. App. Ct., 2008), unreported, aff'g 2008 WL 517279, *as modified by* 2008 WL 1913940 (Mass. Super. Ct. 2008). The appellate Court upheld the trial court's preliminary injunction, finding that a mortgage lender's origination practices likely violated the state unfair and deceptive trade practices act. The Court determined the loans were unfair if they contained the following four characteristics:

(1)     adjustable rate mortgages with an introductory period of three years or less;  in the instant case, the adjustable rate has an introductory period of two years. **Exhibit 2**.

(2)     a teaser rate at least three percent lower than the fully indexed rate; in the instant case the fully indexed rate is 12.3% while the teaser rate is 4.5237%. **Exhibit 3.**

(3)     the borrower has a debt-to-income ratio that would exceed 50% if the debt were measured under the fully indexed rate (and not the teaser rate); in the instant case the plaintiff's mortgage payments exceeded 50% of their net income; and

(4)     the loan-to-value ratio of the loan is 100% or the loan carries a substantial prepayment penalty or the loan carries a prepayment penalty that extends beyond the introductory penalty. In the instant case, the diminishing home values in the Washington Metropolitan Area have placed the value of the home substantially lower than the pre-existing lower.  Furthermore, the Prepayment Rider provides for a substantial prepayment penalty.  **Exhibit 4.**

The trial court had found that the lender knew or should have known that loans with these characteristics were doomed to foreclosure if housing prices decline. *Commonwealth v. Fremont Investment & Loan* (Mass. App. Ct., 2008), unreported, aff'g 2008 WL 517279, *as modified by* 2008 WL 1913940 (Mass. Super. Ct. 2008).

Given the current status of the housing market and the readily ascertainable deviation from acceptable mortgage loan underwriting guidelines by the defendant Fremont Investment and Loan (**see Exhibit 1**), the plaintiffs' unfair and deceptive trade practices claim under the D.C. Consumer Protection  and Procedures Act § 28-3901 et seq. is a claim upon which relief may be granted.

**III.    Count IV Should Not Be Dismissed Because Plaintiffs Joan Blue and Edna Robinson State Valid and Specific Claims of Fraud**

The defendant Fremont Investment & Loans requests of this honorable Court to dismiss plaintiffs' cause of action for common law fraud under Rules 9(b) and 12(b)(6).   In Count IV, the plaintiffs incorporated the entire complaint in the allegations of fraud presented.  In the plaintiffs' first amended complaint, the description of the fraud committed by the defendant Fremont Investment & Loans is pled with particularity.  F.R.C.P. 9(b).

The plaintiff agrees with the defendant in citing *Kitt v. Capital Concerts, Inc.,* 742 A.2d 856 (1999).  The Court in *Kitt*, quoting *Hercules & Co. Shama Restaurant Corp.*, 613 A.2d 916 (D.C. 1992), stated the essential elements of common law fraud are:"(1) a false representation, (2) made in reference to a material fact, (3) with knowledge of  its falsity,(4) with the intent to deceive, and (5) an action that is taken in reliance upon the representation. *Id.*

Throughout the plaintiffs' entire first amended complaint, a complete outline of the fraud committed by the defendants is detailed.   The plaintiffs' detail through their allegations, and supported by the various exhibits, a loan transaction fabricated and premised upon a fraudulent application.  While the main perpetrators of the fraudulent loan transactions require a concerted effort in order effectuate the fraud in one instance, the underwriting component of the transaction creates a separate and distinct fraudulent activity.

The defendant Fremont Investment and Loan makes an erroneous assertion that, "there is no allegation about how or when any Fremont misrepresentation was communicated."  Instead the defendant asserts as its defense that the plaintiffs' claims are formulaic.  Defendant's Motion to dismiss, page 14.  An astute reading of the entire complaint is in order.

Throughout the entire complaint, as it pertains to the defendant Fremont Investment & loans, the plaintiffs complain of the inadequacy of mortgage loan underwriting process, or lack thereof.

The underwriting process commences with the application of the plaintiff for a mortgage loan. The plaintiffs, throughout the entire complaint, allege they did not apply for a mortgage loan. The relaxed underwriting procedures of the defendant Fremont Investment & Loans allowed the defendant Town & Country to submit fraudulent documentation for a loan application. The underwriting procedures of the defendant Fremont Investment and Loans failed to verify the loan application or the material representation of the defendant Town & Country.

The provision of a mortgage loan to the plaintiffs by the defendant Fremont Investment & Loan is a misrepresentation of material fact. The defendant has represented to the plaintiffs that they: (1) applied for a loan and (2) can afford the loan for which they allegedly applied. What appears to be the disconnect in the argument put forth by the defendant Fremont Investment & Loans is their failure to engage in a meaningful underwriting process which happens to be the central component to loan approval.

In paragraph 64 of plaintiffs' first amended complaint, the plaintiffs allege the defendant knew that the representation was false, or the representation was made with such reckless disregard for the truth that knowledge of the falsity of the statement can be imputed to the defendant. Complaint, para. 64.

Understanding that a mortgage loan requires repayment, it would serve to reason that the plaintiffs possessed the ability to repay the loan. The defendant Fremont in its failure to implement an underwriting process failed to verify income and chose to rely upon the foreclosure resale value as a source to secure repayment. **Exhibit 1**.(See also, *Commonwealth v. Fremont Investment & Loan* (Mass. App. Ct., 2008), unreported, aff'g 2008 WL 517279, *as modified by* 2008 WL 1913940 (Mass. Super. Ct. 2008)).

11

## CONCLUSION

**THEREFORE**, in consideration of the defendant Fremont Investment &
Loans motion to dismiss the plaintiffs' first amended complaint and the plaintiffs
opposition thereto, the plaintiffs pray this honorable Court denies the defendant's
motion.


August 4, 2008


/s/ William C. Johnson, Jr.

_____

William C. Johnson, Jr., Esq.
1229 15th St. NW
Washington, D.C. 20005
(202) 483-0808; (202) 431-2650
Fax (202) 483-0909

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a copy of the foregoing was sent to the
following via ECF:
Ober, Kaler, Grimes & Shriver, PC
Attention: Harold G. Belkowitz, Esq.
1401 H Street, N.W.
Suite 500
Washington, D.C. 20005
Counsel for Defendant Fremont Investment & Loans

Law Offices of David E. Ralph, LLC
Attention: David E. Ralph, Esq.
2423 Maryland Avenue, Suite 100
Baltimore, Maryland 21218
Counsel for Defendant Executive Title & Escrow

A copy of the foregoing was sent via first class mail to the following:

Dennis Bishop
Brenda Carew
Town& Country Mortgage and Financial Services

12

August 4, 2008

/s/ William C. Johnson, Jr.

_____

William C. Johnson, Jr., Esq.

FEDERAL DEPOSIT INSURANCE CORPORATION

WASHINGTON, D.C.

_____
                                              )
In the Matter of                              )
                                              )                    ORDER TO
FREMONT INVESTMENT & LOAN                      )              CEASE AND DESIST
BREA, CALIFORNIA                              )
                                              )              Docket No. FDIC-07-035b
FREMONT GENERAL CREDIT CORPORATION,  )
FREMONT GENERAL CORPORATION,                 )
as institution-affiliated parties of          )
FREMONT INVESTMENT AND LOAN                   )
                                              )
(INSURED STATE NONMEMBER BANK)               )
                                              )
_____)

Fremont Investment & Loan, Brea, California ("Bank"), and Fremont General Credit

Corporation ("FGCC") and Fremont General Corporation ("FGC"), institution-affiliated parties

of the Bank, having been advised of their right to a Notice of Charges and of Hearing detailing

the unsafe or unsound banking practices and violations of law and/or regulations alleged to have

been committed by the Bank, FGCC and FGC and of their right to a hearing on the alleged

charges under section 8(b)(1) of the Federal Deposit Insurance Act ("Act"), 12 U.S.C.

§1818(b)(1), and having waived those rights, entered into a STIPULATION AND CONSENT

TO THE ISSUANCE OF AN ORDER TO CEASE AND DESIST ("CONSENT

AGREEMENT") with counsel for the Federal Deposit Insurance Corporation ("FDIC"), dated

March 7, 2007, whereby solely for the purpose of this proceeding and without admitting or

denying the alleged charges of unsafe or unsound banking practices and violations of law and/or

- 2 -

regulations, the Bank, FGCC and FGC consented to the issuance of an ORDER TO CEASE
AND DESIST ("ORDER") by the FDIC.

The FDIC considered the matter and determined that it had reason to believe that the
Bank, FGCC and FGC had engaged in unsafe or unsound banking practices and had committed
violations of law and/or regulations.  The FDIC, therefore, accepted the CONSENT
AGREEMENT and issued the following:

<u>ORDER TO CEASE AND DESIST</u>

IT IS HEREBY ORDERED, that the Bank, its institution-affiliated parties, as that term is
defined in section 3(u) of the Act, 12 U.S.C. §1813(u), and its successors and assigns cease and
desist from the following unsafe and unsound banking practices and violations of law and/or
regulations:

(a)     operating with management whose policies and practices are detrimental to the
Bank;

(b)     operating the Bank without effective risk management policies and procedures in
place in relation to the Bank's primary line of business of brokered subprime mortgage lending;

(c)     operating the Bank without effective risk management policies and procedures in
place in relation to the Bank's other primary line of business of commercial real estate
construction lending;

(d)     operating with inadequate underwriting criteria and excessive risk in relation to
the kind and quality of assets held by the Bank;

(e)     operating without an accurate, rigorous and properly documented ALLL
methodology;

- 3 -

(f)     operating with a large volume of poor quality loans;

(g)     engaging in unsatisfactory lending practices;

(h)     operating without an adequate strategic plan in relation to the volatility of the Bank's business lines and the kind and quality of assets held by the Bank;

(i)     operating with inadequate capital in relation to the kind and quality of assets held by the Bank;

(j)     operating in such a manner as to produce low and unsustainable earnings;

(k)     operating with inadequate provisions for liquidity in relation to the volatility of the Bank's business lines and the kind and quality of assets held by the Bank;

(l)     marketing and extending adjustable-rate mortgage ("ARM") products to subprime borrowers in an unsafe and unsound manner that greatly increases the risk that borrowers will default on the loans or otherwise cause losses to the Bank, including ARM products with one or more of the following characteristics:

(i)     qualifying borrowers for loans with low initial payments based on an introductory or "start" rate that will expire after an initial period, without an adequate analysis of the borrower's ability to repay the debt at the fully-indexed rate;

(ii)     approving borrowers without considering appropriate documentation and/or verification of their income;

(iii)     containing product features likely to require frequent refinancing to maintain an affordable monthly payment and/or to avoid foreclosure;

(iv)     including substantial prepayment penalties and/or prepayment penalties that extend beyond the initial interest rate adjustment period;

- 4 -

(v)     providing borrowers with inadequate and/or confusing information relative to product choices, material loan terms and product risks, prepayment penalties, and the borrower's obligations for property taxes and insurance;

(vi)    approving borrowers for loans with inadequate debt-to-income analyses that do not properly consider the borrowers' ability to meet their overall level of indebtedness and common housing expenses; and/or

(vii)   approving loans or "piggyback" loan arrangements with loan-to-value ratios approaching or exceeding 100 percent of the value of the collateral;

(m)     making mortgage loans without adequately considering the borrower's ability to repay the mortgage according to its terms;

(n)     operating in violation of section 23B of the Federal Reserve Act, 12 U.S.C. §371c-1, made applicable to state nonmember insured institutions by section 18(j)(1) of the Act, 12 U.S.C. §1828(j)(1), in that the Bank engaged in transactions with its affiliates on terms and under circumstances that in good faith would not be offered to, or would not apply to, nonaffiliated companies; and

(o)     operating inconsistently with the FDIC's Interagency Advisory on Mortgage Banking and Interagency Expanded Guidance for Subprime Lending Programs.

IT IS FURTHER ORDERED, that the Bank, its institution-affiliated parties, and its successors and assigns, take affirmative action as follows:

- 5 -

<u>MANAGEMENT REQUIREMENTS AND OVERSIGHT OF BANK OPERATIONS</u>

1.      The Bank shall have and retain qualified management acceptable to the Regional Director of the San Francisco Regional Office ("Regional Director") and the Commissioner of the Department of Financial Institutions for the State of California ("Commissioner").

(a)     Each member of management shall have qualifications and experience commensurate with his or her duties and responsibilities at the Bank.  Management shall include a chief executive officer with proven ability to manage a bank of comparable size, and experience in upgrading a low quality loan portfolio, improving earnings, and other matters needing particular attention.  Management shall also include a qualified chief operating officer and a chief risk officer with proven abilities in risk management of subprime lending programs.  Such officers shall develop and establish an independent centralized risk management program.  Each member of management shall be provided appropriate written authority from the Bank's board of directors to implement the provisions of this ORDER.

(b)     The qualifications of management shall be assessed on its ability to:

(i)      comply with the requirements of this ORDER;

(ii)     operate the Bank in a safe and sound manner;

(iii)    comply with applicable laws and regulations; and

(iv)     restore all aspects of the Bank to a safe and sound condition, including asset quality, capital adequacy, earnings, management effectiveness, liquidity, and sensitivity to market risk.

(c)     During the life of this ORDER, the Bank shall notify the Regional Director and the Commissioner in writing when it proposes to add any individual to the Bank's

- 6 -

board of directors or employ any individual as a senior executive officer.  The notification must

be received at least 30 days before such addition or employment is intended to become effective

and should include a description of the background and experience of the individual or

individuals to be added or employed.  The Bank shall not employ a senior executive who is

associated in any manner with an affiliate as defined in 12 U.S.C. §371c without the Regional

Director's and the Commissioner's prior written approval.

2.        Within 60 days from the effective date of this ORDER, the Bank's board of

directors shall obtain an independent study of the management and personnel structure of the

Bank to determine whether additional personnel are needed for the safe and profitable operation

of the Bank.  Such a study shall include, at a minimum, a review of the duties, responsibilities,

qualifications, and remuneration of the Bank officers. The Bank shall formulate a plan to

implement the recommendations of the study. Such plan shall be provided to the Regional

Director and the Commissioner for review and approval prior to implementation.

3.        (a)        Within 120 days from the effective date of this ORDER, and during the

life of this ORDER, independent directors shall comprise a majority of the Bank's board of

directors.

(b)        The addition of any new Bank directors required by this paragraph may be

accomplished, to the extent permissible by state statute or the Bank's by-laws, by means of

appointment or election at a regular or special meeting of the Bank's shareholders.  For purposes

of this ORDER, an independent director shall be any individual who is not an officer or former

officer of the Bank, any subsidiary, or any of its affiliated organizations; who does not own more

than 10 percent of the outstanding shares of FGCC and FGC; who is not related by blood or

- 7 -

marriage to an officer or director of the Bank or to any shareholder owning more than 10 percent of FGCC's and FGC's outstanding shares and does not otherwise have a common financial interest with such officer, director or shareholder; who is not indebted to the Bank directly or indirectly, including the indebtedness of any entity in which the individual has a substantial financial interest, in an amount exceeding 10 percent of the Bank's total Tier 1 capital and allowance for loan and lease losses; or who is deemed to be an independent director for purposes of this ORDER by the Regional Director and the Commissioner.

        (c)      In addition to the foregoing, within 120 days from the effective date of this ORDER, and during the life of this ORDER, the Bank shall limit the representation of FGC and FGCC in the aggregate to no more than 25 percent of the Bank's board of directors.

        4.      The Bank shall not enter into any contract for services essential to the operations of the Bank with FGCC or FGC or any subsidiary thereof, without the prior written approval of the Regional Director and the Commissioner.

        5.      Within 60 days from the effective date of this ORDER, the Bank shall correct all violations of law and all practices inconsistent with Interagency Statements of Policy as cited in paragraphs (n) and (o) of this ORDER.  In addition, the Bank shall take all necessary steps to ensure future compliance with all applicable laws and regulations.

        6.      Within 30 days from the effective date of this ORDER, the Bank shall establish a Directors Compliance Committee ("Compliance Committee") composed of at least three independent directors.  For purposes of this provision of the ORDER, an independent director is defined as set forth in paragraph 3(b) of this ORDER.  The Compliance Committee shall perform their duties required by this ORDER and otherwise monitor compliance with this ORDER.  In

- 8 -

addition, within 60 days from the effective date of this ORDER, and every 30 days thereafter during the life of this ORDER, it shall submit to the board of directors for consideration at its regular monthly meeting a written report detailing the Bank's compliance with this ORDER. The monthly compliance report shall be incorporated into the minutes of the corresponding board of directors' meeting.  Nothing herein contained shall diminish the responsibility of the entire board of directors to ensure compliance with the provisions of this ORDER.

7.    Following the effective date of this ORDER, the Bank shall send to its shareholders or otherwise furnish a description of this ORDER in conjunction with the Bank's next shareholder communication and also in conjunction with its notice or proxy statement preceding the Bank's next shareholder meeting.  The description shall fully describe the ORDER in all material respects.  The description and any accompanying communication, statement, or notice shall be sent to the FDIC, Registration and Disclosure Unit, Washington, D.C., 20429, at least 15 days prior to dissemination to shareholders.  Any changes requested to be made by the FDIC shall be made prior to dissemination of the description, communication, notice, or statement.

8.    Within 30 days of the end of the first calendar quarter following the effective date of this ORDER, and within 30 days of the end of each calendar quarter thereafter, the Bank shall furnish written progress reports to the Regional Director and the Commissioner detailing the form and manner of any actions taken to secure compliance with this ORDER and the results thereof.  Such reports may be discontinued when the corrections required by this ORDER have been accomplished and the Regional Director and the Commissioner have released the Bank in writing from making further reports.

- 9 -

<u>CORRECTIVE PLANS AND POLICIES ON RESIDENTIAL LENDING</u>

9.    (a)    Within 90 days from the effective date of this ORDER, the Bank shall revise, adopt, and implement written lending policies to provide effective guidance and control over the Bank's residential lending function.  In addition, the Bank shall obtain adequate and current documentation to fully support the prudence of the Bank's underwriting for all loans in the Bank's residential loan portfolio, whether such loans are held for sale or held for investment. Such policies shall be provided to the Regional Director and the Commissioner for review and approval prior to implementation and their implementation shall be in a form and manner acceptable to the Regional Director and the Commissioner as determined at subsequent examinations and/or visitations.

(b)    The initial revisions to the Bank's residential loan policy and practices, required by this paragraph, at a minimum, shall include the following:

(i)    Provisions which require that the Bank's analysis of a borrower's debt-to-income ratio include an assessment of the borrower's ability to meet his or her overall level of indebtedness and common housing expenses, including, but not limited to, real estate taxes, hazard insurance, homeowners' association dues, and private mortgage insurance.  In addition, the Bank's qualifying standards shall include an analysis of the borrower's ability to repay the debt at the fully indexed rate, assuming a fully amortizing repayment schedule.  The Bank shall not increase the 50 percent debt-to-income ratio set forth in its loan policy, and to the extent that the policy allows routine extension of loans resulting in higher debt-to-income ratios, shall reduce such ratios to 50 percent.  In any case in which a loan would result in a debt-to-income ratio greater than 50 percent, the Bank's policy should set forth

- 10 -

specific mitigating factors (e.g., higher credit scores, significant liquid assets, mortgage insurance) that will permit the Bank to determine that the borrower possesses the demonstrated ability to repay the loan.  For purposes of the foregoing debt-to-income measurement, "debt" shall include a realistic estimate of taxes and insurance associated with the loan; and projected loan payments shall be calculated at the fully indexed and fully amortized rate;

        (ii)        Provisions which require that the Bank analyze the risk inherent in a loan, both from the features of the loan and the borrower's characteristics, and further require that the Bank must verify the borrower's income, assets, and liabilities, including the use of recent W-2 statements, pay stubs, tax returns, or similarly reliable documentation, and verify that the borrower remains employed;

        (iii)        Provisions which require that when the Bank uses risk-layered features, such as reduced documentation loans or simultaneous-second lien mortgages, the Bank shall demonstrate the existence of effective mitigating factors that support the underwriting decision and the borrower's repayment capacity, which mitigating factors cannot solely be based on a higher interest rate;

        (iv)        Provisions which require that the Bank inform borrowers of the option to escrow funds for payment of taxes and insurance if such escrows are not required as a condition of the loan; and

        (v)        Provisions that describe the efforts that the Bank will make to restructure loans in distress, consistent with marketability of such loans, with sound principles of underwriting as set forth in paragraph 9 of this ORDER, and in full compliance with applicable consumer protection laws.

- 11 -

10.     (a)     Within 90 days from the effective date of this ORDER, the Bank shall develop, adopt, and implement a policy governing communications with consumers to ensure that the borrowers are provided with sufficient information to enable them to understand all material terms, costs, and risks of loan products at a time that will help the consumer select products and choose among payment options ("Policy on Consumer Communications"). Such policy and its implementation shall be in a form and manner acceptable to the Regional Director and the Commissioner as determined at subsequent examinations and/or visitations.

(b)     The provisions of the Bank's Policy on Consumer Communications required by this paragraph shall, at a minimum, include the following:

(i)     Provisions which require that all communications with consumers, including advertisements, oral statements, and promotional materials, provide clear and balanced information about the relative benefits and risks of the products, and that such communications shall be provided in a timely manner to assist consumers in the product selection process, not just upon submission of an application or at the consummation of the loan;

(ii)     Provisions which require that all mortgage product descriptions and advertisements provide clear, detailed information about all of the costs, terms, features, and risks of the loan to the borrower, including, but not limited to, the following:

(A)     Potential payment increases, including how the new payment will be calculated when the introductory fixed rate expires;

(B)     The existence of any prepayment penalty, how it will be calculated, and when it may be imposed;

(C)     The existence of any balloon payment;

- 12 -

(D)    Whether there is a pricing premium attached to a reduced documentation or stated income program; and

(E)    Whether the borrower will be required to make payments for real estate taxes and insurance in addition to the loan payment, if not escrowed, and the fact that tax and insurance costs can be substantial.

11.    (a)    Within 90 days from the effective date of this ORDER, the Bank shall develop, adopt, and implement strong control systems to monitor whether the Bank's actual practices are consistent with their policies and procedures.  These systems shall address consumer information concerns and underwriting standards, as required by paragraphs 9 and 10 above, and shall encompass both Bank personnel and all applicable third parties, including mortgage brokers and correspondents.  Such systems and their implementation shall be in a form and manner acceptable to the Regional Director and the Commissioner as determined at subsequent examinations and/or visitations.

(b)    The Bank's control systems as required by this paragraph, shall, at a minimum, include the following components:

(i)    Adopting and implementing appropriate criteria for hiring and training loan personnel, entering into and maintaining relationships with third parties, and conducting initial and ongoing due diligence with third parties;

(ii)    Adopting and implementing compensation programs that avoid providing incentives for originations inconsistent with sound underwriting and consumer protection principles;

- 13 -

(iii)     Monitoring compliance with appropriate laws and regulations, applicable third party agreements, and internal policies;

(iv)     Taking appropriate corrective actions in the event of the failure to comply with applicable laws, regulations, third party agreements, or internal policies;

(c)     Maintaining adequate procedures to review consumer complaints to identify potential compliance problems or other negative trends; and

(d)     Maintaining accurate centralized records of consumer and broker-related complaints.

12.     Within 90 days from the effective date of this ORDER, the Bank shall develop and implement a third party mortgage broker monitoring program and plan ("Monitoring Plan"). Such plan shall be in a form and manner acceptable to the Regional Director and the Commissioner as determined at subsequent examinations and/or visitations.  At a minimum, the Monitoring Plan shall provide for the following:

(a)     A functional and validated due diligence process and establishment of other criteria for entering and maintaining relationships with such third party brokers;

(b)     An acceptable selection process that fully evaluates the integrity, character and financial viability of potential brokers and includes the establishment of criteria for third party compensation designed to avoid providing incentives for originations inconsistent with sound underwriting and consumer protection principles;

(c)     Procedures and systems for monitoring compliance with applicable agreements, bank policies, and applicable laws, rules and regulations;

- 14 -

(d)     Appropriate corrective actions in the event that the third party fails to comply with applicable agreements, bank policies or laws, rules and regulations; and

(e)     Procedures and systems for determining which residential mortgage loan brokers generate substantial putbacks (measured as a fraction of the broker's loan volume), and for implementing appropriate corrective action by the Bank with respect to such brokers.

13.     Within 90 days from the effective date of this ORDER, the board and management shall develop a five year strategic plan, which includes policies and procedures for diversifying the Bank's loan portfolio composition, achieving balanced risk tolerance, assessing the Bank's strengths and weaknesses based on different economic scenarios and stress tests, and strategies to mitigate the Bank's concentrations of credit.  In addition, the provisions of the strategic plan should address the Bank's policies and procedures to, among other things, mitigate the risk of the Bank's reliance on third party broker loan originations, diversify the Bank's business plan and/or lending operations including product lines with lower risk profiles, limit the Bank's acquisition of high loan to value subprime mortgages, and develop a contingency funding plan that utilizes economic scenarios that includes market risks, volatility in loan prices and market spreads and dislocations.  Such strategic plan shall be provided to the Regional Director and the Commissioner for review and approval prior to implementation.

14.     Within 90 days from the effective date of this ORDER, the Bank shall develop, adopt, and implement a comprehensive policy covering the Bank's capital analysis on subprime residential loans.  Such analysis shall meet the criteria set forth in the Interagency Guidance on Subprime Lending dated March 1, 1999 and the Interagency Expanded Guidance for Subprime Lending Programs dated January 31, 2001.  Such policy and its implementation shall be in a

- 15 -

form and manner acceptable to the Regional Director and the Commissioner as determined at subsequent examinations and/or visitations.

15.     Within 90 days from the effective date of this ORDER, the Bank shall perform quarterly valuations and cash flow analyses on the Bank's residual interests and mortgage servicing rights from its residential lending operation.  The valuation should compare actual results to estimated results on a regular and ongoing basis and revise assumptions as needed.  At a minimum, review of assumptions shall include prepayment speeds, changes in delinquency and loss estimates, cost of servicing as compared to other subprime lenders, and changes in established discount rates based on a subprime portfolio with similar characteristics.  The Bank shall also obtain an annual independent valuation of the residual interests and mortgage servicing rights.  The Bank will not enter into a contract or any other agreement to conduct the valuation without the prior written consent of the Regional Director and the Commissioner.

## CORRECTIVE PLANS ON COMMERCIAL REAL ESTATE LENDING

16.     (a)     Beginning with the effective date of this ORDER, the Bank shall not extend, directly or indirectly, any additional credit to, or for the benefit of, any commercial real estate borrower who has a loan or other extension of credit from the Bank that has been charged off or classified, in whole or in part, "Loss" and is uncollected.  Subparagraph 16(a) of this ORDER shall not prohibit the Bank from renewing or extending the maturity of any credit in accordance with the Financial Accounting Standards Board Statement Number 15, concerning troubled debt restructurings.

(b)     Beginning with the effective date of this ORDER, the Bank shall not extend, directly or indirectly, any additional credit to, or for the benefit of, any commercial real

- 16 -

estate borrower who has a loan or other extension of credit from the Bank, that has been

classified, in whole or part, "Substandard" without the prior approval of a majority of the board

of directors of the Bank.

    (c)  The Board shall not approve any extension of credit, or additional credit to

a commercial real estate borrower in paragraphs 16(a) and 16(b) above without first collecting in

cash all past due interest.

    17.  Within 90 days from the effective date of this ORDER, the Bank shall revise,

adopt, and implement a written lending and collection policy to provide effective guidance and

control over the Bank's commercial real estate lending function, which policy shall include a

planned material reduction in the volume of funded and unfunded nonrecourse lending and loans

for condominium conversion and construction as a percentage of Tier 1 capital.  Such plan shall

ultimately reduce nonrecourse funding to no more than 200 percent of Tier 1 capital and the

funding of condominium conversion and construction loans to no more than 100 percent of Tier

1 capital within two years.  Such policies shall be provided to the Regional Director and the

Commissioner for review and approval prior to implementation and their implementation shall

be in a form and manner acceptable to the Regional Director and the Commissioner as

determined at subsequent examinations and/or visitations.

<u>CAPITAL PROVISIONS</u>

    18.  (a)  Within 90 days from the effective date of this ORDER, the Bank shall

develop, adopt and implement a Capital Adequacy Plan ("CAP") to maintain adequate Tier 1

capital in relation to the risk profile of the Bank.  In no event shall Tier 1 capital fall below 14

percent of the Bank's total assets during the life of this ORDER.  The CAP shall be provided to

- 17 -

the Regional Director and the Commissioner for review and approval prior to implementation.

Such implementation shall be in a form and manner acceptable to the Regional Director and the

Commissioner as determined at subsequent examinations and/or visitations.

        (b)      Within 90 days from the effective date of this ORDER, the Bank shall

develop and adopt a plan to meet and thereafter maintain the minimum risk-based capital

requirements as described in the FDIC Statement of Policy on Risk-Based Capital contained in

Appendix A to Part 325 of the FDIC Rules and Regulations, 12 C.F.R. Part 325, Appendix A.

The Plan shall be in a form and manner acceptable to the Regional Director and the

Commissioner as determined at subsequent examinations.

        (c)      The level of Tier 1 capital to be maintained during the life of this ORDER

pursuant to Subparagraph 18(a) shall be in addition to a fully funded allowance for loan and

lease losses, the adequacy of which shall be satisfactory to the Regional Director and the

Commissioner as determined at subsequent examinations and/or visitations.

        (d)      Any increase in Tier 1 capital necessary to meet the requirements of

Paragraph 18 of this ORDER may be accomplished by the following:

                (i)      the sale of common stock; or

                (ii)      the sale of noncumulative perpetual preferred stock; or

                (iii)      the direct contribution of cash by the board of directors and/or

shareholders of the Bank's parent company; or

                (iv)      any other means acceptable to the Regional Director and the

Commissioner; or

                (v)      any combination of the above means.

- 18 -

Any increase in Tier 1 capital necessary to meet the requirements of Paragraph 18 of this ORDER may not be accomplished through a deduction from the Bank's allowance for loan and lease losses without the prior written consent of the Regional Director and the Commissioner.

(e)    If all or part of the increase in Tier 1 capital required by Paragraph 18 of this ORDER is accomplished by the sale of new securities, the board of directors shall forthwith take all necessary steps to adopt and implement a plan for the sale of such additional securities, including the voting of any shares owned or proxies held or controlled by them in favor of the plan.  Should the implementation of the plan involve a public distribution of the Bank's securities (including a distribution limited only to the Bank's existing shareholders), the Bank shall prepare offering materials fully describing the securities being offered, including an accurate description of the financial condition of the Bank and the circumstances giving rise to the offering, and any other material disclosures necessary to comply with the Federal securities laws.  Prior to the implementation of the plan and, in any event, not less than 15 days prior to the dissemination of such materials, the plan and any materials used in the sale of the securities shall be submitted to the FDIC, Registration and Disclosure Unit, Washington, D.C. 20429, for review.  Any reasonable changes requested to be made in the plan or materials by the FDIC shall be made prior to their dissemination.  If the increase in Tier 1 capital is provided by the sale of noncumulative perpetual preferred stock, then all terms and conditions of the issue, including but not limited to those terms and conditions relative to dividend rate and convertibility factor, shall be presented to the Regional Director and the Commissioner for prior approval.

(f)    In complying with the provisions of Paragraph 18 of this ORDER, the Bank shall provide to any subscriber and/or purchaser of the Bank's securities, a written notice

- 19 -

of any planned or existing development or other changes which are materially different from the information reflected in any offering materials used in connection with the sale of Bank securities.  The written notice required by this paragraph shall be furnished within 10 days from the date such material development or change was planned or occurred, whichever is earlier, and shall be furnished to every subscriber and/or purchaser of the Bank's securities who received or was tendered the information contained in the Bank's original offering materials.

(g)     For the purposes of this ORDER, the terms "Tier 1 capital" and "total assets" shall have the meanings ascribed to them in Part 325 of the FDIC Rules and Regulations, 12 C.F.R. §§325.2(v) and 325.2(x).

19.     Within 90 days from the effective date of this ORDER, the Bank shall formulate and implement a written profit plan.  Such plan shall be provided to the Regional Director and the Commissioner for review and approval prior to implementation.  At a minimum, the profit plan shall include the following:

(a)     goals and strategies for improving and sustaining the earnings of the Bank, including:

(i)     an identification of the major areas in, and means by which, the board of directors will seek to improve the Bank's operating performance;

(ii)     realistic and comprehensive budgets;

(iii)     a budget review process to monitor the income and expenses of the Bank to compare actual figures with budgetary projections; and

(iv)     a description of the operating assumptions that form the basis for, and adequately support, major projected income and expense components; and

- 20 -

(b)    coordination of the Bank's loan, investment, and operating policies, and budget and profit planning, with the funds management policy.

20.    During the life of this ORDER, the Bank shall not pay cash dividends without the prior written consent of the Regional Director and the Commissioner.

21.    Within 90 days from the effective date of this ORDER, the Bank shall develop or revise, adopt, and implement a written liquidity and funds management policy to provide effective guidance and control over the Bank's liquidity position and needs.  Such policy shall also include a comprehensive contingency plan for a market dislocation strategy.  Such policy and its implementation shall be in a form and manner acceptable to the Regional Director and the Commissioner as determined at subsequent examinations and/or visitations.

22.    Upon the effective date of this ORDER, the Bank shall not accept, renew, or rollover brokered deposits without obtaining a Brokered Deposit Waiver approved by the FDIC pursuant to section 29 of the Act, 12 U.S.C. §1831f.

<u>ASSET MANAGEMENT</u>

23.    (a)    Within 180 days from the effective date of this ORDER, the Bank shall have reduced the assets classified "Substandard" and listed as "Special Mention" in the Report of Examination to not more than $2,676,000,000.

(b)    Within 360 days from the effective date of this ORDER, the Bank shall have reduced the assets classified "Substandard" and listed as "Special Mention" in the Report of Examination to not more than $1,784,000,000.

- 21 -

(c)    Within 540 days from the effective date of this ORDER, the Bank shall
have reduced the assets classified "Substandard" and listed as "Special Mention" in the Report of
Examination to not more than $892,000,000.

(d)    The requirements of subparagraphs 23(a), 23(b), and 23(c) of this ORDER
are not to be construed as standards for future operations and, in addition to the foregoing, the
Bank shall eventually reduce the total of all adversely classified assets. Reduction of these assets
through proceeds of other loans made by the Bank is not considered collection for the purpose of
this paragraph.  As used in subparagraphs 23(a), 23(b), and 23(c), the word "reduce" means:

(i)    to collect;

(ii)    to sell on a non-recourse basis;

(iii)    to charge-off; or

(iv)    to sufficiently improve the quality of assets adversely classified
as to warrant removing any adverse classification, as determined in subsequent on-site
examinations by the FDIC and the Department of Financial Institutions for the State of
California ("DFI").

24.    Within 90 days from the effective date of this ORDER, the board of directors
shall develop or revise, adopt and implement a comprehensive plan for the methodology for
determining the adequacy of the allowance for loan and lease losses.  For the purpose of this
determination, the adequacy of the reserve shall be determined after the charge-off of all loans or
other items classified "Loss."  The policy shall provide for a review of the allowance at least
once each calendar quarter.  Said review should be completed prior to the filing of the quarterly
Call Report, in order that the findings of the board of directors with respect to the loan and lease

- 22 -

loss allowance may be properly reported in the quarterly Reports of Condition and Income. The review should be transparent, justified and should focus on the results of the Bank's internal loan review, loan loss experience, trends of delinquent and non-accrual loans, an estimate of potential loss exposure of significant credits, concentrations of credit, and present and prospective economic conditions. A deficiency in the allowance shall be remedied in the calendar quarter it is discovered, prior to submitting the Report of Condition, by a charge to current operating earnings. The minutes of the board of directors meeting at which such review is undertaken shall indicate the results of the review. Upon completion of the review, the Bank shall increase and maintain its allowance for loan and lease losses consistent with the allowance for loan and lease loss policy established. Such policy and its implementation shall be acceptable to the Regional Director and the Commissioner as determined at subsequent examinations and/or visitations.

## PARENT COMPANIES' PROVISIONS

25.    Beginning with the effective date of this ORDER, FGCC and FGC shall:

(a)    Submit to the Regional Director and the Commissioner an annual listing of their subsidiaries, which will be updated every year thereafter;

(b)    Consent to their examination and to the examination of their subsidiaries to monitor compliance with the provisions of the Act or any other Federal law that the FDIC has specific jurisdiction to enforce against FGCC, FGC, or their subsidiaries and those governing the transactions and relationships between the Bank and its affiliates; and

(c)    Maintain the Bank's capital in accordance with the provisions of paragraph 18 of this ORDER and liquidity at such levels as the FDIC and the DFI deem appropriate, and/or take such other actions as the FDIC and the DFI deem appropriate to

- 23 -

provide the Bank with a resource for additional capital and liquidity including, for example, pledging assets, obtaining and maintaining a letter of credit, and indemnifying the Bank.

<u>SAVINGS CLAUSE</u>

26.    The provisions of this ORDER shall not bar, estop or otherwise prevent the FDIC or any other Federal or State agency or department from taking any other action or seeking further remedies against the Bank or any of the Bank's current or former institution-affiliated parties or agents including third party brokers for violations of any laws, engaging in unsafe or unsound banking practices, or unfair or deceptive practices.

This ORDER shall become effective upon its issuance by the FDIC.  The provisions of this ORDER shall remain effective and enforceable except to the extent that, and until such time as, any provisions of this ORDER shall have been modified, terminated, suspended, or set aside by the FDIC.

Pursuant to delegated authority.

Dated at San Francisco, California, this 7th day of March, 2007.

_____
John F. Carter
Regional Director
Division of Supervision and Consumer Protection
San Francisco Region
Federal Deposit Insurance Corporation

# EXHIBIT

# 2

# ADJUSTABLE RATE RIDER

THIS ADJUSTABLE RATE RIDER is made this **29th** day of **September**, **2005**, and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to **FREMONT INVESTMENT & LOAN**

(the "Lender") of the same date and covering the Property described in the Security Instrument and located at:
**1001 F ST   NE, WASHINGTON, DC 20002**

ADDITIONAL COVENANTS. In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A.    Sections 3 and 4 of the Note state as follows:**

**3.    PAYMENTS**
    **(A)  Time and Place of Payments**
    I will make a payment on the first day of every month, beginning on **November 1, 2005**. Before the First Principal and Interest Payment Due Date, as described in Section 4 of this Note, my payment will equal one-twelfth of one year's interest that would be due on an amount equal to the unpaid principal balance of the Note. Thereafter, I will pay principal and interest by making a payment every month as provided below.
    I will make monthly payments of principal and interest beginning on the First Principal and Interest Payment Due Date as described in Section 4 of this Note.   I will make these payments every month until I have paid all of the principal, interest and any other charges that I may owe under this Note.   Each monthly payment will be applied as of its scheduled due date, and if the payment includes both principal and interest, it will be applied to interest before principal.  If, on **October 1, 2035**, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."
    I will make my monthly payments at **2727 E IMPERIAL HIGHWAY, BREA CA 92821**
    or at a different place if required by the Note Holder.

    **(B)  Amount of My Initial Monthly Payments**
    My initial monthly payment will be in the amount of U.S. $ **2,331.00**. However, if I make a partial principal prepayment prior to the first Change Date, my monthly payment will decrease for the remainder of the term that my scheduled payments consist only of interest.

    **(C)  Monthly Payment Changes**
    Beginning with the First Principal and Interest Due Date, my monthly payment will change, as described in Section 4 of this Note.   The Note Holder will notify me prior to the date of changes in my monthly payment.

**4.    ADJUSTABLE INTEREST RATE AND MONTHLY PAYMENT CHANGES**
    **(A)  Change Dates**
    The initial fixed interest rate I will pay will change to an adjustable interest rate on the first

IOARMP1   jxn  06/06/03

day of **October 1, 2007**     , and the adjustable interest rate I will pay may change on that date every sixth month thereafter.    The date on which my initial fixed interest rate changes to an adjustable interest rate, and each date on which my adjustable interest rate could change, is called a "Change Date."

### (B)  The Index

Beginning with the first Change Date, my adjustable interest rate will be based on an Index.    The "Index" is the average of Interbank offered rates for six-month U.S. dollar-denominated deposits in the London market based on quotations of major banks based on the London Interbank Offered Rate ("LIBOR"), as published in *The Wall Street Journal*. The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index and adjust the Margin, as defined below.   The Note Holder will give me notice of this choice.

### (C)  Calculation of Changes

Before each Change Date, the Note Holder will calculate my new interest rate by adding **Four and Five Hundred Twenty-Three Thousandths** percentage points (**4.5237**    %) (the "Margin") to the Current Index.    The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%).    Subject to the limits stated in Section 4 (D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments.    The result of this calculation will be the new amount of my monthly payment.

### (D)  Limits on Interest Rate Changes

The interest rate I am required to pay at the first Change Date will not be greater than **8.300**     % or less than **6.3000**     %.    Thereafter, my adjustable interest rate will never be increased or decreased on any single Change Date by more than **One and One-Half**                     percentage point(s)    (**1.5000**   %) from the rate of interest I have been paying for the preceding month.    My interest rate will never be greater than **12.3000** % or less than **6.3000**     %.

### (E)  Effective Date of Changes

My new interest rate will become effective on each Change Date.    I will pay the amount of my new monthly payment beginning on the first monthly payment date after each Change Date until the amount of my monthly payment changes again.

### (F)  Notice of Changes

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change.    The notice will include information required by law to be given to me and also the telephone number of a person who will answer any question I may have regarding the notice.

### (G)  Date of First Principal and Interest Payment

The date of my first payment consisting of both principal and interest on this Note (the "First Principal and Interest Payment Due Date") shall be the first monthly payment date after the first Change Date.

**B.**     **TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**

Section 18 of the Security Instrument is amended to read as follows:

IOARMP2  jxn  06/10/03

# EXHIBIT

# 3

# RIDER TO ADJUSTABLE RATE NOTE FOR TEMPORARY
# INTEREST-ONLY PAYMENT SCHEDULE

THIS RIDER TO ADJUSTABLE RATE NOTE FOR TEMPORARY INTEREST-ONLY PAYMENT SCHEDULE is made this 29th        day of  **September**            , 2005         , and is incorporated into and shall be deemed to amend, and supplement the Adjustable Rate Note dated **September 29, 2005**                   given by the undersigned (the "Borrower") to **FREMONT INVESTMENT & LOAN**

(the "Lender") of the same date and covering the Property located at:
       **1001 F ST   NE, WASHINGTON, DC 20002**

(Property Address)

**A. Section 3 of the Adjustable Rate Note is amended and restated in its entirety to read as follows:**

   **3.   PAYMENTS**
      **(A)      Time and Place of Payments**
      I will make a payment on the first day of every month, beginning on **November 1, 2005**    .

Before the First Principal and Interest Payment Due Date, as described in Section 4(G) of this Note, on each payment due date my monthly payment will equal one-twelfth of one year's interest that would be due on the unpaid principal balance of this Note that I am expected to owe on the same day one month prior to the payment due date at the interest rate that is provided for in accordance with Section 2 and Section 4 of this Note.

   Beginning on the First Principal and Interest Payment Due Date, I will make monthly payments of principal and interest.  These payments will be calculated as described in Section 4 of this Note.  I will make these payments every month until I have paid all of the principal, interest and any other charges that I may owe under this Note.

   Each monthly payment will be applied as of its scheduled due date, and if the payment includes both principal and interest, it will be applied to interest before principal. If, on **October 1, 2035**       , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

   I will make my monthly payments at **2727 E IMPERIAL HIGHWAY, BREA CA 92821**

   or at a different place if required by the Note Holder.

      **(B)      Amount of My Initial Monthly Payments**
      My initial monthly payment will be in the amount of U.S. $ **2,331.00**          . This amount will change.

      **(C)      Monthly Payment Changes**
      Before the First Principal and Interest Due Date, my monthly payments will change to reflect changes in the unpaid principal balance of this Note.  In addition, following the first Change Date, my monthly payments will change to reflect changes in the interest rate that I must pay.

   Beginning with the First Principal and Interest Due Date, my monthly payment will change to include both principal and interest.  In addition, my monthly payment will change to reflect changes in the unpaid principal balance of this Note and changes in the interest rate that I must pay.

IOARM1RD XMM 12/13/04

B.  Section 4 of the Adjustable Rate Note is amended and restated in its entirety to read as follows:

## 4.  ADJUSTABLE INTEREST RATE AND MONTHLY PAYMENT CHANGES

**(A)  Change Dates**

The initial fixed interest rate I will pay will change to an adjustable interest rate on the first day of **October 1, 2007**       , and the adjustable interest rate I will pay may change on that day every sixth month thereafter.   The date on which my initial fixed interest rate changes to an adjustable interest rate, and each date on which my adjustable interest rate could change, is called a "Change Date."

**(B)  The Index**

Beginning with the first Change Date, my adjustable interest rate will be based on an Index.   The "Index" is the six month London Interbank Offered Rate ("LIBOR"), which is the average of interbank offered rates for six-month U.S. dollar-denominated deposits in the London market, as published in The Wall Street Journal.  The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index and adjust the Margin, as defined below.   The Note Holder will give me notice of this choice.

**(C)  Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding **Four and Five Hundred Twenty-Three Thousandths** percentage point(s) ( **4.5237**     %) (the "Margin") to the Current index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) of this Note, this rounded amount will be my new interest rate until the next Change Date.

For each Change Date prior to the First Principal and Interest Change Date (as described in Section 4(G) of this Note), the Note Holder will then determine the amount of the monthly payment that is equal to one-twelfth of one year's interest that would be due on the unpaid principal balance of this Note that I am expected to owe on the Change Date at my new interest rate.  The result of this calculation will be the new amount of my monthly payment until the monthly payment changes again in accordance with this Note.

For each Change Date beginning with the First Principal and Interest Change Date (as described in Section 4(G) of this Note), the Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal balance that I am expected to owe at the Change Date in full on the Maturity Date, together with interest at my new interest rate, in substantially equal installments. The result of this calculation will be my new monthly payment until the monthly payment changes again in accordance with this Note.

**(D)  Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than **8.300** % or less than **6.3000**     %. Thereafter, my adjustable interest rate will never be increased or decreased on any single Change Date by more than one and one-half percentage points (1.50%) from the rate of interest I have been paying for the preceding six months. My interest rate will never be greater than **12.3000**     % or less than **6.3000**         %.

**(E)  Effective Date of Changes**

My new interest rate will become effective on each Change Date.  I will pay the amount of my new monthly payment beginning on the first monthly payment due date after each Change Date until the amount of my monthly payment changes again.

*JB E.R.R.*

IOARM2RD XMM 12/12/04

**(F) Effective Date of Changes**

The Note Holder will deliver or mail to me such notice of changes in my interest rate and the amount of my monthly payments as may be required by law. The notice will include information required by law to be given to me, and also the telephone number of a person who will respond to any question I may have regarding the notice.

**(G) First Principal and Interest Payment Due Date and First Principal and Interest Change Date**

The date of my first payment consisting of both principal and interest on this Note (the "First Principal and Interest Payment Due Date") will be **November 1, 2010**    . The Change Date immediately preceding the First Principal and Interest Payment Due Date is called the "First Principal and Interest Change Date."

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Rider to Adjustable Rate Note for Temporary Interest-Only Payment Schedule.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)    _____ (Seal)
JOANNE BLUE                                  EDNA ROBINSON

_____ (Seal)    _____ (Seal)

IOARM3RD XMM 12/13/04

# EXHIBIT

# 4

## PREPAYMENT RIDER TO NOTE

THIS PREPAYMENT RIDER is made this **29th**        day of **September, 2005**nd is incorporated into and shall be deemed to amend and supplement the Note made by the undersigned (the "Borrower") to:

**FREMONT INVESTMENT & LOAN**

(the "Lender") of the same date covering the property located at:

### 1001 F ST   NE, WASHINGTON, DC 20002

### (PROPERTY ADDRESS)

### BORROWER'S RIGHT TO PREPAY
This Prepayment Rider Supersedes Section 5        of the Note

I have the right to make payments of principal at any time before they are due. A payment of principal only is known as a "prepayment". When I make a prepayment, I will tell the Note Holder in a letter that I am doing so. A prepayment of all of the unpaid principal is known as a "full payment." A prepayment of only part of the unpaid principal is known as a "partial prepayment."

I may make a full or partial prepayment; however, the Note Holder may charge me for the privilege of prepayment. If a partial or full prepayment is made within 2    years from the date the deed of trust is executed, a prepayment charge shall be assessed in an amount equal to two (2) months advance interest on the amount of the prepayment that when added to all other amounts prepaid during the 12 month period immediately preceding the date of the prepayment, exceeds one third (1/3) of the original principal amount of the Note.   If I make a prepayment, there will be no delays in the due dates or changes in the amount of my monthly payments unless the Note Holder agrees in writing to those delays or changes. I may make a full prepayment at any time. If I choose to make a partial prepayment the Note Holder may require me to make the prepayment on the same day that one of my monthly payments is due.


| | |
|---|---|
| **JOANNE BLUE** _____ **DATE** | **EDNA ROBINSON** _____ **DATE** |
| _____ **DATE** | _____ **DATE** |

DCPPY1 CL4/11/05

# EXHIBIT

# 5

## IN THE FEDERAL DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

Joan Blue, et. al.                              )
1001 F Street, NE                               )
Washington, D.C. 20002                          )
        Plaintiff,                      )
       v.                                      )    CA No.:  1:08-cv-00729-CKK
                                        )
Fremont Investment & Loan, Inc., et. al.  )
2727 E. Imperial Highway                        )
Brea, California 92821                          )
        Defendant,                      )
                                        )
_____  )

## AFFIDAVIT

1.  Affiant, Tyrone Grandberry, avers that I am over the age of eighteen (18) and competent to testify to the matters contained herein.

2.  I have reviewed of all of the facts contained herein.

3.  I have been employed as a real estate professional in excess of ten (10) years.  I concentrated in the area of residential sales and underwriting.

4.  I am currently the principle of G Group International, LLC, a private equity funding company.

5.  Once a mortgage application is taken, the phase of the loan process known as underwriting begins. It is perhaps the most difficult segment of the process because information must be collected and thoroughly analyzed in order to decide whether or not the loan will be granted.

6.  The loan documentation and verifiable statements of the plaintiffs do not indicate the existence of a valid underwriting process.

7.  The borrower's employment, income, and funds on deposit for the down payment and closing costs have not been verified.

8.  The appraisal for the property is missing. It is common place in subprime loans to perform drive-by appraisals or feign appraisals due to the property owner's high equity positions in the property.

9.  In a valid underwriting process, the underwriter, or loan endorser, carefully reviews the borrower's documentation and decides whether he or she would be a sound lending risk.

10. If segments of the borrower's employment, credit history, or overall financial picture are vague, problematic, or appear to be contradictory, the underwriter will request more information.

11. The underwriters to the aforementioned transaction failed to make a further inquiry into the necessary background information of Joan Blue or Edna Robinson.

12. This decision process can take hours or even weeks to complete. However, much of the procedure is streamlined using current technology such as electronic underwriting and credit scoring, which help interpret the borrower's financial qualifications. It does not appear if Fremont Investment and Loans implemented these procedures.

## OATH

**I HEREBY AFFIRM** under penalties of perjury that the foregoing statement is true to the best of my knowledge.

August 1, 2008

Tyrone Grandberry

**IN THE FEDERAL DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| Joan Blue, et. al. | ) | |
| 1001 F Street, NE | ) | |
| Washington, D.C. 20002 | ) | |
| Plaintiff, | ) | |
| v. | ) | CA No.: 1:08-cv-00729 |
| | ) | |
| Fremont Investment & Loan, Inc., et. al. | ) | |
| 2727 E. Imperial Highway | ) | |
| Brea, California 92821 | ) | |
| Defendant, | ) | |
| | ) | |
| | ) | |

**<u>PROPOSED ORDER</u>**

**UPON CONSIDERATION** of the foregoing defendant Fremont Investment & Loans Motion to Dismiss Plaintiffs' First Amended Complaint, and any opposition thereto, it is, this ___ day of _____, 2008 at _____ a.m./p.m., by the District Court for the District of Columbia.

ORDERED the Motion to Dismiss is DENIED;

ORDERED that a party or any person affected by this Order may apply for a modification or dissolution of this Court may prescribe.

_____
Judge

Cc:

William C. Johnson, Jr., Esq.
1229 15th St. NW
Washington, D.C. 20005

Ober, Kaler, Grimes & Shriver, PC
Harold Belkowitz, Esq.

1401 H Street, N.W., Suite 500
Washington, D.C. 20005

Law Offices of David E. Ralph, LLC
David E. Ralph, Esq.
2423 Maryland Ave., Suite 100
Baltimore, MD 21218

Town and Country Mortgage and Financial
Services, Inc.
1300 Mercantile Lane
Suite 150
Largo, Maryland 20776

Dennis Bishop
1300 Mercantile Lane
Suite 150
Largo, Maryland 20776

Brenda Carew
10423 Beacon Ridge Drive
Mitchellville, Maryland 20721