**IN THE FEDERAL DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| Joan Blue, et. al. | ) |
| 1001 F Street, NE | ) |
| Washington, D.C. 20002 | ) |
|         Plaintiff, | ) |
|         v. | )      CA No.:  1:08-cv-00729-CKK |
| | ) |
| Fremont Investment & Loan, Inc., et. al. | ) |
| 2727 E. Imperial Highway | ) |
| Brea, California 92821 | ) |
|         Defendant, | ) |
| | ) |
| _____ | ) |

**PLANTIFFS' OPPOSITION TO DEFENDANT EXECUTIVE TITLE AND
ESCROW'S MOTION TO DISMISS FIRST AMENDED COMPLAINT**

**COMES NOW**, the plaintiffs, by and through counsel, hereby opposes the
Defendant Executive Title and Escrow's Motion to Dismiss the plaintiff's first
amended complaint.  The plaintiffs argue in the opposite of the defendant's
position pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6).  In
support of their opposition to defendant Executive Title and Escrow's Motion to
Dismiss Plaintiff's First Amended Complaint, the plaintiff supplies the
accompanying memorandum of points and authorities.

August 4, 2008

*/s/ William C. Johnson, Jr.*
_____
William C. Johnson, Jr., Esq.
1229 15th St. NW
Washington, D.C. 20005
(202) 483-0808; (202) 431-2650
Fax (202) 483-0909

## IN THE FEDERAL DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| Joan Blue, et. al. | ) | |
| 1001 F Street, NE | ) | |
| Washington, D.C. 20002 | ) | |
| Plaintiff, | ) | |
| v. | ) | CA No.: 1:08-cv-00729-CKK |
| | ) | |
| Fremont Investment & Loan, Inc., et. al. | ) | |
| 2727 E. Imperial Highway | ) | |
| Brea, California 92821 | ) | |
| Defendant, | ) | |
| | ) | |
| | ) | |

## PLANTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT EXECUTIVE TITLE & ESCROW'S MOTION TO DISMISS FIRST AMENDED COMPLAINT

### Foreword

The defendant Executive Title & Escrow, LLC has sought to dismiss the plaintiffs' first amended complaint under the guise that no claim of action may exist against it under the current facts and allegations. The defendant's role in this transaction is that of a conduit for fraud. The fraud conducted by the defendants Town & Country, Dennis Bishop and Brenda Carew required a facilitator for the fraudulent mortgage loan documents prepared by the defendant Executive Title & Escrow, LLC.

The defendant Executive Title & Escrow, LLC responsibilities in preparing the closing documentation and facilitating the closing activity is a necessary component to the fraud committed by the defendants. The "pre-discovery" documentation submitted to this Court as exhibits implicate the defendant Executive Title & Escrow, LLC as participant to the fraud as alleged.

The area of mortgage fraud and predatory lending as it pertains to the decline in the housing market has opened the door to an inquiry into the role and limitation of liability for all active participants in the "mortgage lending chain." The defendants in the instant action all represent a phase of the mortgage lending process to which a necessary level of collusion is required to facilitate a mortgage fraud transaction.

The varied participants in the mortgage lending chain coupled with the profits to be earned upon a successful mortgage loan closing has facilitated a channel of unabashed greed, deceit and fraud. The transaction complained of involves a variation of the "bait and switch scheme." It is the plaintiffs' position that all parties to this transaction knew, or should have known, of the mortgage fraud which has been alleged.

The defendant Executive Title & Escrow, LLC's role in the fraud was critical for, in addition to its fiduciary obligation to the plaintiffs, it acted as an agent to the defendants Town & Country, Dennis Bishop and Brenda Carew. The defendant Executive Title & Escrow, LLC certified on the HUD-1 the disbursements of funds. A prime example would include the false certification that the plaintiff's provided a down payment in the amount of $55,500.00 for the purchase of the property located at 1001 F St. NE, Washington, D.C. 20002. **Exhibit 3 and Exhibit 4.**

Knowledge of an on-going fraud does not alone create a cause of action. However, facilitating and benefiting from the very fraud to which knowledge may be imputed as an unfair and deceptive trade practice to which a remedy exists. The issue to which this Court must be concerned is whether the plaintiff has pled the necessary facts and allegations to support a cause of action for a violation under the District of Columbia Consumer Protection Act and fraud.

## <u>INTRODUCTION</u>

### (Defendant Executive Title & Escrow, LLC's Role in the Fraudulent Mortgage Scheme)

The facts of the complaint are seemingly straight forward as to the mortgage transaction supported by the documentation available in the public records.  It is clear through the facts of the Complaint and the corresponding documentation attached as exhibits hereto, the plaintiffs were victims of a scheme to abscond away with the equity of their home.  The plaintiffs allege the defendant Executive Title & Escrow, LLC was integral part of the fraudulent scheme.  **See all Exhibits.**

The subject property was held as "tenants in the entirety" by Halbert and Rose Blue.  The property had an existing mortgage on the property in the amount of $50,000.00.  Halbert and Rose Blue were retirees living on a fixed retirement income.  Also living in the home were their two daughters: Joan Blue and Edna Robinson.  The property was placed into foreclosure by the original lender.

The plaintiffs were approached by defendant Mr. Denis Bishop of Town & Country Mortgage.  Defendant Bishop informed the plaintiffs that he could get them a loan to stop the foreclosure.  The plaintiffs in their complaint allege they were fraudulently led to believe they were receiving a loan to refinance their property.  They never applied for the refinancing loan.

Despite not having an application for the loan, the plaintiffs were instructed to attend a closing of the loan on April 27, 2004.  At the closing, the plaintiffs were not informed as to the nature of the transaction.  The plaintiffs were led believe it was a refinancing but, were actually signing documents to orchestrate the sale of their property to Brenda Carew.  **Exhibit 1; Exhibit 3.**

The subject property was in fact fraudulently transferred to Brenda Carew who then obtained a mortgage to the now defunct and/or bankrupt New Century Mortgage Company.  **Exhibit 2**.  Upon signing the deed, the plaintiff's were instructed not to worry about the deed, "that it was necessary in order for them to receive a loan."  The plaintiffs were led to believe they received a loan to stop an impending foreclosure and that they were applying for a loan to refinance the

property. The plaintiffs were instructed as to where they should send their payments.

The plaintiffs began to receive notices and applications for loan approvals at their address for Brenda Carew. With the belief that they owned their property, the plaintiff then called Denis Bishop at Town & Country Mortgage to ask for an explanation as to why Brenda Carew was receiving loan applications at their home address.

Under suspicion as to the transaction, Plaintiffs then stopped making their monthly mortgage payments. New Century Mortgage commenced to send foreclosure notices to Brenda Carew at the plaintiff's home address. Another call to defendant Denis Bishop concerning the identity of Brenda Carew was made. Defendant Denis Bishop informed the plaintiffs that, "he would take care of it."

Approximately six weeks later, the defendant Denis Bishop, once again instructed the plaintiffs Rose Blue and, this time, Edna Robinson to attend a closing at Executive Title & Escrow. This time, the plaintiffs were instructed to sign the documents in order to obtain a refinancing to stop the foreclosure. The plaintiffs Joan Blue and Edna Robinson were informed they were being utilized to replace their mother and father, plaintiffs Halbert and Rose Blue, because their incomes were higher.

At no time, did the plaintiffs, Joan Blue and Edna Robinson, understand that Brenda Carew already owned their property. The loan was provided by the defendant Fremont Investment & Loan. The plaintiffs never made an application to neither defendant Town & Country Mortgage nor defendant Fremont Investment & Loan. The defendant Fremont provided a loan to the plaintiffs without their authorization and under fraudulent conditions.

The defendant Executive Title & Escrow, LLC facilitated the fraud of the mortgage loan transaction by certifying the fraudulent transfers. The defendant willfully turned a "blind-eye" to the fraudulent loan transaction and made a

misrepresentation to the plaintiffs by certifying the disbursements on the HUD-1. **Exhibit4; Exhibit 5.**

The defendant Executive Title & Escrow, LLC fraudulently released lender funds held in escrow to defendants Town & Country, Dennis Bishop and Brenda Carew. **Exhibit 5.** When defendant Executive Title & Escrow, LLC received the bank wire transfer back from defendant Fremont Investment & Loan, defendant Executive Title & Escrow, LLC would complete the transaction, falsely certifying to the lender on the settlement statement that the down payment came from the plaintiffs Joan Blue and Edna Robinson. **Exhibit 5.** On the settlement statement, defendant Executive Title & Escrow, LLC also fraudulently accounted for disbursements to the defendants Town and Country, by falsely listing the expense as a phony down payment, or as a "credit" due to the defendant's. **Exhibit 5; see also Exhibit 3.** The defendant Executive Title & Escrow, LLC falsified the settlement statements to conceal its wrongful and fraudulent release of lender escrow funds.

The defendant Executive Title & Escrow, LLC concealed the fraudulent activities of the defendants Town and Country, Dennis Bishop and Brenda Carew in two separate transactions involving the plaintiffs Joan Blue Edna Robinson. Defendant Executive Title & Escrow, LLC fraudulently released funds in lender escrow funds as part of the fraudulent scheme. As a result of defendant Executive Title & Escrow, LLC submitting false certifications on settlement statements for each of these loans, defendant Executive Title & Escrow, LLC fraudulently induced the disbursement of loans to the other defendants.

## STANDARD FOR REVIEW

In *Bell Atlantic Corp. v. Twombly,* --- U.S. ----, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), the Supreme Court clarified the standard of pleading that a plaintiff must meet in order to survive a motion to dismiss under Rule 12(b)(6). The Court noted that "Federal Rule of Civil Procedure 8(a)(2) requires only 'a

short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests[.]' " *Id.* at 1965 (quoting *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)); *see also Erickson v. Pardus,* ---U.S. ----, ----, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007). Although "detailed factual allegations" are not necessary to survive a Rule 12(b)(6) motion to dismiss, to provide the "grounds" of "entitle[ment] to relief," a plaintiff must furnish "more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Bell Atlantic Corp. v. Twombly,* 127 S.Ct. at 1964-65; *see also Papasan v. Allain,* 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986). The Court stated that while there was no "probability requirement at the pleading stage," *Bell Atlantic Corp. v. Twombly,* 127 S.Ct. at 1965, "something beyond ... mere possibility ... must be alleged[.]" *Id.* at 1966. The facts alleged in the complaint "must be enough to raise a right to relief above the speculative level," *id.* at 1965, or must be sufficient "to state a claim for relief that is plausible on its face." *Id.* at 1974. The Court referred to this newly clarified standard as "the plausibility standard." *Id.* at 1968 (abandoning the "no set of facts" language from *Conley v. Gibson* ).

On a motion to dismiss for failure to state a claim under Rule 12(b)(6), the Court "must accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus,* 127 S.Ct. at 2200; *see also Bell Atlantic Corp. v. Twombly,* 127 S.Ct. at 1965; *Summit Health, Ltd. v. Pinhas,* 500 U.S. 322, 325, 111 S.Ct. 1842, 114 L.Ed.2d 366 (1991). The complaint "is construed liberally in the plaintiffs' favor, and [the Court should] grant plaintiffs the benefit of all inferences that can be derived from the facts alleged." *Kowal v. MCI Communications Corp.,* 16 F.3d 1271, 1276 (D.C.Cir.1994); *see also Browning v. Clinton,* 292 F.3d 235, 242 (D.C.Cir.2002); *Sparrow v. United Air Lines, Inc.,* 216 F.3d 1111, 1113 (D.C.Cir.2000). While the complaint is to be construed liberally in plaintiffs' favor, the Court need not accept inferences drawn by plaintiffs if

those inferences are unsupported by facts alleged in the complaint; nor must the Court accept plaintiffs' legal conclusions. *See Kowal v. MCI Communications Corp.,* 16 F.3d at 1276; *Browning v. Clinton,* 292 F.3d at 242.

## LEGAL ARGUMENT

### I.    The Claims of the Plaintiffs Commences on September 29, 2005

The defendant Executive Title commences its argument for a motion to dismiss with the premise that any claim that stems from the April 24, 2004 real estate closing is time barred.  Oddly enough, through its claim that the plaintiffs' complaint is nebulous, the defendant appears to understand the need to bifurcate the two grossly related real estate settlements that it performed to facilitate the fraudulent transfer of the plaintiff's property.

In an effort to assist the defendant Executive Title in alleviating its confusion, plaintiff submits to this honorable Court the facts pertaining to the April 24, 2004 closing, as well as the September 29, 2005 real estate closing, was is in fact one fraudulent event.  **Exhibit 3**.  The Court will take notice that the participants in the "Bait and Switch" scheme are in fact the same.  Lest the defendant forget, the plaintiffs, four adults living in the same house, had their property transferred amongst them by the defendants.  The defendant Executive Title & Escrow was utilized as the facilitator in the transfer of property among the residents of the same household all in the name of absconding away with the plaintiffs' home equity.  This fraud is "ONE" transaction that commenced April 24, 2004  and ended September 29, 2005.  **Exhibit 1; Exhibit 3; Exhibit 4; Exhibit 5.**

In order to prove civil conspiracy, plaintiffs must show " '(1) an agreement between two or more persons; (2) to participate in an unlawful act, or in a lawful act in an unlawful manner; and (3) an injury caused by an unlawful overt act performed by one of the parties to the agreement (4) pursuant to, and in furtherance of, the common scheme.' " *Executive Sandwich Shoppe, Inc. v. Carr*

*Realty Corp.,* 749 A.2d 724, 738 (D.C.2000) (citing *Griva v. Davison,* 637 A.2d 830, 848 (D.C.1994)); *see Brady v. Livingood,* 360 F.Supp.2d 94, 104 (D.D.C.2004).   In the District of Columbia, "there is no recognized independent tort action for civil conspiracy...." *Executive Sandwich Shoppe, Inc. v. Carr Realty Corp.,* 749 A.2d at 738 (citing *Waldon v. Covington,* 415 A.2d 1070, 1074 n. 14 (D.C.1980)). Rather, "it is a means for establishing vicarious liability for the underlying tort.' " *Id.* (citing *Halberstam v. Welch,* 705 F.2d 472, 479 (D.C. Cir1983)). As a result, "civil conspiracy depends on performance of some underlying tortious act." *Id.* (citing *Halberstam v. Welch,* 705 F.2d at 479).

Because civil conspiracy depends on an actionable underlying tort, the statute of limitations for plaintiffs' conspiracy claim is "established by the statute of limitations governing the underlying tort," and begins to run when the plaintiff is on notice of the underlying injury. *Thomas v. News World Commc's,* 681 F.Supp. 55, 73 (D.D.C.1988) (notice of libel occurs at the time of injury, and civil conspiracy statute of limitations begins to run at the time of notice).

The plaintiffs were placed upon inquiry notice of the fraud once they began receiving notices of foreclosure for Brenda Carew in 2005.  The defendant Executive Title has a prominent and important role in the fraud.  It is in fact the settlement company for every pertinent transaction related to the fraudulent transfer of land to Brenda Carew.

The facts of the complaint are incorporated herein and identify the fraud beyond the point of the defendant's confusion.  What is glaringly obvious is the role of the defendant Executive Title in both real estate settlement transactions involving one family of Plaintiffs.  Without the active participation of defendant Executive Title, the fraud against the plaintiff does not occur and the statute of limitations does commence to run until the discovery of the fraud.

**II.    The Plaintiffs Claim of Civil Conspiracy In Count I Is Not A Stand Alone Claim And Is Supported The Remaining Claims Of The Complaint**

**And Should Not Be Dismissed Because Plaintiffs Halbert Rose, Edna Rose, Joan Blue and Edna Robinson State Adequate Claims For Relief**

The instant action involves a fraudulent scheme to induce individuals to release the equity value within their homes.  This action, in and of itself, is based upon Fraud.  Fraud is the core claim of the plaintiffs' complaint.  Other causes of action are based upon and arise from the fraud conducted by the defendant.  The plaintiffs' put forth a claim of Civil Conspiracy, much to the dismay of the defendant.  The defendant erroneously argues the Civil Conspiracy Claim, as put forth by the plaintiffs, is a stand alone claim.

A review of the plaintiffs' complaint clearly indicates the various claims of fraud and unfair deceptive trade practices that have been committed against the plaintiffs by the defendants.  In addition to the various claims, the plaintiffs allege statutory claims to which the defendant may also be liable

 In the District of Columbia, the claim of Civil Conspiracy requires a showing of (1) an agreement between two or more persons; (2) to participate in an unlawful act in an unlawful manner; and (3) an injury caused by an unlawful overt act performed by one of the parties to the agreement (4) pursuant to, and in furtherance of, the common scheme.  Paul v. Howard University, 754 A.2d 297 (D.C 2000) citing *Griva v. Davison*, 637 A.2d 830, 848 (D.C.1994).

In Paul, the plaintiff made several conclusory statements in her complaint that defendant had engaged in a conspiracy against her, she alleged no specific facts to support these assertions, and the record contains no actual evidence of an agreement between or among any of the appellees to commit an unlawful act against Dr. Paul. When a plaintiff does not allege and prove such an agreement, summary judgment is proper. *Id.* at 849.

The Court in <u>Paul</u> supports the proposition that proof of civil conspiracy does not require an overt or even direct agreement.  A statement that a defendant engaged in a conspiracy is a "bald assertion" of "conclusory allegations" without supporting facts.  The plaintiffs in the instant action provide facts identifying the

relationship between the defendants Town and Country Mortgage, Executive Title & Escrow, Dennis Bishop and Brenda Carew  See Complaint, para. 15 thru 36. The relationship demonstrates an agreement whereby defendants Dennis Bishop and Town Country Mortgage arrange a loan through defendant Fremont utilizing Brenda Carew as a straw purchaser.  The aforementioned defendants then arrange for the closing of the loan through defendant Executive Title & Escrow.

The defendant Executive Title & Escrow appears to infer the allegations regarding "fraudulently inserting erroneous dollar amounts are not supported by the facts of the case."  Defendant's Motion to Dismiss, pg. 5.  The most glaring evidence in support of the plaintiffs' position appears in the HUD-1.  In order to account for the discrepancies in the funds provided for the purported sale of the properties, categories had to be created.  In the instant action, the defendant Executive Title utilized categories such as down payments, seller credits and phony unpaid bills and fees.  **Exhibit 3; Exhibit 5.**

The defendant appears to be unaware that its certification of the existence of said funds is fraud.  The fraud committed by the defendant Executive Title & Escrow's manifests itself in the certification and recognition of funds, such as the phony "down payment" by the plaintiffs, in order to facilitate the sale.  **Exhibit 3; Exhibit 5.**  The defendant cannot substantiate the existence of the down payment to which it has certified as being true and valid.  **Exhibit 3; Exhibit 5.**  The defendant Executive Title & Escrow then commenced to "fudge" the numbers in order to allow the settlement statement to balance.  **Exhibit 3; Exhibit 5.**  The defendant Executive Title & Escrow then certifies the disbursement of funds to the parties.  It is the plaintiffs claim that the defendant Executive Title & Escrow, in facilitation of the conspiracy, certified the disbursement of funds that did not exist. **Exhibit 3; Exhibit 5.**

Furthermore, the defendants' arguments that the Civil Conspiracy cause of action, as utilized in the plaintiffs' complaint, is a stand alone claim are without merit.  Civil conspiracy is not an independent tort but only "a means for

establishing vicarious liability for [an] underlying tort." *Griva, 637 A.2d at 848;*
*see also Elliott v. Healthcare Corp., 629 A.2d 6, 9 (D.C.1993)*.  The plaintiffs
provided fraud and various statutory claims as the underlying torts.  As such, the
Civil Conspiracy cause of action may stand alongside the various claims.

Wherefore, the plaintiffs have provided their response to the defendants'
claim, should the Court deem the Complaint as insufficient as provided, we ask
that this honorable Court allows the plaintiffs an opportunity to amend the claims
as it pertains to this particular defendant in these proceedings.

**III.    The Plaintiffs of a Violation of The District of Columbia Consumer**
**Protection And Procedures Act In Count II Should Not Be Dismissed Because**
**Plaintiffs Halbert Rose, Edna Rose, Joan Blue and Edna Robinson State**
**Adequate Claims For Relief**

The defendant erroneously claims the plaintiffs Count II and Count III
should be dismissed.  First a clear reading of the complaint indicated that only
Count II pertains to the defendant Executive Title & Escrow.  The plaintiffs' Count
III addresses the claim against defendant Fremont Investment & Loans only.

The defendant alleges the complaint to be nebulous and cryptic.  Once
again, the plaintiff shall seek to alleviate the defendant's feigned confusion.
Upon first glance, it appears as if the defendant's confusion in self-inflicted.  The
facts of the complaint and all pleadings incorporated therein, promotes a clear fact
pattern as to the activities that give ground to the claims of the plaintiff.  The facts
and initial supporting documents further identify the defendants and demonstrate
their relationship in the two (2) real estate settlements identified in the complaint.
The various exhibits attached to the complaint and this opposition details the
defendant Executive Title & Escrows participation in the fraudulent scheme.

The defendant Executive Title & Escrow alleges plaintiffs Joan Blue and
Edna Robinson fails to assert a cause of action under the District of Columbia's
Consumer and Protection and Procedures Act, D.C. Code **§** 28-3901 et. seq [sic]

In support of its position, the defendant cites the opinion of *Osbourne v. Capital City Mortgage Company*, 727 A.2d 322, (D.C. 1999)(citations omitted).

In *Osbourne,* the Court states, "[t]he Consumer Protection and Procedures Act is a comprehensive statute with an extensive regulatory framework designed to remedy all improper trade practices." *Id.* at 325. The plaintiffs agree and consistently argue that the defendant Executive Title & Escrow, LLC facilitation of the mortgage fraud scheme involving defendants Town & Country, Dennis Bishop and Brenda Carew in connection with the real estate settlement of plaintiffs loan transaction represent improper trade practices.

The issue before the Court is whether the plaintiffs adequately and particularly pled facts sufficient to make a claim under the Consumer Protection and Procedures Act. The failure to conduct an adequate real estate settlement and facilitating a fraud is an improper trade practice.

The plaintiff alleged the defendant Executive Title & Escrow committed a violation of the D.C. Consumer Protection and Procedures Act, by certifying and facilitating a loan when it knew or should have known there was no reasonable probability of repayment in full. D.C. Code section 28-3904(r)(1), by misrepresenting a material fact the failure of which tends to mislead, D.C. Code section 28-3904(e), and by failing to state a material fact which tends to mislead, D.C. Code section28-3904(f).

It is improbable that this Court will allow the defendant Executive Escrow & Title to assert a defense based upon the ruling of *Ellipso, Inc. v. Mann*,460 F. Supp. 2d 99, 105 (D.D.C. 2006). The allegation of fraud coupled with factual evidence is sufficient to place the defendant on notice of the impending action. The defendant is attempting to implement a standard for pleading that is patently unfair for any victim of fraud. This is not the interpretation of *Ellipso* that the Court should subscribe. The plaintiffs' complaint factually describes the transaction in detail. Moreover, the "Introduction" section sets the stage for the information utilized in the closing of the real estate transaction and is supported by

the accompanying documentation.  ie  HUD-1. **Exhibit 3; Exhibit 5.**  The allegations of the complaint are supported by the facts of the Introduction and serve as the basis for the plaintiffs claims.

Specifically, the Court should take note of the plaintiffs' detail of the composition of the HUD-1.  The allegation that a deposit was fictitious commences the claim that the defendant engaged in fraudulent conduct by certifying that the "deposit" funds were in fact disbursed.  That is a fraud upon the plaintiffs and it is described and alleged with particularity.

The defendant appears to set up its defense by claiming, "with the exception of the taxes and D.C. recordation fees set by the government and the charges for the Executive Title's services, Executive Title as the settlement agent obtains the figures inserted in the HUD-1 from the parties to the transaction."   While it is true that it receives the figures from the parties, the defendant Executive Title & Escrow's position is not entirely true.  The defendant Executive Title & Escrow has a fiduciary obligation to the plaintiff.  It is charged with the responsibility of accumulating and disbursing funds of the transaction.  The fiduciary obligation requires it to be truthful as to the content of the HUD-1 and not serve as a rubber stamp as to the financial needs of the lender and mortgage brokers.

## IV.   Count IV Should Not Be Dismissed Because Plaintiffs State Valid and Specific Claims of Fraud

The defendant Executive Title & Escrow requests of this honorable Court to dismiss plaintiffs' cause of action for common law fraud under Rules 9(b) and 12(b)(6).   In Count IV, the plaintiffs incorporated the entire complaint in the allegations of fraud presented.  In the plaintiffs' first amended complaint, the description of the fraud committed by the defendant Executive Title & Escrow is pled with particularity.  F.R.C.P. 9(b).

The plaintiffs cites *Kitt v. Capital Concerts, Inc.,* 742 A.2d 856 (1999).  The Court in *Kitt*, quoting *Hercules & Co. Shama Restaurant Corp.*, 613 A.2d 916 (D.C. 1992), stated the essential elements of common law fraud are:"(1) a false

representation, (2) made in reference to a material fact, (3) with knowledge of its falsity, (4) with the intent to deceive, and (5) an action that is taken in reliance upon the representation. *Id.*

Throughout the plaintiffs' entire first amended complaint, a complete outline of the fraud committed by the defendants is detailed. The plaintiffs' detail through their allegations, and supported by the various exhibits, a loan transaction consummated at a real estate closing utilized as an artifice to defraud.

Utilizing the framework of *Kitt* the plaintiffs argues the complaint, in its entirety and as incorporated specifically places the defendant on notice of the fraud claim. In paragraph 18 of the first amended complaint the plaintiff satisfies the first element of *Kitt* by identifying (1) a false representation made by the defendant. That false representation is the $43,000.00 deposit certified on the HUD-1 by the defendant Executive Title & Escrow. This false representation is further duplicated and identified in a separate transaction involving the September 29, 2005 HUD-1. **Exhibit 5** .

The plaintiff alleges in paragraph 33 of the first amended complaint that the defendant Executive Title & Escrow, by agreement, facilitated the fraud by purposefully and fraudulently inserting erroneous dollar amounts into the HUD-1 form in order to obfuscate the transaction and mislead the plaintiffs. See complaint, para. 41. The erroneous dollar amounts were comprised of the fictitious deposits at a bare minimum.

The false and misleading dollar figures of the HUD-1 are (2) made in reference to a material fact. The purpose of the HUD-1 is to reflect the transaction such that a consumer would be aware of the transaction. Clearly, if true, the defendant Executive Title & Escrow has misrepresented as to a material fact. The plaintiffs allege in paragraph 43 of the first amended complaint the defendants failure to disclose material facts to the transaction. **Exhibit 3; Exhibit 5.**

By virtue of it fiduciary position to the plaintiff, the defendant Executive Title & Escrow was obligated to provide the plaintiffs with notice of the (3) falsity

of the transaction.  Knowledge of the falsity must be imputed to the defendant due to its facilitating role of the funds required to be disbursed.  The defendant was informed of a fictitious deposit to which it was charged with the responsibility of disbursement.  It would serve to reason that if in fact the deposit was received by the defendant, it would have disbursed it according to the agreement at closing.

It is also alleged the defendants' demonstrated (4) the intent to deceive. The plaintiffs clearly allege in paragraph 46 of the first amended complaint the defendant Executive Title intended to deceive the plaintiffs.  The plaintiffs alleged the concerted actions of all of the defendants were intended to deceive them.  It is necessary at points during the complaint to describe the parties in unison.  This is a common practice involving defendants engrossed in the same common nucleus facts that amount to fraud or else the pleading becomes unnecessarily duplicative.

The final element of (5) an action that is taken in reliance upon the representation is pled in paragraph 42 of the first amended complaint.  While the "introduction" section of the complaint clearly states the necessary facts demonstrating the reliance by the plaintiff on the representations of the Defendant, it also underscores the fact that the plaintiffs did not initially intend to transfer their property to Brenda Carew.

## CONCLUSION

THEREFORE, in consideration of the defendant Executive Title & Escrow motion to dismiss the plaintiffs' first amended complaint and the plaintiffs' opposition thereto, the plaintiffs pray this honorable Court denies the defendant's motion.

August 4, 2008

*/s/ William C. Johnson, Jr.*

_____
William C. Johnson, Jr., Esq.
1229 15th St. NW
Washington, D.C. 20005

(202) 483-0808; (202) 431-2650
Fax (202) 483-0909

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a copy of the foregoing was sent to the following via ECF:

Ober, Kaler, Grimes & Shriver, PC
Attention: Harold G. Belkowitz, Esq.
1401 H Street, N.W.
Suite 500
Washington, D.C. 20005
Counsel for Defendant Fremont Investment & Loans

Law Offices of David E. Ralph, LLC
Attention:  David E. Ralph, Esq.
2423 Maryland Avenue, Suite 100
Baltimore, Maryland 21218
Counsel for Defendant Executive Title & Escrow

A copy of the foregoing was sent via first class mail to the following:

Dennis Bishop
Brenda Carew
Town& Country Mortgage and Financial Services

August 4, 2008

/s/ William C. Johnson, Jr.
_____
William C. Johnson, Jr., Esq.

**IN THE FEDERAL DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

Joan Blue, et. al.                                      )
1001 F Street, NE                                      )
Washington, D.C. 20002                        )
        Plaintiff,                                  )
      v.                                                    )      CA No.:  1:08-cv-00729
                     )
Fremont Investment & Loan, Inc., et. al.  )
2727 E. Imperial Highway                     )
Brea, California 92821                            )
        Defendant,                              )
                     )
_____)

**<u>PROPOSED ORDER</u>**

      **UPON CONSIDERATION** of the foregoing defendant Executive Title &

Escrow, LLC Motion to Dismiss Plaintiffs' First Amended Complaint, and any

opposition thereto, it is, this ___ day of _____, 2008 at _____

a.m./p.m., by the District Court for the District of Columbia.

      ORDERED the Motion to Dismiss is DENIED;

      ORDERED that a party or any person affected by this Order may apply for

a modification or dissolution of this Court may prescribe.


                                 _____

                                 Judge


Cc:

William C. Johnson, Jr., Esq.
1229 15th St. NW
Washington, D.C. 20005

Ober, Kaler, Grimes & Shriver, PC
Harold Belkowitz, Esq.

1401 H Street, N.W., Suite 500
Washington, D.C. 20005

Law Offices of David E. Ralph, LLC
David E. Ralph, Esq.
2423 Maryland Ave., Suite 100
Baltimore, MD 21218

Town and Country Mortgage and Financial
Services, Inc.
1300 Mercantile Lane
Suite 150
Largo, Maryland 20776

Dennis Bishop
1300 Mercantile Lane
Suite 150
Largo, Maryland 20776

Brenda Carew
10423 Beacon Ridge Drive
Mitchellville, Maryland 20721

# EXHIBIT

# 1

Doc# 2004072447

File No. 04-435RTL
DEED-SHORT FORM D.C.

**This Deed**, made this **27th** day of **April, 2004**, by and between Halbert T. Blue, Rose M. Blue and Joanne Blue, parties of the first part, and Brenda D. Carew, party of the second part.

WITNESSETH, that in consideration of the sum of FOUR HUNDRED THIRTY THOUSAND AND 00/100 DOLLARS ($430,000.00), the parties of the first part do hereby grant unto the party of the second part, in fee simple, as sole owner, all that piece or parcel of land, together with the improvements, rights, privileges and appurtenances to the same belonging, situate in the District of Columbia, described as follows, to wit:

LOT 18 IN VINCENT W. KRAMER'S SUBDIVISION OF LOTS IN SQUARE 961AS PER PLAT RECORDED IN THE OFFICE OF THE SURVEYOR FOR THE DISTRICT OF COLUMBIA IN LIBER 75 AT FOLIO 55 SUBJECT TO A PERPETUAL RIGHT OF WAY OVER THE REAR 12 FEET OF SAID LOT NUMBERED 18 FOR THE USE AND BENEFIT OF LOTS NUMBERED 19, 20 AND 21 IN SAID IN SAID SUBDIVISION.
PROPERTY ADDRESS:1001 F STREET N.E WASHINGTON DC 20002
PROPERTY TAX ID NUMBER:SQUARE 0961 LOT 0018

AND the said parties of the first part covenant that they will warrant specially the property hereby conveyed; and that they will execute such further assurances of said land as may be requisite.

WITNESS the hands and seals the day and year first hereinbefore written.

IN PRESENCE OF:

_____     _____ {SEAL}
                                     **Halbert T. Blue**

_____     _____ {SEAL}
                                     **Rose M. Blue**

_____     _____ {SEAL}
                                     **Joanne Blue**

DISTRICT OF COLUMBIA

I, Lawrence Elliott , a Notary Public, in and for the jurisdiction aforesaid, do hereby certify that Halbert T. Blue, Rose M. Blue and Joanne Blue, who are personally well known to me as the grantors in, and the persons who executed the foregoing and annexed deed, bearing the date of **April 27, 2004**, personally appeared before me in the said District and acknowledged the said deed to be their act and deed.

Given under my hand and seal this **27th** day of **April, 2004**.

_____
Notary Public

My Commission Expires: _____

AFTER RECORDING MAIL TO:                    GRANTEE ADDRESS:
**Executive Title and Escrow L.L.C.**
**9500 Arena Drive, Suite 480**
**Largo, MD  20774**

Doc# 2004072447
Book:
Page:
Filed & Recorded
  05/24/2004  02:01:58 PM
LARRY TODD
RECORDER OF DEEDS
WASHINGTON D.C. RECORDER OF DEEDS
  RECORDING      $     20.00
  SURCHARGE      $      6.50
  RECORDATION TAX  $  6,458.00
  TRANSFER TAX 1.  $  6,458.00

# EXHIBIT

# 2

Executive Title And Escrow LLC
9500 Arena Dr. #480
Largo, MD 20774

Return To:
NEW CENTURY MORTGAGE CORPORATION

18400 VON KARMAN, SUITE 1000
IRVINE, CA 92612

*File 04-435*

*Old Republic National Tax ID #* *Square :0961*
*Lot :18*

[Space Above This Line For Recording Data]
*Purchase Money*

# DEED OF TRUST

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) **"Security Instrument"** means this document, which is dated **April 27, 2004** together with all Riders to this document.

(B) **"Borrower"** is
**BRENDA D. CAREW**

Borrower's address is **10423 BEACON RIDGE RD    MITCHELVILLE, MD 20721**
. Borrower is the trustor under this Security Instrument.

(C) **"Lender"** is **NEW CENTURY MORTGAGE CORPORATION**

Lender is a **CORPORATION**
organized and existing under the laws of **CALIFORNIA**
Lender's address is **18400 VON KARMAN, SUITE 1000**
**IRVINE, CA 92612**
Lender is the beneficiary under this Security Instrument.

(D) **"Trustee"** is **Stephen F.J. Ornstein, Esq.**

Trustee's address is **1700 Pennsylvania Avenue N.W.**
**Washington, D.C. 20006**

**DISTRICT OF COLUMBIA**-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT    Form 3009

-6(DC) (0205).01    1/01 (rev. 5/02)
Page 1 of 16    Initials: BC
VMP MORTGAGE FORMS - (800)521-7291

0001498691

(E) "Note" means the promissory note signed by Borrower and dated **April 27, 2004**
The Note states that Borrower owes Lender   **Three Hundred Eighty-Seven Thousand and No/100** -------------------------------------------------------- Dollars
(U.S. $   **387,000.00**   ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than   **May 1, 2034**

(F) "**Property**" means the property that is described below under the heading "Transfer of Rights in the Property."

(G) "**Loan**" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(H) "**Riders**" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| [X] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [ ] Planned Unit Development Rider | [ ] 1-4 Family Rider |
| [ ] VA Rider | [ ] Biweekly Payment Rider | [X] Other(s) [specify] |

**Prepayment Rider**

(I) "**Applicable Law**" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(J) "**Community Association Dues, Fees, and Assessments**" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(K) "**Electronic Funds Transfer**" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(L) "**Escrow Items**" means those items that are described in Section 3.

(M) "**Miscellaneous Proceeds**" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(N) "**Mortgage Insurance**" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(O) "**Periodic Payment**" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(P) "**RESPA**" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used

0001498691

-6(DC) (0205).01                    Page 2 of 16           Initials: _____           Form 3009 1/01 (rev. 5/02)

in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(Q) "**Successor in Interest of Borrower**" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the District of Columbia:
**SEE LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF.**

Parcel ID Number: **SQUARE 0961 LOT 0013**                    which currently has the address of
**1001 F STREET NE**                                                                        [Street]
Washington, District of Columbia    **20002**         [Zip Code] ("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items

**0001498691**
Initials: _BSC_

-6(DC) (0205).01                    Page 3 of 15                    **Form 3009 1/01 (rev. 5/02)**

pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all

**0001498691**

-6(DC) (0205).01                    Page 4 of 15          Initials: _BC_          **Form 3009 1/01 (rev. 5/02)**

Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain

priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to

**0001498691**

Initials: _BC_

the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien

**0001498691**

Initials: BBC

-6(DC) (0205).01                    Page 7 of 16                    **Form 3009** 1/01 (rev. 5/02)

which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. **Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) **Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

**0001498691**

Initials: _BC_

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**0001498691**

Initials: _SC_

-6(DC) (0205).01    Page 9 of 16    Form 3009 1/01 (rev. 5/02)

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). To the extent permitted by Applicable Law, Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

0001493691

Initials: _BC_

-6(DC) (0206).01          Page 10 of 15          Form 3009 1/01 (rev. 5/02)

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the

address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. **Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

**0001498691**

Initials: _____

-6(DC) (0205).01                    Page 12 of 15                    Form 3009  1/01 (rev. 5/02)

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall send written notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall give notice of sale by public advertisement as Trustee deems proper to protect the interests of Borrower and Lender. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, Trustee's fees of 5.00 % of the gross sale price and reasonable attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

23. Release. Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to release this Security Instrument and shall surrender all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24. Substitute Trustee. Lender, at its option, may from time to time remove Trustee and appoint a successor trustee to any Trustee appointed hereunder by recording a Deed of Appointment. Without conveyance of the Property, the successor trustee shall succeed to all the title, power and duties conferred upon Trustee herein and by Applicable Law.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____        _____ (Seal)
                                        BRENDA D. CAREW              -Borrower


                                        _____ (Address)

_____        _____ (Seal)
                                                                     -Borrower


                                        _____ (Address)

_____ (Seal)  _____ (Seal)
                        -Borrower                                    -Borrower


_____ (Address)  _____ (Address)

_____ (Seal)  _____ (Seal)
                        -Borrower                                    -Borrower


_____ (Address)  _____ (Address)

_____ (Seal)  _____ (Seal)
                        -Borrower                                    -Borrower


_____ (Address)  _____ (Address)

0001498691

-6(DC) (0205).01              Page 14 of 15              Form 3009  1/01 (rev. 5/02)

**DISTRICT OF COLUMBIA, ss:**

I, _Lawrence Elliott_, a Notary Public in and for the District
of Columbia, do hereby certify that

_Brenda D. Craven_

personally known to me as the person(s) who executed the foregoing instrument bearing date of
day of                          , personally appeared before me in said District and acknowledged said
instrument to be his/her/their act and deed, and that he/she/they executed said instrument for the purposes
therein contained.

Witness my hand and official seal this  27  day of  _April_  2002 .

Notary Public, D.C.                                                        (Seal)

THIS IS TO CERTIFY THAT THIS
DOCUMENT WAS PREPARED BY, OR
UNDER THE SUPERVISION OF THE
UNDERSIGNED, AN ATTORNEY DULY
ADMITTED TO PRACTICE BEFORE
THE COURT OF APPEALS OF
MARYLAND.

LAWRENCE O. ELLIOTT, JR.
NOTARY PUBLIC
MY COMMISSION EXPIRES 12/1/07
PRINCE GEORGE'S COUNTY, MD

0001498691

Initials: _____

-6(DC) (0205).01              Page 15 of 15              Form 3009 1/01 (rev. 5/02)

## Exhibit A

LOT 18 IN VINCENT W. KRAMER'S SUBDIVISION OF LOTS IN SQUARE 961 AS PER PLAT RECORDED IN THE OFFICE OF THE SURVEYOR FOR THE DISTRICT OF COLUMBIA IN LIBER 75 AT FOLIO 55 SUBJECT TO A PERPETUAL RIGHT OF WAY OVER THE REAR 12 FEET OF SAID LOT NUMBERED 18 FOR THE USE AND BENEFIT OF LOTS NUMBERED 19, 20 AND 21 IN SAID   IN SAID SUBDIVISION.
PROPERTY ADDRESS:1001 F STREET N.E WASHINGTON DC 20002
PROPERTY TAX ID NUMBER:SQUARE 0961 LOT 0018

## ADJUSTABLE RATE RIDER
### (LIBOR Six-Month Index (As Published In The Wall Street Journal) - Rate Caps)
### 2 YEAR RATE LOCK

THIS ADJUSTABLE RATE RIDER is made this **27th** day of **April**,
**2004** ,and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned ("Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to
**NEW CENTURY MORTGAGE CORPORATION**

("Lender") of the same date and covering the property described in the Security Instrument and located at:

**1001 F STREET NE   , WASHINGTON, DC  20002**

*(Property Address)*

**THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE INTEREST RATE AND THE MONTHLY PAYMENT. THE NOTE LIMITS THE MAXIMUM RATE BORROWER MUST PAY.**

ADDITIONAL COVENANTS. In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A.    INTEREST RATE AND MONTHLY PAYMENT CHANGES**
The Note provides for an initial interest rate of  **6.0000**  %. The Note provides for changes in the interest rate and the monthly payments as follows:

**4.  INTEREST RATE AND MONTHLY PAYMENT CHANGES**

(A)    **Change Dates**

The interest rate I will pay may change on the first day of  **May**,  **2006** and on the same day of every 6th month thereafter. Each date on which my interest rate could change is called an "Interest Rate Change Date."

(B)    **The Index**

Beginning with the first Interest Rate Change Date, my interest rate will be based on an Index plus a margin. The "Index" is the average of interbank offered rates for six-month dollar deposits in the London market ("LIBOR"), as published in The Wall Street Journal "Money Rates" Table. The most recent Index figure available as of the first business day of the month immediately preceding the month in which the Change Date occurs is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

**0001498691**

NCMC                                                        *Page 1 of 3*
*2/28 Six Month LIBOR Adjustable Rate Rider*
*RE-409            (111803)*

RE409P1ifd
krr 010404

**(C) Calculation of Changes**

At each Interest Rate Change Date, the Note Holder will calculate my new interest rate by adding **Five and Fifty-Five Hundredths** percentage points ( **5.5500%**) to the Current Index. The Note Holder will then round this figure to the nearest one-eighth of one percentage point (0.125%). Subject to the limit stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Interest Rate Change Date.

      **(i) Interest-Only Period.** The "Interest-only Period" is the period from the date of this Note through **May 1, 2006** . For the Interest-only Period, the Note Holder will calculate the amount of the monthly payment to be one-twelfth (1/12th) of one (1) year's interest at **6.0000** % per annum. The result of this calculation will be the amount of my monthly payment until the Interest Rate Change Date.

      **(ii) Amortization Period.** The "Amortization Period" is the period after the Interest-only Period and continuing until the Maturity Date. During the Amortization Period, after calculating my new interest rate as provided in Section 4(C) above, the Note Holder will then calculate the amount of the monthly payment that would be sufficient to fully repay the remaining unpaid principal in equal monthly payments by the Maturity Date, assuming, for purposes of each calculation, that the interest rate remained unchanged during that period. The result of this calculation will be the new amount of my monthly payment.

**(D) Limit on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than **7.5000** % or less than **6.0000** %. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than one and one half percentage points (1.5%) from the rate of interest I have been paying for the preceding month. My interest rate will never be greater than **13.0000** % nor less than **6.0000%**.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Interest Rate Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Interest Rate Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment at least 25 days before the effective date of any change. The notice will include information required by law to be given me and also the title and telephone number of a person who will answer any questions I may have regarding the notice.

**0001498691**

NCMC
2/28 Six Month LIBOR Adjustable Rate Rider
RE-409          (111803)

Page 2 of 3

RE409P2.iid
krr 010404

## 11. GOVERNING LAW - SECURED

The Note is governed by federal law and the law of the jurisdiction in which the property encumbered by the Security Instrument (as defined below) is located. In addition to the protections given to the Note Holder under the Note, a Mortgage, Deed of Trust or Security Deed (the "Security Instrument"), dated the same date as the Note protects the Note Holder from possible losses which might result if I do not keep the promises which I make in the Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under the Note. Some of those conditions are described as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

_____          _____
BRENDA D. CAREW          - Borrower                              - Borrower

_____          _____
                         - Borrower                              - Borrower

_____          _____
                         - Borrower                              - Borrower

_____          _____
                         - Borrower                              - Borrower

*(Sign Original Only)*

0001498691

*Page 3 of 3*

NCMC
*2/28 Six Month LIBOR Adjustable Rate Rider*
*RE-409*          *(111803)*

RE409P3.ifd
krr 010404

Loan Number    0001498691

# PREPAYMENT RIDER
## ADJUSTABLE RATE LOAN - D.C., MD

This prepayment Rider is made this    27th    day of April, 2004
and is incorporated into and shall be deemed to amend and supplement the Promissory Note (the "Note") and Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure repayment of Borrower's Note to

NEW CENTURY MORTGAGE CORPORATION

(the "Lender")

To the extent that the provisions of this Prepayment Rider are consistent with the provisions of the Note and/or Security Instrument, the provisions of this rider shall prevail over and shall supercede any such inconsistent provisions of the Note and/or Security Instrument.

In addition the covenants and agreements made in the Note and Security Instrument, the Borrower and Lender further covenant and agree as follows:

## 5. BORROWERS RIGHT TO PREPAY

I have the right to make prepayments of principal any time before thay are due. A payment of principal only is known as a "prepayment". When I make a prepayment, I will tell the Note Holder in writing I am doing so. The Note Holder will use all of my prepayments to reduce the amount of principal that I owe under this Note. If I make a partial prepayment, there will be no changes in the due dates of my monthly payments unless: the Note Holder agrees in writing to those changes.

If within    2 year(s) from the due date of the execution of the Security Instrument, I make a full prepayment or, in certain cases a partial prepayment, and the total of such prepayment(s) in any 12 month period exceeds ONE THIRD (1/3) of the original principal amount of this loan, I will pay a prepayment charge in an amount equal to the payment of 2 months advance interest on the amount by which the total of my prepayment(s) within that 12 month period exceeds ONE THIRD (1/3) of the original principal amount of the loan.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Prepayment Rider.


_____          _____
BRENDA D. CAREW

_____          _____

NCMC
Adjustable Rate Prepayment Rider
D.C., MD
RE-134 (060603) (nki)

# SECURITY AFFIDAVIT

## CLASS 1 AND CLASS 2

File No. 04-435RTL

I, Brenda D. Carew, the owner of the real property described within, certify, subject to criminal penalties for making false statements pursuant to Section 404 of the District of Columbia Theft and White Collar Crimes Act of 1982, effective December 1, 1982 (D.C. Law 4-164; D.C. Code 22-2514), that the real property described within is either Class 1 Property or Class 2 Property, as those classes of property are established pursuant to Section 412a of district of Columbia Real Property Tax Revision Act of 1974, approved September 3, 1974 (88 Stat. 1051 D.C. Code 47-813), with 5 or fewer units.

_____

**Brenda D. Carew**

_____

Subscribed and sworn to before me this 27th day of April, 2004.

_____
Notary Public

My commission expires: _____

Book:
Pages:  —
Filed & Recorded
    05/24/2004  02:01:56 PM
LARRY TODD
RECORDER OF DEEDS
WASHINGTON D.C. RECORDER OF DEEDS
  RECORDING      $   153.00
  SURCHARGE      $     6.50

# EXHIBIT

# 3

Previous editions are obsolete

**A. Settlement Statement**

U.S. Department of Housing and Urban Development
OMB Approval No. 2502-0265 (expires 9/30/2008)

**B. Type of Loan**

| 1. ☐FHA | 2. ☐FmHA | 3. ☐Conv. Unins. | 6. File Number | 7. Loan Number | 8. Mortgage Insurance Case Number |
|---|---|---|---|---|---|
| 4. ☐VA | 5. ☐Conv. Ins. | | 04-435RTL | 0001498691 | |

C. Note: This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown. Items marked "(p.o.c)" were paid outside the closing; they are shown here for information purposes and are not included in the totals. WARNING: It is a crime to knowingly make false statements to the United States on this or any other similar form. Penalties upon conviction can include a fine and imprisonment. For details see: Title 18 U.S. Code Section 1001 and Section 1010.

TitleExpress Settlement System

| | |
|---|---|
| D. NAME OF BORROWER: | Brenda D. Carew |
| ADDRESS: | 1001 F Street, NE, Washington, DC 20002 |
| E. NAME OF SELLER: | Halbert T. Blue and Rose M. Blue and Joanne Blue |
| ADDRESS: | 1001 F Street, NE, Washington, DC 20002 |
| F. NAME OF LENDER: | New Century Mortgage Corporation |
| ADDRESS: | 18400 Von Karman, Ste 1000, Irvine, CA 92612 |
| G. PROPERTY ADDRESS: | 1001 F Street, NE, Washington, DC 20002 |
| H. SETTLEMENT AGENT: | Executive Title and Escrow L.L.C., Telephone: 301-341-6444 Fax: 301-341-1238 |
| PLACE OF SETTLEMENT: | 9500 Arena Drive, Suite 480, Largo, MD 20774 |
| I. SETTLEMENT DATE: | 04/27/2004 |

| J. SUMMARY OF BORROWER'S TRANSACTION: | | K. SUMMARY OF SELLER'S TRANSACTION: | |
|---|---|---|---|
| **100. GROSS AMOUNT DUE FROM BORROWER** | | **400. GROSS AMOUNT DUE TO SELLER** | |
| 101.  Contract sales price | 430,000.00 | 401.  Contract sales price | 430,000.00 |
| 102.  Personal Property | | 402.  Personal Property | |
| 103.  Settlement charges to borrower (line 1400) | 20,835.80 | 403. | |
| 104. | | 404. | |
| 105. | | 405. | |
| *Adjustments for items paid by seller in advance* | | *Adjustments for items paid by seller in advance* | |
| 109. | | 409. | |
| 110. | | 410. | |
| 111. | | 411. | |
| 112. | | 412. | |
| **120. GROSS AMOUNT DUE FROM BORROWER** | 450,835.80 | **420. GROSS AMOUNT DUE TO SELLER** | 430,000.00 |
| **200. AMOUNTS PAID BY OR ON BEHALF OF BORROWER** | | **500. REDUCTIONS IN AMOUNT DUE TO SELLER** | |
| 201.  Deposit or earnest money | 43,000.00 | 501.  Excess Deposit (see instructions) | 43,000.00 |
| 202.  Principal amount of new loans | 387,000.00 | 502.  Settlement charges to seller (line 1400) | 7,075.00 |
| 203.  Existing loan(s) taken subject to | | 503.  Existing loan(s) taken subject to | |
| 204. | | 504.  Payoff:30910806 | 315,485.20 |
| | | Ocwen Federal Bank | |
| 205. | | 505. | |
| 206. | | 506.  Release Fee | 225.00 |
| | | Executive Title and Escrow L.L. | |
| 207. | | 507. | |
| 208. | | 508. | |
| 209. | | 509. | |
| *Adjustments for items unpaid by seller* | | *Adjustments for items unpaid by seller* | |
| 210.  City/town taxes  04/01/04 to 04/27/04 | 107.47 | 510.  City/town taxes  04/01/04 to 04/27/04 | 107.47 |
| 213. | | 513.  Water Escrow | 450.00 |
| 214.  SELLER CREDIT | 17,500.00 | 514.  SELLER CREDIT | 17,500.00 |
| 215. | | 515.  MISC/BILL | 27,000.00 |
| 216. | | 516.  MISC/BILL | 4,000.00 |
| 217. | | 517.  ESCROW | 8,000.00 |
| 218. | | 518. | |
| 219. | | 519. | |
| **220. TOTAL PAID BY/FOR BORROWER** | 447,607.47 | **520. TOTAL REDUCTION AMOUNT DUE SELLER** | 422,842.6 |
| **300. CASH AT SETTLEMENT FROM OR TO BORROWER** | | **600. CASH AT SETTLEMENT TO OR FROM SELLER** | |
| 301.  Gross amount due from borrower (line 120) | 450,835.80 | 601.  Gross amount due to seller (line 420) | 430,000.0 |
| 302.  Less amounts paid by/for borrower (line 220) | 447,607.47 | 602.  Less reduction amount due seller (line 520) | 422,842.6 |
| **303. CASH FROM BORROWER** | 3,228.33 | **603. CASH TO SELLER** | 7,157.3 |

SUBSTITUTE FORM 1099 SELLER STATEMENT: The information contained herein is important tax information and is being furnished to the Internal Revenue Service. If you are required to file a return, a negligence penalty or other sanction will be imposed on you if this item is required to be reported and the IRS determines that it has not been reported. The Contract Sales Price described on line 401 above constitutes the Gross Proceeds of this transaction.

You are required by law to provide the settlement agent (Fed. Tax ID No:_____) with your correct taxpayer identification number. If you do not provide your correct taxpayer identification number, you may be subject to civil or criminal penalties imposed by law. Under penalties of perjury, I certify that the number shown on this statement is my correct taxpayer identification number.

TIN: ___ ___ ___ - ___ ___ - ___ ___ ___ ___ / ___ - ___ ___ - ___ ___ ___ ___     SELLER(S) SIGNATURE(S): _____ / _____

SELLER(S) NEW MAILING ADDRESS: _____

SELLER(S) PHONE NUMBERS: _____ (H) _____ (W)

Previous editions are obsolete

| U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT | File Number: 04-435 | | |
|---|---|---|---|
| **SETTLEMENT STATEMENT** | TitleExpress Settlement System | | PAGE 2 |

| L. SETTLEMENT CHARGES | | PAID FROM BORROWER'S FUNDS AT SETTLEMENT | PAID FROM SELLER'S FUNDS AT SETTLEMENT |
|---|---|---|---|
| 700. TOTAL SALES/BROKER'S COMMISSION based on price $430,000.00 = | | | |
| Division of commission (line 700) as follows: | | | |
| 701. $ | to | | |
| 702. $ | to | | |
| 703. Commission paid at Settlement | | | |
| 704. Administrative Fee | | | |
| **800. ITEMS PAYABLE IN CONNECTION WITH LOAN** | | | |
| 801. Loan Origination Fee    2,000 % Town and Country Mortgage | | 7,740.00 | |
| 802. Loan Discount    % | | | |
| 803. Appraisal Fee | to Town and Country Mortgage | 350.00 | |
| 804. Credit Report | to Town and Country Mortgage | 9.00 | |
| 805. UNDERWRITING FEE | to New Century Mortgage Corporation | 350.00 | |
| 806. DOCUMENT FEE | to New Century Mortgage Corporation | 359.00 | |
| 807. TAX SERVICE FEE | to New Century Mortgage Corporation | 78.00 | |
| 808. FLOOD CERTIFICATION | to New Century Mortgage Corporation | 11.20 | |
| 809. PROCESSING FEE | to Town and Country Mortgage | 600.00 | |
| 810. | | | |
| 811. | | | |
| **900. ITEMS REQUIRED BY LENDER TO BE PAID IN ADVANCE** | | | |
| 901. Interest From    04/27/2004 to 05/01/2004    @$    63.6200 /day    4 Days | | 254.48 | |
| 902. Mortgage Insurance Premium for    to | | | |
| 903. Hazard Insurance Premium for    to STATE FARM    (P.O.C.) 1,288.00 Buyer | | | |
| 904. | | | |
| 905. | | | |
| **1000. RESERVES DEPOSITED WITH LENDER FOR** | | | |
| 1001. Hazard Insurance    2 mo. @ $    101.50 /mo | | 203.00 | |
| 1002. Mortgage Insurance    mo. @ $    /mo | | | |
| 1003. City Property Taxes    2 mo. @ $    209.06 /mo | | 418.12 | |
| 1004. County Property Taxes    mo. @ $    /mo | | | |
| 1005. Annual Assessments    mo. @ $    /mo | | | |
| 1009. Aggregate Analysis Adjustment | | 0.00 | 0.00 |
| **1100. TITLE CHARGES** | | | |
| 1101. Settlement or closing fee | to Executive Title and Escrow L.L.C. | 175.00 | 250.00 |
| 1102. Abstract or title search | to LKW Title and Abstract Service, LLC | 255.00 | |
| 1103. Title examination | to Executive Title and Escrow L.L.C. | 325.00 | |
| 1104. Title insurance binder | to Executive Title and Escrow L.L.C. | 75.00 | |
| 1105. Document Preparation | to Executive Title and Escrow L.L.C. | | 150.00 |
| 1106. Notary Fees | | | |
| 1107. Attorney's fees | to Lawrence O. Elliott, Jr. Esq. | 100.00 | |
| (includes above items No: ) | | | |
| 1108. Title Insurance | to Old Republic National Title Insurance Co. | 2,378.00 | |
| (includes above items No: ) | | | |
| 1109. Lender's Policy    387,000.00  - 1,522.96 | | | |
| 1110. Owner's Policy    430,000.00  - 855.04 | | | |
| 1111. Judgment Search | to Property Insight | 25.00 | |
| 1112. | | | |
| 1113. Courier/Overnight | to Executive Title and Escrow L.L.C. | 65.00 | 65.00 |
| **1200. GOVERNMENT RECORDING AND TRANSFER CHARGES** | | | |
| 1201. Recording Fees Deed $ 40.00    ; Mortgage $ 250.00    ; Release $ 160.00 | | 290.00 | 160.00 |
| 1202. City Transfer Tax    Deed $6,450.00    ; Mortgage $ | | 3,225.00 | 3,225.00 |
| 1203. City Recordation Tax    Deed $6,450.00    ; Mortgage $ | | 3,225.00 | 3,225.00 |
| 1204. Construction Tax    Deed $    ; Mortgage $ | | | |
| 1205. | | | |
| **1300. ADDITIONAL SETTLEMENT CHARGES** | | | |
| 1301. Survey | to Duley and Associates, Inc. | 275.00 | |
| 1302. Pest Inspection | | | |
| 1303. CLEAL LIEN | to DC TREASURER | 50.00 | |
| 1304. | | | |
| 1305. | | | |
| 1306. | | | |
| 1307. | | | |
| 1308. | | | |
| **1400. TOTAL SETTLEMENT CHARGES**    (enter on lines 103, Section J and 502, Section K) | | 20,835.80 | 7,075.0 |

HUD CERTIFICATION OF BUYER AND SELLER

I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction. I further certify that I have received a copy of the HUD-1 Settlement Statement.

Brenda D. Carew
161782272

_____    _____    _____
Harban T. Blue    Rose M. Blue    Joanna Blue

WARNING: IT IS A CRIME TO KNOWINGLY MAKE FALSE STATEMENTS TO THE UNITED STATES ON THIS OR ANY SIMILAR FORM. PENALTIES UPON CONVICTION CAN INCLUDE A FINE AND IMPRISONMENT. FOR DETAILS SEE TITLE 18: U.S. CODE SECTION 1001 AND SECTION 1010.

The HUD-1 Settlement Statement which I have prepared is a true and accurate account of this transaction. I have caused or will cause the funds to be disbursed in accordance with this statement.

By:_____

# EXHIBIT

# 4




File No. **05-860RTL**   LT1-5-2005148519-1   LT2-0-0-2
DEED-SHORT FORM D.C.

# This Deed, made this **29th** day of **September, 2005**, by and between Brenda D. Carew, party of the first part, and Joanne Blue and Edna Robinson, parties of the second part.

WITNESSETH, that in consideration of the sum of FIVE HUNDRED FIFTY FIVE THOUSAND AND 00/100 DOLLARS (**$555,000.00**), the party of the first part does hereby grant unto the parties of the second part, in fee simple, as joint tenants with the right of survivorship, all that piece or parcel of land, together with the improvements, rights, privileges and appurtenances to the same belonging, situate in the District of Columbia, described as follows, to wit:

### See Attached Exhibit A

AND the said party of the first part covenants that he will warrant specially the property hereby conveyed; and that he will execute such further assurances of said land as may be requisite.

WITNESS the hand and seal the day and year first hereinbefore written.

IN PRESENCE OF:

_____     _____Carew_____{SEAL}
                                     **Brenda D. Carew**

State of MD, Prince George's Co.

~~DISTRICT OF COLUMBIA~~

I, Lorrene Clliott , a Notary Public, in and for the jurisdiction aforesaid, do hereby certify that Brenda D. Carew, who is personally well known to me as the grantor in, and the person who executed the foregoing and annexed deed, bearing the date of **September 29, 2005**, personally appeared before me in the said District and acknowledged the said deed to be his act and deed.

Given under my hand and seal this **29th** day of **September, 2005**.

_____
Notary Public

My Commission Expires: _____

AFTER RECORDING MAIL TO:              GRANTEES ADDRESS:
**Executive Title and Escrow L.L.C.**     **1001 F Street NE**
**9500 Arena Drive**                      **Washington, DC 20002**
**Suite 480**
**Largo, MD 20774**

# Exhibit A

LOT 18 IN VINCENT W. KRAMER'S SUBDIVISION OF LOTS IN SQUARE 961 AS PER PLAT RECORDED IN THE OFFICE OF THE SURVEYOR FOR THE DISTRICT OF COLUMBIA IN LIBER 75 AT FOLIO 55 SUBJECT TO A PERPETUAL RIGHT OF WAY OVER THE REAR 12 FEET OF SAID LOT NUMBERED 18 FOR THE USE AND BENEFIT OF LOTS NUMBERED 19, 20 AND 21 IN SAID  IN SAID SUBDIVISION.
PROPERTY ADDRESS:1001 F STREET N.E WASHINGTON DC 20002
PROPERTY TAX ID NUMBER:SQUARE 0961 LOT 0018

RECORDING
SURCHARGE                      $       20.00
RECORDATION TAX FEE           $        6.50
TRANSFER TAX FEE              $     6,050.00
                             $     6,050.00

Doc# 2005148519 Fees:$12126.50
10/17/2005   9:41AM Pages 2
Filed & Recorded in Official Records c
WASH DC RECORDER OF DEEDS LARRY TODD

# EXHIBIT

# 5

| A. | Settlement Statement | | | U.S. Department of Housing and Urban Development |
|---|---|---|---|---|

B. Type of Loan

| 1. ☐FHA | 2. ☐FmHA | 3. ☐Conv. Unins. | 6. File Number | 7. Loan Number | 8. Mortgage Insurance Case Number |
|---|---|---|---|---|---|
| 4. ☐VA | 5. ☐Conv. Ins. | | 05-860RTL | 921000278868 | |

C. Note: This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown. Items marked "(p.o.c.)" were paid outside the closing; they are shown here for information purposes and are not included in the totals. WARNING: It is a crime to knowingly make false statements to the United States on this or any other similar form. Penalties upon conviction can include a fine and imprisonment. For details see: Title 18 U.S. Code Section 1001 and Section 1010.

TitleExpress Settlement System

| D. NAME OF BORROWER: | Joanne Blue and Edna Robinson |
|---|---|
| ADDRESS: | 1001 F Street NE, Washington, DC 20002 |
| E. NAME OF SELLER: | Brenda D. Carew |
| ADDRESS: | 1001 F Street NE, Washington, DC 20002 |
| F. NAME OF LENDER: | Fremont Investment & Loans |
| ADDRESS: | ISAOA and/or ATIMA, 1065 N. Pacificenter Drive, Anaheim, CA 92806 |
| G. PROPERTY ADDRESS: | 1001 F Street NE, Washington, DC 20002 |

| H. SETTLEMENT AGENT: | Executive Title and Escrow L.L.C., Telephone: 301-341-6444 Fax: 301-341-1238 |
|---|---|
| PLACE OF SETTLEMENT: | 9500 Arena Drive, Suite 480, Largo, MD 20774 |
| I. SETTLEMENT DATE: | 09/29/2005 |

| J. SUMMARY OF BORROWER'S TRANSACTION: | | K. SUMMARY OF SELLER'S TRANSACTION: | |
|---|---|---|---|
| **100. GROSS AMOUNT DUE FROM BORROWER** | | **400. GROSS AMOUNT DUE TO SELLER** | |
| 101. Contract sales price | 555,000.00 | 401. Contract sales price | 555,000.00 |
| 102. Personal Property | | 402. Personal Property | |
| 103. Settlement charges to borrower (line 1400) | 29,232.57 | 403. | |
| 104. | | 404. | |
| 105. | | 405. | |
| *Adjustments for items paid by seller in advance* | | *Adjustments for items paid by seller in advance* | |
| 106. City/town taxes  04/02/05 to 09/29/05 | 32.25 | 406. City/town taxes  04/02/05 to 09/29/05 | 32.25 |
| 109. Release Fee | | 409. | |
| 110. | | 410. | |
| 111. | | 411. | |
| 112. | | 412. | |
| **120. GROSS AMOUNT DUE FROM BORROWER** | 584,264.82 | **420. GROSS AMOUNT DUE TO SELLER** | 555,032.25 |
| **200. AMOUNTS PAID BY OR ON BEHALF OF BORROWER** | | **500. REDUCTIONS IN AMOUNT DUE TO SELLER** | |
| 201. Deposit or earnest money | 55,500.00 | 501. Excess Deposit (see instructions) | 55,500.00 |
| 202. Principal amount of new loans | 444,000.00 | 502. Settlement charges to seller (line 1400) | 6,385.00 |
| 203. Existing loan(s) taken subject to | | 503. Existing loan(s) taken subject to | |
| 204. | | 504. Payoff:0001498691 | 403,739.55 |
| | | New Century Mortgage Corporati | |
| 205. | | 505. | |
| 206. | | 506. | |
| 207. | | 507. | |
| 208. | | 508. | |
| 209. | | 509. | |
| *Adjustments for items unpaid by seller* | | *Adjustments for items unpaid by seller* | |
| 213. SELLER HED 2ND LOAN | 55,500.00 | 513. SELLER HED 2ND LOAN | 55,500.00 |
| 214. | | 514. WATER ESCROW | 350.00 |
| 215. | | 515. RELEASE FEE | 225.00 |
| 216. BROKER CREDIT | 5,000.00 | 516. | |
| 217. | | 517. | |
| 218. SELLER CONTRIBUTION | 24,264.82 | 518. SELLER CONTRIBUTION | 24,264.82 |
| 219. | | 519. | |
| **220. TOTAL PAID BY/FOR BORROWER** | 584,264.82 | **520. TOTAL REDUCTION AMOUNT DUE SELLER** | 545,964.37 |
| **300. CASH AT SETTLEMENT FROM OR TO BORROWER** | | **600. CASH AT SETTLEMENT TO OR FROM SELLER** | |
| 301. Gross amount due from borrower (line 120) | 584,264.82 | 601. Gross amount due to seller (line 420) | 555,032.25 |
| 302. Less amounts paid by/for borrower (line 220) | 584,264.82 | 602. Less reduction amount due seller (line 520) | 545,964.37 |
| **303. CASH FROM BORROWER** | 0.00 | **603. CASH TO SELLER** | 9,067.88 |

SUBSTITUTE FORM 1099 SELLER STATEMENT: The information contained herein is important tax information and is being furnished to the Internal Revenue Service. If you are required to file a return, a negligence penalty or other sanction will be imposed on you if this item is required to be reported and the IRS determines that it has not been reported. The Contract Sales Price described on line 401 above constitutes the Gross Proceeds of this transaction.

SELLER INSTRUCTIONS: If this real estate was your principal residence, file Form 2119, Sale or Exchange of Principal Residence, for any gain, with your income tax return; for other transactions, complete the applicable parts of Form 4797, Form 6252 and/or Schedule D (Form 1040).

You are required by law to provide the settlement agent (Fed. Tax ID No: _____) with your correct taxpayer identification number. If you do not provide your correct taxpayer identification number, you may be subject to civil or criminal penalties imposed by law. Under penalties of perjury, I certify that the number shown on this statement is my correct taxpayer identification number.

TIN: _____ / _____    SELLER(S) SIGNATURE(S): _____ / _____

SELLER(S) NEW MAILING ADDRESS: _____

SELLER(S) PHONE NUMBERS: _____ (H) _____ (W)

PAGE 2

U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT
**SETTLEMENT STATEMENT**     REV. HUD-1 (3/86)

File Number: 05-860
TitleExpress Settlement System

| L.  SETTLEMENT CHARGES | | PAID FROM BORROWER'S FUNDS AT SETTLEMENT | PAID FROM SELLER'S FUNDS AT SETTLEMENT |
|---|---|---|---|
| 700.  TOTAL SALES/BROKER'S COMMISSION based on price $555,000.00 = | | | |
| Division of commission (line 700) as follows: | | | |
| 701.  $                              to | | | |
| 702.  $                              to | | | |
| 703.  Commission paid at Settlement | | | |
| **800. ITEMS PAYABLE IN CONNECTION WITH LOAN** | | | |
| 801.  Loan Origination Fee          %Fremont Investment & Loans | | 489.00 | |
| 802.  Loan Discount                 % | | | |
| 803.  Appraisal Fee        to  Town and Country Mortgage      (P.O.C.) 350.00 Buyer | | | |
| 804.  Credit Report        to  Town and Country Mortgage | | 20.00 | |
| 805.  BROKER FEE           to  Town and Country Mortgage | | 13,979.00 | |
| 806.  UNDERWRITING FEE    to  Fremont Investment & Loans | | 405.00 | |
| 807.  TAX SERVICE FEE      to  LANDAMERICA TAX  AND FLOOD SERVICES | | 60.00 | |
| 808.  FLOOD CERT FEE       to  LANDAMERICA TAX AND FLOOD SERVICES | | 9.50 | |
| 809.  PROCESSING FEE       to  Town and Country Mortgage | | 600.00 | |
| 810. | | | |
| 811. | | | |
| **900. ITEMS REQUIRED BY LENDER TO BE PAID IN ADVANCE** | | | |
| 901.  Interest From   09/29/2005 to 10/01/2005   @$   76.6400 /day          2 Days | | 153.28 | |
| 902.  Mortgage Insurance Premium for          to | | | |
| 903.  Hazard Insurance Premium for        to  STATE FARM | | 1,201.00 | |
| 904. | | | |
| 905. | | | |
| **1000. RESERVES DEPOSITED WITH LENDER FOR** | | | |
| 1001.  Hazard Insurance       3  mo. @ $      100.09 /mo | | 300.27 | |
| 1002.  Mortgage Insurance        mo. @ $           /mo | | | |
| 1003.  City Property Taxes       mo. @ $      392.46 /mo | | | |
| 1004.  County Property Taxes   4  mo. @ $      392.47 /mo | | 1,569.88 | |
| 1005.  Annual Assessments        mo. @ $           /mo | | | |
| 1009.  Aggregate Analysis Adjustment  to  Fremont Investment & Loans | | -392.61 | 0.00 |
| **1100. TITLE CHARGES** | | | |
| 1101.  Settlement or closing fee       to  Executive Title and Escrow L.L.C. | | 175.00 | 175.00 |
| 1102.  Abstract or title search        to  TJ Abstracts | | 280.75 | |
| 1103.  Title examination       to  Executive Title and Escrow L.L.C. | | 570.00 | |
| 1104.  Title insurance binder    to  Executive Title and Escrow L.L.C. | | 75.00 | |
| 1105.  Document Preparation | | | |
| 1106.  Notary Fees | | | |
| 1107.  Attorney's fees        to  Lawrence O. Elliott, Jr. Esq. | | 100.00 | |
| (includes above items No:                                      ) | | | |
| 1108.  Title Insurance        to  Old Republic National Title Insurance Co. | | 2,982.50 | |
| (includes above items No:                                      ) | | | |
| 1109.  Lender's Policy         444,000.00  - 1,568.00 | | | |
| 1110.  Owner's Policy          555,000.00  - 1,414.50 | | | |
| 1111.  Judgment Search        to  Property Insight | | 25.00 | |
| 1112. | | | |
| 1113.  Courier/Overnight        to  Executive Title and Escrow L.L.C. | | 65.00 | 65.00 |
| **1200. GOVERNMENT RECORDING AND TRANSFER CHARGES** | | | |
| 1201.  Recording Fees Deed $ 40.00      ; Mortgage $ 250.00      ; Release $ | | 250.00 | 40.00 |
| 1202.  City Transfer Tax        Deed $6,105.00      ; Mortgage $ | | 3,052.50 | 3,052.50 |
| 1203.  City Recordation Tax     Deed $6,105.00      ; Mortgage $ | | 3,052.50 | 3,052.50 |
| 1204.  Construction Tax         Deed $           ; Mortgage $ | | | |
| 1205. | | | |
| **1300. ADDITIONAL SETTLEMENT CHARGES** | | | |
| 1301.  Survey              to  Duley and Associates, Inc. | | 210.00 | |
| 1302.  Pest Inspection | | | |
| 1303. | | | |
| 1304. | | | |
| 1305. | | | |
| 1306. | | | |
| 1307. | | | |
| 1308. | | | |
| **1400. TOTAL SETTLEMENT CHARGES**     (enter on lines 103, Section J and 502, Section K) | | 29,232.57 | 6,385.00 |

HUD CERTIFICATION OF BUYER AND SELLER

I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction. I further certify that I have received a copy of the HUD-1 Settlement Statement. I agree to further adjustments in the event of errors or omissions and indemnify and hold harmless Settlement Agent against such error or omissions.

Joanne Blue
579900596

Edna Robinson
145543670

Brenda D. Carew

WARNING: IT IS A CRIME TO KNOWINGLY MAKE FALSE STATEMENTS TO THE UNITED STATES ON THIS OR ANY SIMILAR FORM. PENALTIES UPON CONVICTION CAN INCLUDE A FINE AND IMPRISONMENT. FOR DETAILS SEE TITLE 18: U.S. CODE SECTION 1001 AND SECTION 1010.

The HUD-1 Settlement Statement which I have prepared is a true and accurate account of this transaction. I have caused or will cause the funds to be disbursed in accordance with this statement.

By:_____
                          DATE